**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com
*- additional counsel on signature page -*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL FINK, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> SUNRUN INC., LYNN MICHELLE JURICH, and ROBERT PATRICK KOMIN JR., <br><br> Defendants | Case No.: <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Michael Fink ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sunrun Inc. ("Sunrun" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Sunrun securities between September 16, 2015 and May 2, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Sunrun Inc. engages in the design, development, installation, sale, ownership, and maintenance of residential solar energy systems in the United States. The Company markets and sells its products through direct channels, partner channels, mass media, digital media, canvassing, referral, retail, and field marketing.

3. Founded in 2007, the Company is headquartered in San Francisco, California. Sunrun's stock trades on the NASDAQ under the ticker symbol "RUN."

4. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Sunrun failed to adequately disclose how many customers canceled contracts after signing up for the Company's home-solar energy system; (ii) discovery of the foregoing conduct would subject the Company to heightened regulatory scrutiny and potential civil sanctions; and (iii) as a result, Sunrun's public statements were materially false and misleading at all relevant times.

5. On May 3, 2017, *The Wall Street Journal* published an article entitled "SEC Probes Solar Companies Over Disclosure of Customer Cancellations," reporting that the Company was the subject of a probe initiated by the SEC. The article stated in relevant part:

> **SEC Probes Solar Companies Over Disclosure of Customer Cancellations**
>
> Federal regulators are investigating whether solar-energy companies are masking how many customers they are losing, according to a person familiar with the matter.

2

The Securities and Exchange Commission is examining whether San Francisco-based Sunrun Inc. and Elon Musk's San Mateo, Calif.-based SolarCity Corp. have adequately disclosed how many customers have canceled contracts after signing up for a home solar-energy system, the person said.

Investors use that cancellation metric as one way to gauge the companies' health. Companies typically give customers a few days after signing a contract, or even up until the time of installation, to back out of a deal.

Some solar-energy companies have recently disclosed in public filings and earnings calls that increasing numbers of customers are canceling, but the companies have provided few details about the number of cancellations or their impact on the companies' business.

***The SEC recently issued a subpoena to Sunrun and interviewed current and former employees about the adequacy of its disclosures on account cancellations, said the person familiar with the investigation***. The SEC is also looking at SolarCity, the person said.

***

Cancellations grew to be so large at SolarCity that in early 2016, before the company was sold to Tesla, about half of its customers were backing out of contracts before solar panels could be installed, according to people familiar with the matter.

***At Sunrun, that cancellation figure grew to be as high as 40% earlier this year, according to people familiar with the figure.*** The cancellation rates were especially high among customers who were approached by salespeople at their doorstep or while they were shopping at big-box stores, these people say.

***The increase in cancellations caused Sunrun to halve its growth expectations in 2016 from 80% to 40%, one of these people said.***

***Most of those figures weren't disclosed to investors. Instead, the companies have provided limited transparency.***

In its annual report in March, Sunrun said, "We have experienced increased customer cancellations in certain markets during 2016." The company does report how many systems it has installed net of cancellations, but it doesn't break out the number of cancellations.

SolarCity said the number of cancellations increased last year, but didn't say by how much.

Company executives, salespeople and homeowners blame the rise in cancellations on what they describe as aggressive sales tactics used by the industry.

Katarzyna Herink, 35, said she listened to a persuasive pitch from a Sunrun salesman at her house in Long Island, New York, last year and considered moving forward with installing solar panels on her roof.

3

> Days later, the company told her she had signed a contract and they were going to start installation, without providing her any details about the cost or showing her the contract, Ms. Herink said.
>
> When she complained, Sunrun told her a document she had initialed on the salesman's iPad during his initial visit constituted the contract, Ms. Herink said.
>
> Ms. Herink immediately canceled the deal.
>
> "We actually wanted to do it, but it was such a scary experience," she said. "Now we've decided to stay away from it."

(Emphasis added.)

6. On this news, Sunrun's share price fell $0.46, or 8.83%, to close at 4.75 on May 3, 2017.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and operate facilities in this district, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this Judicial District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.     Plaintiff, as set forth in the accompanying Certification, purchased Sunrun securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

12.     Defendant Sunrun is incorporated in Delaware and its principal executive offices are located at 595 Market Street, 29th Floor, San Francisco, California 94105.  Sunrun's securities are traded on the NASDAQ under the ticker symbol "RUN."

13.     Defendant Lynn Michelle Jurich ("Jurich") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Director.

14.     Defendant Robert Patrick Komin Jr. ("Komin") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

15.     The Defendants referenced above in ¶¶ 13-15 are sometimes collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Sunrun Inc. engages in the design, development, installation, sale, ownership, and maintenance of residential solar energy systems in the United States. The Company markets and sells its products through direct channels, partner channels, mass media, digital media, canvassing, referral, retail, and field marketing.

### Materially False and Misleading Statements Issued During the Class Period

17.     The Class Period begins on September 16, 2015, the day after Sunrun filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  For the quarter, Sunrun reported net income of $7.54 million, or $0 per diluted share, on revenue of $72.69 million.

18.     In the Q2 2015 10-Q, Sunrun stated, in part:

5

**Operating Activities**

For the six months ended June 30, 2015, we used $44.6 million in net cash in operating activities. ***The primary driver of our operating cash inflow consists of payments received from customers.*** During the six months ended June 30, 2015, we had an increase in deferred revenue of approximately $20.3 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $67.1 million from our net loss excluding non-cash and non-operating items. Net changes in working capital resulted in an inflow of cash of $2.2 million.

(Emphasis added.)

19. The Q2 2015 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

20. On November 13, 2015, Sunrun filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). For the quarter, Sunrun reported a net loss of $2.77 million, or $0.41 per diluted share, on revenue of $82.60 million.

21. In the Q3 2015 10-Q, Sunrun stated, in part:

**Operating Activities**

For the nine months ended September 30, 2015, we used $71.9 million in net cash in operating activities. ***The primary driver of our operating cash inflow consists of payments received from customers.*** During the nine months ended September 30, 2015, we had an increase in deferred revenue of approximately $31.9 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $116.0 million from our net loss excluding non-cash and non-operating items. Net changes in working capital resulted in an inflow of cash of $12.2 million.

(Emphasis added.)

22. The Q3 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

23. On March 11, 2016, Sunrun filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K"). For the quarter, Sunrun reported a net loss of $15.02 million, or $0.07 per diluted share, on revenue of $99.64 million. For fiscal year 2015, Sunrun reported a net loss of $28.25 million, or $0.96 per diluted share, on revenue of $304.61 million, compared to a net loss of $70.85 million, or $3.11 per diluted share, on revenue of $198.56 million for fiscal year 2014.

24. In the 2015 10-K, Sunrun stated, in part:

**Operating Activities**

During 2015, we used $105.3 million in net cash in operating activities. The primary driver of our operating cash inflow consists of payments received from customers. During 2015, we had an increase in deferred revenue of approximately $47.7 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $159.3 million from our net loss excluding non-cash and non-operating items. Net changes in working capital, other than deferred revenue, resulted in an inflow of cash of $6.3 million.

25. The 2015 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

26. On May 13, 2016, Sunrun filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). For the quarter, Sunrun reported net income of $13.13 million, or $0.13 per diluted share, on revenue of $98.74 million, compared to a net loss of $18 million, or $0.74 per diluted share, on revenue of $49.68 million for the same period in the prior year.

27. In the Q1 2016 10-Q, Sunrun stated, in part:

**Operating Activities**

During the three months ended March 31, 2016, we used $77.4 million in net cash in operating activities. ***The primary driver of our operating cash inflow consists of payments received from customers.*** During the three months ended March 31, 2016, we had an increase in deferred revenue of approximately $5.6 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $48.5 million from our net loss excluding non-cash and non-operating items. Changes in inventory resulted in a cash outflow of $23.3 million. Changes in working capital, other than deferred revenue and inventory, resulted in an outflow of cash of $11.2 million.

[Emphasis added.]

28. The Q1 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29. On August 11, 2016, Sunrun filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q"). For the quarter, Sunrun reported net income of $32.64 million, or $0.31 per diluted share, on revenue of $122.54 million, compared to net income of $7.54 million, or $0 per diluted share, on revenue of $72.69 million for the same period in the prior year.

30. In the Q2 2016 10-Q, Sunrun stated, in part:

**Operating Activities**

During the six months ended June 30, 2016, we used $98.4 million in net cash in operating activities. ***The driver of our operating cash inflow consists of payments received from customers.*** During the six months ended June 30, 2016, we had an increase in deferred revenue of approximately $3.3 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $79.3 million from our net loss excluding non-cash and non-operating items. Changes in inventory resulted in a cash outflow of $16.8 million. Changes in working capital, other than deferred revenue and inventory, resulted in an outflow of cash of $5.6 million.

[Emphasis added.]

8

31.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

32.     On November 10, 2016, Sunrun filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q"). For the quarter, Sunrun reported net income of $16.88 million, or $0.16 per diluted share, on revenue of $112.03 million, compared to a net loss of $2.77 million, or $0.41 per diluted share, on revenue of $82.60 million for the same period in the prior year.

33.     In the Q3 3016 10-Q, Sunrun stated, in part:

**Operating Activities**

During the nine months ended September 30, 2016, we used $127.2 million in net cash in operating activities. ***The driver of our operating cash inflow consists of payments received from customers.*** During the nine months ended September 30, 2016, we had an increase in deferred revenue of approximately $7.2 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $109.7 million from our net loss excluding non-cash and non-operating items. Changes in inventory resulted in a cash outflow of $14.6 million. Changes in working capital, other than deferred revenue and inventory, resulted in a cash outflow of $10.1 million.

[Emphasis added.]

34.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.     On March 8, 2017, Sunrun an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K"). For the quarter, Sunrun reported net income of $29.03 million, or $0.27 per diluted share, on revenue of $120.58 million, compared to a net loss of $15.02 million, or $0.07 per diluted share, on revenue of $99.64 million for the same period in the prior year. For fiscal year 2016, Sunrun

reported net income of $91.69 million, or $0.87 per diluted share, on revenue of $453.90 million, compared to a net loss of $28.25 million, or $0.96 per diluted share, on revenue of $304.61 million for fiscal year 2015.

36.     In the 2016 10-K, Sunrun stated, in part:

**Operating Activities**

During 2016, we used $150.5 million in net cash in operating activities. ***The driver of our operating cash inflow consists of payments received from customers.*** During 2016, we had an increase in deferred revenue of approximately $10.3 million relating to upfront lease payments received from customers and solar energy system incentive rebate payments received from various state and local utilities. This increase was offset by our operating cash outflows of $132.2 million from our net loss excluding non-cash and non-operating items. Changes in accounts payable resulted in a cash outflow of $40.3 million. Changes in working capital, other than deferred revenue and accounts payable, resulted in a cash inflow of $11.7 million.

[Emphasis added.]

37.     The 2016 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

38.     The statements referenced in ¶¶ 17-37 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Sunrun failed to adequately disclose how many customers canceled contracts after signing up for the Company's home-solar energy system; (ii) discovery of the foregoing conduct would subject the Company to heightened regulatory scrutiny and potential civil sanctions; and (iii) as a result, Sunrun's public statements were materially false and misleading at all relevant times

### The Truth Emerges

39. On May 3, 2017, *The Wall Street Journal* published an article entitled "SEC Probes Solar Companies Over Disclosure of Customer Cancellations," reporting that the Company was the subject of a probe initiated by the SEC. The article stated in relevant part:

**SEC Probes Solar Companies Over Disclosure of Customer Cancellations**

Federal regulators are investigating whether solar-energy companies are masking how many customers they are losing, according to a person familiar with the matter.

The Securities and Exchange Commission is examining whether San Francisco-based Sunrun Inc. and Elon Musk's San Mateo, Calif.-based SolarCity Corp. have adequately disclosed how many customers have canceled contracts after signing up for a home solar-energy system, the person said.

Investors use that cancellation metric as one way to gauge the companies' health. Companies typically give customers a few days after signing a contract, or even up until the time of installation, to back out of a deal.

Some solar-energy companies have recently disclosed in public filings and earnings calls that increasing numbers of customers are canceling, but the companies have provided few details about the number of cancellations or their impact on the companies' business.

*The SEC recently issued a subpoena to Sunrun and interviewed current and former employees about the adequacy of its disclosures on account cancellations, said the person familiar with the investigation*. The SEC is also looking at SolarCity, the person said.

***

Cancellations grew to be so large at SolarCity that in early 2016, before the company was sold to Tesla, about half of its customers were backing out of contracts before solar panels could be installed, according to people familiar with the matter.

*At Sunrun, that cancellation figure grew to be as high as 40% earlier this year, according to people familiar with the figure.* The cancellation rates were especially high among customers who were approached by salespeople at their doorstep or while they were shopping at big-box stores, these people say.

*The increase in cancellations caused Sunrun to halve its growth expectations in 2016 from 80% to 40%, one of these people said.*

*Most of those figures weren't disclosed to investors. Instead, the companies have provided limited transparency.*

In its annual report in March, Sunrun said, "We have experienced increased customer cancellations in certain markets during 2016." The company does report

> how many systems it has installed net of cancellations, but it doesn't break out the number of cancellations.
>
> SolarCity said the number of cancellations increased last year, but didn't say by how much.
>
> Company executives, salespeople and homeowners blame the rise in cancellations on what they describe as aggressive sales tactics used by the industry.
>
> Katarzyna Herink, 35, said she listened to a persuasive pitch from a Sunrun salesman at her house in Long Island, New York, last year and considered moving forward with installing solar panels on her roof.
>
> Days later, the company told her she had signed a contract and they were going to start installation, without providing her any details about the cost or showing her the contract, Ms. Herink said.
>
> When she complained, Sunrun told her a document she had initialed on the salesman's iPad during his initial visit constituted the contract, Ms. Herink said.
>
> Ms. Herink immediately canceled the deal.
>
> "We actually wanted to do it, but it was such a scary experience," she said. "Now we've decided to stay away from it."

(Emphasis added.)

40. On this news, Sunrun's share price fell $0.46, or 8.83%, to close at 4.75 on May 3, 2017.

41. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

42. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sunrun securities publicly traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their

12

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sunrun securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

13

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

- whether the prices of Sunrun securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

48. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Sunrun securities are traded in efficient markets;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Sunrun securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

49.  Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50.  Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

51.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.  This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Sunrun securities during the Class Period.

55. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

56. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

57. As a result of the foregoing, the market price of Sunrun securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Sunrun securities during the Class Period in purchasing Sunrun securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

58. Had Plaintiff and the other members of the Class been aware that the market price of Sunrun securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Sunrun securities at the artificially inflated prices that they did, or at all.

59. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

60. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Sunrun securities during the Class Period.

**COUNT II**

**(Violation of Section 20(a) of The Exchange Act Against The Individual Defendants)**

61. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

63. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

64. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sunrun securities.

65. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual

Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

66. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 3, 2017

    Respectfully submitted,

    **POMERANTZ LLP**

    By: *s/ Jennifer Pafiti*
    Jennifer Pafiti (SBN 282790)
    468 North Camden Drive
    Beverly Hills, CA 90210
    Telephone: (818) 532-6499
    E-mail: jpafiti@pomlaw.com

    **POMERANTZ, LLP**
    Jeremy A. Lieberman
    J. Alexander Hood II

Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com
E-mail: hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*