# Comparison of First Amended Complaint to Second Amended Complaint

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail:  jpafiti@pomlaw.com

Jeremy A. Lieberman (admitted *pro hac vice*)
Marc I. Gross (admitted *pro hac vice*)
Austin P. Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
E-mail:  jalieberman@pomlaw.com
migross@pomlaw.com
avan@pomlaw.com

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Sunrun Inc. Securities Litigation | Master File No. 3:17-cv-02537-VC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Deleted:

## TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................................1

II.    JURISDICTION AND VENUE ...........................................................................................2

III.   PARTIES ..............................................................................................................................3

IV.   SUBSTANTIVE ALLEGATIONS .......................................................................................3

    A.    Background ...............................................................................................................3

         1.    Sunrun's Solar Power Business ...................................................................3

         2.    Sunrun's IPO ...............................................................................................6

    B.    Sunrun Misled Investors About Megawatts Booked Figures .................................6

    C.    Upon Partial Revelation of Sunrun's Fraud in 2016, Sunrun's Stock Price Dropped 10

    D.    Sunrun Misled Investors To Believe that Increased Cancellations Were Not Materially and Adversely Affecting Its Business, When in Fact They Were .............11

    E.    Upon Additional Revelations of Sunrun's Frauds in 2017, Sunrun's Stock Price Dropped Again ..............................................................................................................12

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ......................................13

    A.    Defendants' False and Misleading Statements in 2015..........................................13

         1.    Second Quarter 2015 Results .....................................................................13

         2.    Third Quarter 2015 Results ........................................................................15

    B.    Defendants' False and Misleading Statements in 2016..........................................16

         1.    Fourth Quarter and Year End 2015 Results ...............................................16

         2.    First Quarter 2016 Results ..........................................................................16

         3.    Second Quarter 2016 Results .....................................................................17

         4.    Third Quarter 2016 ....................................................................................18

    C.    Defendants' False and Misleading Statements in 2017..........................................19

         1.    Fourth Quarter and Year End 2016 ...........................................................19

         2.    First Quarter 2017 .....................................................................................19

VI.   ADDITIONAL SCIENTER ALLEGATIONS ...................................................................19

VII.  CLASS ACTION ALLEGATIONS ...................................................................................22

VIII. COUNT ONE .....................................................................................................................24

    Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants .........................................................................................................24

IX.   COUNT TWO .....................................................................................................................26

    Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ............26

X.    PRAYER FOR RELIEF.......................................................................................................27

XI.   JURY TRIAL DEMANDED ..............................................................................................28

CERTIFICATE OF SERVICE.......................................................................................................29

Deleted: I.  INTRODUCTION  1¶
II.  JURISDICTION AND VENUE  2¶
III.  PARTIES  3¶
IV.  SUBSTANTIVE ALLEGATIONS  4¶
    A.  Background  4¶
      1.  Sunrun's Solar Power Business  4¶
      2.  Sunrun's IPO  6¶
    B.  Sunrun Misled Investors About Megawatts Booked Figures  6¶
    C.  Upon Revelation of Sunrun's Fraud, Sunrun's Stock Price Dropped  8¶
V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS  11¶
    A.  Defendants' False and Misleading Statements in 2015  11¶
    B.  Defendants' False and Misleading Statements in 2016  14¶
    C.  Defendants' False and Misleading Statements in 2017  17¶
VI.  ADDITIONAL SCIENTER ALLEGATIONS  18¶
VII.  CLASS ACTION ALLEGATIONS  21¶
IX.  COUNT ONE  24¶
    Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants  24¶
X.  COUNT TWO  26¶
    Violation of Section 20(a) of the Exchange Act Against the Individual Defendants  26¶
XI.  PRAYER FOR RELIEF  27¶
XII.  JURY TRIAL DEMANDED  28¶
¶
¶

Deleted: ¶

Lead Plaintiffs Ricky Elmore, Dmitri Karpov, William McCormick, Joseph McIntire, and Alice Twomey (collectively, "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sunrun Inc. ("Sunrun" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## I.     INTRODUCTION

1.     This is a federal securities class action (the "Action") on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Sunrun securities between September 16, 2015 and May 21, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Sunrun is a solar power company.  The Company sells and maintains residential solar energy systems in the United States.

3.     Throughout the Class Period, Sunrun misled investors about a performance metric: the amount of electricity the Company had contracted to sell, or "booked," each quarter, otherwise referred to as "Megawatts Booked."  As expressly defined, this metric was to be calculated net of customer cancellations.

4.     In planning its August 2015 initial public offering ("IPO"), Sunrun sought to create the impression of explosive growth in the period immediately following the IPO, as measured by, *inter alia*, Megawatts Booked.  Beginning in or around Spring 2015 and continuing for at least several months after the IPO, Sunrun upper management directed regional sales managers to stop indefinitely the internal reporting of customer contract cancellations.  By deferring reporting these

Deleted: <object><object><object><object>

cancellations, Sunrun increased its reported Megawatts Booked, thereby inflating measures of its performance and prospects, as well as its stock price.

5.     In March 2016, Sunrun partially revealed the impact of its scheme.  In reporting its fourth quarter 2015 results, the Company disclosed that it would not be growing at the rate that its previously inflated bookings had led investors to expect.  Importantly, Defendants failed to acknowledge that these lower growth rates were due, at least in part, to Sunrun's prior artificial inflation of Megawatts Booked through deferring reporting of customer cancellations.  By withholding this material information, Defendants misled investors regarding, among other things, management's credibility and the Company's exposure to risks of SEC sanctions.  On the news mentioned above, Sunrun's share price fell by over 11%.

Deleted: prior

6.     Beginning in August 2016, Sunrun knowingly misled investors in a second way, that is independent of the first.  Sunrun repeatedly implied to investors that the increased cancellations it had been experiencing were not materially and adversely affecting the Company's business operations.  In fact, in early 2016, Sunrun had been forced to lower its internal growth estimates for the fiscal year 2016 from 80% to 40% specifically as a result of increased cancellations, so increased cancellations were indeed materially and adversely affecting Sunrun's business.

Deleted: However, Investors remained in the dark as to the Company's prior scheme until May 2017.

7.     Relevant truths about the Company's frauds were further revealed in May 2017.  On May 3, 2017, an article in *The Wall Street Journal* ("*WSJ*") indicated that Sunrun had misled investors regarding customer cancellations and their impact on its business, and revealed an SEC investigation.  On May 22, 2017, the *WSJ* revealed that former regional sales managers at Sunrun had been instructed to withhold reporting cancellations of contracts in the months surrounding Sunrun's 2015 IPO. On this news, Sunrun's shares again fell precipitously.

Deleted: four
Deleted: senior

## II.     JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

Deleted:
Deleted:
Deleted:
Deleted:

**Deleted:** *<object><object><object><object>*

**Deleted:**

**Deleted:**

**Deleted:**

**Deleted:**

10.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as Defendants conduct business and operate facilities in this district, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### III.     PARTIES

12.     Plaintiffs, as set forth in the previously submitted Certifications, purchased Sunrun securities at artificially inflated prices during the Class Period and were damaged thereby.

13.     Defendant Sunrun is incorporated in Delaware, and its headquarters and principal executive offices are located at 595 Market Street, 29th Floor, San Francisco, California 94105. Sunrun's securities are traded on the NASDAQ under the ticker symbol "RUN."  Founded in 2007, the Company designs, market, sells and leases solar power systems.

14.     Defendant Lynn Michelle Jurich ("Jurich") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Director.

15.     Defendant Robert Patrick Komin Jr. ("Komin") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

16.     Defendants Jurich and Komin are sometimes collectively referred to herein as the "Individual Defendants."

### IV.     SUBSTANTIVE ALLEGATIONS

**A.     Background**

**1.     Sunrun's Solar Power Business**

17.     Sunrun's primary business is providing solar power to homes in the United States. The Company sells solar power to customers either by selling solar power systems, which the customers then own outright and may use to power their homes independently, or by selling solar power through an ongoing agreement (the "Customer Agreement").  Sunrun sells its products

Deleted: *<object><object><object><object>*

directly to customers as well as indirectly through distributors. Most of Sunrun's customers purchase solar power through Customer Agreements.

18. Sunrun has two types of Customer Agreements. Under the first type, customers lease a solar power system from Sunrun, while under the second type, customers purchase the power produced by the solar energy system through a "net metering" plan, under which Sunrun charges the customer for the electricity the customer uses, less any excess electricity the customer generates through the solar panels but does not use, which is then diverted to other users or stored. Both types of Customer Agreements typically have an initial term of 20 years.

19. Under both types of Customer Agreements, Sunrun installs the solar power system at the home of the customer. The installation requires a number of steps, including a site audit, completion of designs for the installation, permitting, physical installation, electrical sign-off and interconnection. Customers may cancel their Customer Agreement, subject to certain conditions, at any time prior to the commencement of the physical installation of the solar power system.

Deleted: Sunrun also may cancel a Customer Agreement. Sunrun cancels a Customer Agreement when its services cannot be delivered to the home; for example, Sunrun may cancel a Customer Agreement if it determines that a solar power system cannot be installed at a customer's house because the customer needs to make repairs to the house, or to install a new roof, or that there is excessive shading on the property.

20. Sunrun tracks the success of its operations with what it labels "key operating metrics," which it discloses in each quarterly SEC filing. These metrics are highly material to investors because they are direct indicators of the success of Sunrun's operations. As Sunrun has stated, "We regularly review a number of metrics, including [...] key operating metrics, to evaluate our business, measure our performance, identify trends affecting our business, formulate financial projections and make strategic decisions."[1]

Deleted: .

21. One of these key operating metrics is "Megawatts Booked." During the Class Period, Sunrun defined "Megawatts Booked" as "the aggregate megawatt production capacity of our solar energy systems sold directly to customers or subject to an executed Customer Agreement, *net of cancellations*."[2] (Emphasis added.) Sunrun defined "Megawatts Deployed" during the Class Period

Deleted:

---

[1] *See, e.g.*, Sunrun, Inc., Annual Report on Form 10-K (Mar. 8, 2017) at 47.

[2] Beginning with Sunrun's Annual Report filed March 8, 2017, Sunrun defined "Megawatts Booked" as "the aggregate megawatt production capacity of our solar energy systems, whether sold directly to customers or subject to an executed Customer Agreement, for which we have confirmation that the systems have reached NTP, net of cancellations."

as "the aggregate megawatt production capacity of our solar energy systems, whether sold directly to customers or subject to executed Customer Agreements, for which we have (i) confirmation that the systems are installed on the roof, subject to final inspection or (ii) in the case of certain system installations by our partners, accrued at least 80% of the expected project cost."

22.    In its press releases announcing its quarterly and annual results, Sunrun also provided guidance for the coming quarters and year regarding its expectations for these key operating metrics. During the Class Period, investors relied heavily on this guidance; analysts at KeyBanc Capital Markets, Bank of America Merrill Lynch, Morgan Stanley and Deutsche Bank Securities Inc. routinely cited Sunrun's "Megawatts Booked" figures during the Class Period in assessing the financial condition of the company and its proper valuation.

23.    Diagram A below illustrates the levels of the reporting chain in Sunrun's sales operations.  Sunrun's sales were made in the first instance by a group of some 600-800 "field sales consultants."  These field sales consultants were managed by some 20-40 "regional sales managers" across Sunrun's operations, each of whom oversaw around fifteen or more field sales consultants. The regional sales managers reported to between five to seven "regional sales directors," all of whom reported to the Chief Sales Officer, Bill Schuh (or after Schuh left the company, to Vice President of Sales Kurt Miller, and after Miller left, to Vice President of Sales Matthew Woods) who in turn reported directly to Defendant Jurich.

24.    [This paragraph is intentionally left blank.]

**Deleted:** *<object><object><object><object>*

**Diagram A**



2. **Sunrun's IPO**

25. Participants in the financial industry commonly recognize that in public markets, as elsewhere, first impressions matter. The post-IPO period is extremely important. If the company does well during this period, the company can establish itself as a solid investment opportunity and lay the foundation for a stable share price. If, however, a new company performs poorly post-IPO, investors quickly view the company negatively.

26. Defendants were highly aware of the importance of Sunrun's post-IPO performance. Given that the solar power industry is in its infancy, investors are relatively inexperienced in investing in the industry and valuing industry participants. Accordingly, Sunrun's IPO was especially critical for the Company.

B. **Sunrun Misled Investors About Megawatts Booked Figures**

27. In order to bolster its key operating metrics around Sunrun's August 2015 IPO, Defendants engaged in a fraudulent scheme to inflate the Megawatts Booked figures reported to investors. Starting no later than March 2015, and continuing at least into the fourth quarter of 2015,

Sunrun delayed reporting of cancellations in two ways. *First*, Sunrun executives, at the level of Chief Sales Officer/Vice President of Sales, or at one level above, at the level of CEO Defendant Jurich (*see* Diagram A), directed regional sales managers to withhold or delay reporting customers' cancellations of their contracts to the department at Sunrun responsible for recording those customer cancellations in Sunrun's internal SalesForce database (referred to herein as the "Cancellations Department"). Sunrun regional sales managers complied with this directive from Sunrun executives and delayed or withheld reporting cancellations of contracts customers had cancelled. *Second*, after regional sales managers ultimately reported these customer cancellations to the Cancellations Department, the Cancellations Department would delay recording the cancelled contracts as cancelled, sometimes for as long as six months or more.

28. In this way, Sunrun inflated its publicly reported Megawatts Booked figures for at least the first two quarters following its IPO, thereby ensuring a favorable initial view of the company.

29. Sunrun divides its operations into six to seven regions, including among others Southern California, Northern California, East Coast, and Mid-West. Sunrun's scheme was implemented in all major regions in which it operated, including Southern and Northern California (which houses roughly 50% of Sunrun's customers), Hawaii (another one of Sunrun's largest markets) and the East Coast. On information and belief, Sunrun implemented this scheme in all other geographical areas in which Sunrun operates.

30. Sunrun materially underreported customer cancellations in the months surrounding the IPO. The rate at which customers cancelled their contracts with Sunrun was extremely high at all relevant times, and was increasing over the years 2015 and 2016. A confidential witness ("CW1") has estimated that approximately 30% of total orders at Sunrun were cancelled in the years 2012 to 2017. CW1 was a Project Manager and Field Installation Coordinator at Sunrun from February 2012 to January 2017, where CW1's job responsibilities included assisting Sunrun customers from the time they signed their contract through the installation process, and was the individual whom customers would contact when they wanted to cancel their contracts with Sunrun. CW1 worked out of Sunrun's branch office in Westminster, Colorado.

31. A second confidential witness ("CW2") has estimated that in 2016, customers routinely cancelled between 40-48% of Sunrun's total orders in Sunrun's Northern California region, and that the cancellation rate for Sunrun nationwide was approximately 42%. CW2 worked as a Branch Operations Manager at Sunrun from March 13, 2016 to December 26, 2016, where CW2 oversaw all operations at Sunrun's Novato, California branch. CW2's job responsibilities were broad and included scheduling work and installations at the branch, hiring and dismissing employees, and training new employees. CW2 reported to Greg Miller, one of three Directors of Regional Operations at Sunrun, who reported in turn to VP of Regional Operations Ryan Zink, who reported to Defendant CEO Jurich.

32. Given Sunrun's high customer cancellation rate, Sunrun's directive to regional sales managers to withhold reporting cancellations resulted in Sunrun's failing to report cancellations of contracts equaling a significant fraction of total orders. As Darren Jennings, a Sunrun regional sales manager in Hawaii from February 2015 until February 2017, has stated, employees in the Hawaii region routinely did not process cancellations amounting to approximately 40% of total orders. Other regions, facing similar cancellation rates, and acting on the same directives from Sunrun management as those given to Hawaii managers to withhold reporting cancellations, also delayed processing cancellations amounting to similar percentages of total orders for those regions.

33. Sunrun's policy of delaying reporting cancellations of Customer Agreements originated from upper management. In Spring 2015, Sunrun regional mangers joined a national conference call attended by Sunrun executives at the level of Chief Sales Officer/Vice President of Sales, or at one level above, at the level of CEO Defendant Jurich (the "Spring 2015 Conference Call"). On this call, the Sunrun executives directed the regional sales managers to delay reporting cancellations.

34. Confidential witnesses confirm that Defendant Jurich was informed of, and sometimes directly participated in, conference calls held among the sales management team. A third confidential witness ("CW3") was a regional sales manager at Sunrun from February 2014 to November 2017 and was based in San Diego, California. As a regional sales manager, CW3 managed and mentored a team of field sales consultants who sold solar power systems to customers

Deleted: <object><object><object><object>

in their homes.  CW3 reported to Regional Sales Director David Shaw through May 2015 and to Regional Sales Director Austin Frogge during the remainder of CW3's time at Sunrun.  CW3 has confirmed that Sunrun held weekly nationwide conference calls attended by all the regional sales managers, regional sales directors, and Vice Presidents of Sales.  CW3 stated that Defendant Jurich participated in these calls herself on occasion.

35.    Statements of a fourth confidential witness ("CW4") also confirm that Defendant Jurich was informed of conference calls held among the sales management team.  CW4 worked as a Senior Project Coordinator, Retail Strategy & Field Operations at Sunrun from September 2014 to August 2017 in Sunrun's San Francisco, California offices where CW4 organized Sunrun's canvassing program and recruited canvassers.  CW4 reported to Revenue Operations Manager Brian Morrison, who in turn reported to the Vice President of Sales.  Approximately once a month, CW4 would attend conference calls held by the sales management team.  Asked whether anyone reported on such sales calls to Jurich, CW4 stated:  "Oh yeah, she most definitely heard about the calls."

36.    CW2 has confirmed that the content of what was discussed at similar conference calls, among the operations team, was regularly reported directly to Sunrun's CEO, Defendant Jurich.  According to CW2, Sunrun held weekly conference calls each Thursday among the operations team that were attended by the regional operations managers as well as Senior Director of Field Operations Jason Zink.  CW2 stated that Zink regularly reported what was discussed at these weekly conference calls directly to Defendant Jurich.

37.    At least four former Sunrun managers confirmed that they were aware of, or participated in, withholding reporting customer cancellations in the months prior to and following Sunrun's IPO.

38.    Darren Jennings, a Sunrun regional sales manager in Hawaii from February 2015 until February 2017, attended the Spring 2015 Conference Call.  Jennings has stated that he and other regional sales managers were directed by superiors to delay processing customer cancellations.  According to Jennings, following this directive, sales employees in Hawaii did not process about 200 cancellations, equal to approximately 40% of total orders in Hawaii.

Deleted: such

Deleted: CW1 worked as a Branch Operations Manager at Sunrun from March 13, 2016 to December 26, 2016.  CW1 reported to Director of Regional Operations Greg Miller.

Deleted: CW1

Deleted: CW1

Deleted: directed by their superiors not to process

Deleted: March

Deleted: He

Deleted: Sunrun

Deleted: hold off on

39.     Evan Stockdale also attended the Spring 2015 Conference Call. Stockdale was a Sunrun regional manager from April 2015 to January 2016 in Fresno, California. Stockdale has confirmed that regional sales managers (including managers in California) were directed by their superiors on a conference call to delay reporting cancellations. According to Stockdale, managers complied—managers did not process customer cancellations in the months before and after the IPO. Stockdale explained that superiors pressured managers to delay cancellations in order to inflate sales figures: "We were pushed for sales numbers."

40.     CW3 has confirmed that Sunrun delayed reporting cancellations in the second way described above: CW3 has stated that after regional sales managers ultimately reported customer cancellations to the Cancellations Department, the Cancellations Department would delay recording the cancelled contracts as cancelled, sometimes for as long as six months or more.

41.     At least one other former Sunrun manager has confirmed that he or she was aware of or took part in delaying the reporting of hundreds of customer cancellations.

**C.      Upon Partial Revelation of Sunrun's Fraud in 2016, Sunrun's Stock Price Dropped**

42.     Having led the market to believe that it had successfully navigated the IPO period by inflating reported Megawatts Booked, Sunrun began in 2016 to disclose its backlog of customer cancellations by incorporating these cancellations into its performance metrics. In March 2016, Sunrun revealed a lower growth rate for that period in Megawatts Booked, and importantly, projected significantly lower growth rates in Megawatts Deployed going forward than Sunrun's inflated Megawatts Booked figures had led analysts to expect.

43.     Specifically, on March 10, 2016, after the market closed, Sunrun issued a press release in which it stated, "For 2016, we expect to deploy approximately 285 MW." This figure was significantly below analysts' expectations. Based on prior (inflated) performance metrics, analysts had projected that Sunrun would deploy approximately 345-363 megawatts in 2016. Accordingly, Sunrun's guidance for 2016 of 285 Megawatts Deployed represented a rate of growth that was more than 20% lower than what analysts had expected. Sunrun also reported a significant downturn in the

Deleted: <object><object><object><object>

rate of Megawatts Booked in the fourth quarter of 2015 compared to the prior quarter—only 80 MW, a decrease of 10%, and approximately 25% less than that of its primary competitor, Solar City.

44. The Company failed to disclose that it had manipulated analysts' expectations in prior periods by inflating reported Megawatts Booked.

45. Analysts expressed concern about these results. Vishal Shah at Deutsche Bank Securities Inc. stated in a March 11, 2016 report that, "We anticipate disappointing 2016 deployment guidance of 40% YoY to be the biggest investor focus post Q4 results." Analysts Matt Tucker and Grier Buchanan at KeyBanc Capital Markets wrote in bolded text, "1Q and 2016 Guidance Below Our Estimates," and that "Management expects to deploy ~285 MW (+40% YOY) in 2016, which compares to our estimate of 345 MW . . . ." Analysts at Morgan Stanley stated bluntly, "2016 guidance was disappointing relative to our estimates, and we are lowering our price target from $28 to $19 to reflect a more conservative view on long-term growth."

Deleted: . .

46. After Sunrun issued its March 10, 2017 press release, its share price fell $0.80, or 11.12%, to close at $6.36 on March 11, 2016, on unusually heavy trading volume.

Deleted:

**D. Sunrun Misled Investors To Believe that Increased Cancellations Were Not Materially and Adversely Affecting Its Business, When in Fact They Were**

47. During the Class Period, Sunrun misled investors in a second way that is independent of the first—Sunrun misled investors about the effect of increased cancellations on Sunrun's business operations by implying that the increased cancellations it had been experiencing were not materially and adversely affecting its business operations. Specifically, in its August 11, 2016, Second Quarter 2016 Form 10-Q, and in each quarterly and annual filing during the remainder of the Class Period, Sunrun told investors, "If we continue to experience increased customer cancellations, our financial results will potentially be materially and adversely affected." With this statement, Sunrun clearly implied that Sunrun's business was not already being materially and adversely affected by increased customer cancellations.

48. In fact, increased customer cancellations already had harmed Sunrun's operations severely, and Sunrun clearly knew this fact when it directly and repeatedly implied the contrary. A fourth confidential witness ("CW5") worked for a major international newspaper and personally

Deleted: *<object><object><object><object>*

conducted interviews of Sunrun employees in 2017 to obtain information for a story CW5 authored.
CW5 spoke directly to one of the following three individuals: Defendant Jurich, Defendant Komin
or Sunrun Chairperson of the Board Edward Fenster (the "High-Level Informant"), and was told by
the High-Level Informant that Sunrun was forced to lower its growth estimates for the fiscal year
2016 *from 80% to 40%* specifically *as a result of increased cancellations.* The High-Level
Informant, who during the Class Period either was, or worked directly with, Sunrun's CEO,
Defendant Jurich, was present when the decision to lower growth estimates was made internally.

49.    That increased customer cancellations were materially and adversely affecting
Sunrun's business mattered significantly to investors. Investors care about all factors that materially
and adversely affect a company's operations, as knowledge of such factors permits investors to
assess important risks the company faces. Investors particularly would have wanted to know that
increased cancellations were significantly harming Sunrun's business, as trends relating to such
cancellations had a direct impact on Sunrun's revenue and profitability.

**E.    Upon Additional Revelations of Sunrun's Frauds in 2017, Sunrun's Stock Price
Dropped Again**

50.    Importantly, the market's reaction to Sunrun's March 10, 2016 press release only
partially corrected the distortion caused by Sunrun's fraud. Investors were not told the degree to
which the prior inflation contributed to the slower expected growth, or the legal and reputational
liability arising from the scheme: Sunrun did not reveal that it had overstated Megawatts Booked in
2015, or that it had done so deliberately.

51.    Those revelations did not occur until May 2017, when two articles in the *WSJ*
exposed the full extent of Sunrun's fraud. The first article, published May 3, 2017 and titled "SEC
Probes Solar Companies Over Disclosure of Customer Cancellations," indicated that the SEC was
examining whether Sunrun had "adequately disclosed how many customers ha[d] canceled contracts
after signing up for a home solar-energy system."[3]

Deleted: The article added:

---

[3] Kirsten Grind, SEC Probes Solar Companies Over Disclosure of Customer Cancellations, *The Wall Street Journal* (May 3, 2017).

52. The article simultaneously revealed that Sunrun had misled investors about the effect of increased cancellations on Sunrun's business operations. The article stated:

[Sunrun's] cancellation figure grew to be as high as 40% earlier this year, according to people familiar with the figure. [. . .] The increase in cancellations caused Sunrun to halve its growth expectations in 2016 from 80% to 40%, one of these people said.

53. On this news, Sunrun's share price fell $0.46, or 8.83%, to close at $4.75 on May 3, 2017, on unusually heavy trading volume.

54. The second article, published on May 22, 2017 and titled, "Solar Company Sunrun Was Manipulating Sales Data, Say Former Managers," revealed that four Sunrun managers had been requested by their superiors to delay reporting, or otherwise to underreport, cancellations of customer contracts in the months surrounding Sunrun's IPO in 2015.

55. On this news, Sunrun's share price fell $0.15, or 2.97%.

56. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS.

### A.     Defendants' False and Misleading Statements in 2015

#### 1.     Second Quarter 2015 Results

57. Sunrun reported results for the second quarter ended June 30, 2015 in a Form 10-Q filed September 15, 2015. The Company reported net income of $7.54 million, or $0 per diluted share.

58. With respect to Megawatts Booked, the Second Quarter Form 10-Q stated in part:

**Key Operating Metrics**

[. . .]

*Megawatts Booked* represents the aggregate megawatt production capacity of our solar energy systems sold to customers or subject to an executed customer agreement, net of cancellations.

[. . .]

Deleted: <object><object><object><object>

For the Three Months Ended June 30, 2015, Megawatts booked (during the period) [were] 61.2 [where this figure] Includes 14.7 MWs associated with purchase of asset portfolio in the second quarter of 2014.

59.    With respect to Sunrun's internal controls, the Second Quarter Form 10-Q stated:

Deleted: ¶

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q.

[. . .]

Deleted: ¶
[. . .]¶
¶

Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as a result of material weakness in our internal control over financial reporting as previously disclosed in our prospectus dated August 4, 2015, filed with the SEC pursuant to Rule 424 promulgated under the Securities Act of 1933, as amended, our disclosure controls and procedures were not effective as of June 30, 2015.

[. . .]

Deleted: ¶
[. . .]¶
¶

In connection with the preparation, audits and interim reviews of our consolidated financial statements, we identified a material weakness in internal control over financial reporting.  [. . .]  Specifically, we identified material errors related to the accounting for our deferred tax liabilities, prepaid tax assets and related amortization as it related to income taxes incurred on intercompany transactions. The foregoing resulted in the restatement of our prior financial statements.  In addition, subsequent to the three months ended March 31, 2015, we also identified and corrected an immaterial error related to the accounting for taxes on intercompany transactions.

Deleted: .

60.    Defendants Jurich and Komin also certified compliance with all the disclosure requirements of the securities laws:  "each of the undersigned officers of Sunrun Inc. (the "Company") hereby certifies that the Company's Quarterly Report on Form 10-Q for the period ended June 30, 2015 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

61.    The statements referenced in ¶¶ 57-60 above were materially false and/or misleading because:  (i) Sunrun's reported financial results were inflated to the extent that they did not recognize reserves for liabilities, including sanctions, relating to its overstatement of Megawatts Booked, and did not disclose the risk of adverse events or sanctions arising from such misconduct;

Deleted: 45-48

Deleted: <object><object><object><object>

(ii) Sunrun materially overstated the number of Megawatts Booked during the period by misrepresenting that the number of Megawatts Booked was calculated net of all cancellations during the period, when in fact, Sunrun was subtracting materially fewer than all cancellations during the period in calculating the number of Megawatts Booked; (iii) Sunrun's statements relating to the adequacy of its internal controls failed to disclose that, in addition to any weaknesses described, these controls failed to prevent Sunrun's overstatements of its Megawatts Booked and the resulting misrepresentations in Sunrun's financial reporting; (iv) Sunrun's SEC filing did not fairly present Sunrun's financial condition and results of operations because Sunrun overstated the number of Megawatts Booked, inflated financial results by failing to recognize reserves, and failed to disclose the risk of liabilities arising from this scheme, as required, *inter alia*, by Item SK-303, 17 C.F.R. 229.303.

Deleted:

### 2. Third Quarter 2015 Results

62. Sunrun reported results for the third quarter ended September 30, 2015 in a Form 10-Q filed November 13, 2015. The Company reported a net loss of $2.77 million, or $0.41 per diluted share.

63. With respect to Megawatts Booked, the Third Quarter Form 10-Q stated:

**Key Operating Metrics**

[. . .]

Deleted: ¶
[. . .]¶
¶

*Megawatts Booked* represents the aggregate megawatt production capacity of our solar energy systems sold to customers or subject to an executed customer agreement, net of cancellations.

[. . .]

Deleted: ¶
[. . .]¶
¶

For the Three Months Ended September 30, 2015, Megawatts booked (during the period) [were] 94.5.

64. The statements referenced in ¶¶ 62-63 above were materially false and/or misleading for the same or substantially similar reasons as those set forth above at ¶ 61(i)-(ii).

Deleted: ¶
Deleted: 50-51
Deleted: 49

65. The Third Quarter 2015 Form 10-Q contained the same or substantially similar attestations of internal controls and certification of accuracy of reported results and financial

condition as those set forth above at ¶¶ 59-60, which were false and misleading for the same or substantially similar reasons as those set forth above at ¶ 61(iii)-(iv).

**B.  Defendants' False and Misleading Statements in 2016**

**1.  Fourth Quarter and Year End 2015 Results**

66.  Sunrun reported results for the fourth quarter and year end of 2015 in a Form 10-K filed March 11, 2016.  The Company reported a net loss of $15.02 million, or $0.07 per diluted share for the fourth quarter of 2015.  For fiscal year 2015, Sunrun reported a net loss of $28.25 million, or $0.96 per diluted share.

67.  With respect to Sunrun's internal controls, the 2015 10-K stated in part:

> We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this Annual Report on Form 10-K, pursuant to Rules 13a-15(e) and 15d-15(e) under the Exchange Act.

> In connection with that evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective and designed to provide reasonable assurance that the information required to be disclosed is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms as of December 31, 2015.

68.  The statements referenced in ¶¶ 66-67 above were materially false and/or misleading for the same or substantially similar reasons as those set forth above at ¶ 61(i), (iii).

69.  The 2015 10-K contained the same or a substantially similar certification of accuracy of reported results and financial condition as that set forth above at ¶ 60, which was false and misleading for the same or substantially similar reasons as those set forth above at ¶ 61(iv).

**2.  First Quarter 2016 Results**

70.  Sunrun reported results for the first quarter of 2016, ended March 31, 2016, in a Form 10-Q filed May 12, 2016.  The Company reported net income of $13.13 million, or $0.13 per diluted share.

71.  The statements referenced in ¶ 70 above were materially false and/or misleading for the same or substantially similar reasons as those set forth above at ¶ 61(i).

72. The First Quarter 2016 Form 10-Q contained the same or substantially similar attestations of internal controls and certification of accuracy of reported results and financial condition as those set forth above at ¶¶ 60, 67, which were false and misleading for the same or substantially similar reasons as those set forth above at ¶ 61(iii)-(iv).

**3. Second Quarter 2016 Results**

73. Sunrun reported results for the second quarter of 2016, ended June 30, 2016, in a Form 10-Q filed August 11, 2016. The Company reported net income of $32.64 million, or $0.31 per diluted share.

74. In comparing Megawatts Booked for the second quarter 2016, the Form 10-Q compared results to the uncorrected and inflated second quarter 2015 results:

**Key Operating Metrics**

[. . .]

*Megawatts Booked* represents the aggregate megawatt production capacity of our solar energy systems sold directly to customers or subject to an executed Customer Agreement, net of cancellations.

[. . .]

For the Three Months Ended June 30, 2015, Megawatts booked (during the period) [were] 61.

75. In its Second Quarter 2016 Form 10-Q, Sunrun stated in part: "If we continue to experience increased customer cancellations, our financial results will potentially be materially and adversely affected." Sunrun made the same or substantially similar statements in its Quarterly Report on Form 10-Q filed November 10, 2016, Annual Report on Form 10-K filed March 8, 2017, and Quarterly Report on Form 10-Q filed May 10, 2017.

76. The statements referenced in ¶ 73 above were materially false and/or misleading for the same or substantially similar reasons as those set forth above at ¶ 61(i). In addition, the statements referenced in ¶¶ 74-75 above were materially false and/or misleading because: (i) Sunrun materially overstated (and failed to correct its prior misstatement of) the number of Megawatts Booked during the three months ending June 30, 2015 by misrepresenting that the number of

Deleted: <object><object><object><object>

Megawatts Booked was calculated net of all cancellations during that period, when in fact, Sunrun was subtracting materially fewer than all cancellations during that period in calculating the number of Megawatts Booked; (ii) Sunrun's statements regarding customer cancellations implied that Sunrun's results by the time it made each such statement had not already been materially and adversely affected by increased customer cancellations, when in fact they had been.

77. The Second Quarter 2016 Form 10-Q contained the same or substantially similar attestations of internal controls, and certification of accuracy of reported results and financial condition as set forth above at ¶¶ 60, 67, which were false and misleading for the same or substantially similar reasons as those set forth above at ¶ 61(iii)-(iv).

Deleted: 48, 55
Deleted: 49

### 4. Third Quarter 2016

78. Sunrun reported results for the third quarter of 2016, ended September 30, 2016, in a Form 10-Q filed November 10, 2016. The Company reported net income of $16.88 million, or $0.16 per diluted share.

79. In comparing Megawatts Booked for the third quarter 2016, the Form 10-Q compared results to the uncorrected and inflated third quarter 2015 results:

**Key Operating Metrics**

[. . .]

Deleted: ¶
[. . .]¶
¶

*Megawatts Booked* represents the aggregate megawatt production capacity of our solar energy systems sold directly to customers or subject to an executed Customer Agreement, net of cancellations.

[. . .]

Deleted: ¶
[. . .]¶
¶

For the Three Months Ended September 30, 2015, Megawatts booked (during the period) [were] 95.

80. The statements referenced in ¶¶ 78-79 above were materially false and/or misleading for the same or substantially similar reasons as those set forth above at ¶¶ 61(i), 76(i).

Deleted: ¶
Deleted: 66-67
Deleted: 49
Deleted: 64

81. The Third Quarter 2016 Form 10-Q contained the same or substantially similar attestations of internal controls, and certification of accuracy of reported results and financial

condition as set forth above at ¶¶ 60, 67, which were false and misleading for the same or substantially similar reasons as those set forth above at ¶ 49(iii)-(iv).

## C. Defendants' False and Misleading Statements in 2017

### 1. Fourth Quarter and Year End 2016

82. Sunrun reported results for the fourth quarter and year end of 2016, in a Form 10-K filed March 8, 2017. The Company reported net income of $29.03 million, or $0.27 per diluted share for the fourth quarter. For fiscal year 2016, Sunrun reported net income of $91.69 million, or $0.87 per diluted share.

83. The statements referenced in ¶ 82 above were materially false and/or misleading for the same or substantially similar reasons as those set forth above at ¶ 61(i).

84. The 2016 Form 10-K contained the same or substantially similar attestations of internal controls, and certification of accuracy of reported results and financial condition as set forth above at ¶¶ 60, 67, which were false and misleading for the same or substantially similar reasons as those set forth above at ¶ 61(iii)-(iv).

### 2. First Quarter 2017

85. Sunrun reported results for the first quarter of 2017, ended March 31, 2017, in a Form 10-Q filed May 10, 2017. The Company reported net income of $12.7 million.

86. The statements referenced in ¶ 85 above were materially false and/or misleading for the same or substantially similar reasons as those set forth above at ¶ 61(i).

87. The First Quarter 2017 Form 10-Q contained the same or substantially similar attestations of internal controls, and certification of accuracy of reported results and financial condition as set forth above at ¶¶ 60, 67, which were false and misleading for the same or substantially similar reasons as those set forth above at ¶ 61(iii)-(iv).

## VI. ADDITIONAL SCIENTER ALLEGATIONS

88. Sunrun, Jurich and Komin each knew that Sunrun reported inflated Megawatts Booked figures during the Class Period, and each knew the false and misleading nature of the statements discussed above, or at a minimum was reckless for not knowing these matters.

89. That Sunrun executives, at the level of Chief Sales Officer/Vice President of Sales, or at one level above, at the level of CEO Defendant Jurich, joined a national conference call with all regional sales managers, on which the Sunrun executives directed the regional sales managers to delay reporting cancellations, makes clear that either Defendant Jurich herself, or executives one level removed from Defendant Jurich, issued this directive or were personally aware of it.

90. The significance of the directive to withhold reporting cancellations was so great for the Company that the order must have come from, or been known to, Defendants, including the Individual Defendants. Given that Sunrun's customer cancellation rate was between 30% and 48%, a directive to withhold reporting such cancellations would have significantly inflated Sunrun's key operating metrics, and Defendants would have known about a directive that would have such a significant effect.

91. Defendant Jurich served as CEO of Sunrun at all relevant times and was a Director of Sunrun throughout the Class Period. As CEO, Jurich was the head of Sunrun's management and operations teams. Defendants Komin served as CFO of Sunrun at all relevant times and likewise served as a Director of Sunrun throughout the Class Period. Jurich, by virtue of her responsibilities and activities as CEO and Director of the Company, was privy to all material information concerning Sunrun's key operating metrics, including all information concerning Sunrun's widespread request that managers delay reporting cancellations during the period surrounding Sunrun's IPO. Likewise, Komin, as CFO, was privy to, and participated in, all matters directly impacting the financial aspects of Sunrun's core business, including the delaying of cancellations so as to inflate the price of Sunrun's stock during the critical financial period before and after its IPO.

92. The core of Sunrun's business is the selling of solar power to customers in the United States. As explained above, Sunrun measures and reports the amount of solar power it sells to customers in "Megawatts Booked" and "Megawatts Deployed." Sunrun itself labels these figures "key operating metrics," and so admits that they are "key" in measuring Sunrun's operations and therewith its core business. Indeed, Sunrun has repeatedly explained the importance in its SEC filings of these "key operating metrics," including Megawatts Booked and Megawatts Deployed:

Deleted: <object><object><object><object>

We regularly review a number of metrics, including the following key operating metrics, to evaluate our business, measure our performance, identify trends affecting our business, formulate financial projections and make strategic decisions.

Deleted:
Deleted: ¶

93.     Moreover, Sunrun has repeatedly emphasized in its SEC filings the importance of its Megawatts Booked and Megawatts Deployed figures to the value of its business in noting that Sunrun's key operating metrics, along with its revenue, are the figures that investors use to value Sunrun:

> [O]ur actual revenue or key operating metrics in one or more future quarters may fall short of the expectations of investors and financial analysts. If that occurs, the trading price of our common stock could decline and you could lose part or all of your investment.

94.     Given the key importance of Sunrun's measures of Megawatts Booked and Megawatts Deployed to Sunrun's business, strategy, and valuation, these key metrics constitute part of Sunrun's core business. Defendants Sunrun, Jurich and Komin each had knowledge of all material information affecting Sunrun's core business, and so had knowledge of all material information affecting Sunrun's Megawatts Booked and Megawatts Deployed figures.

Deleted: ¶

95.     Statements of former Sunrun managers likewise make clear that Sunrun and the Individual Defendants were aware of Sunrun's plan to inflate its Megawatts Booked figures by requesting managers to withhold or delay reporting of customer cancellations. (*See supra* ¶¶ 34-51.)

96.     Defendants scienter with respect to the effect of Sunrun's increased cancellations on its business is clear from, among other sources, the statements of CW5. CW5 has made clear that either the Individual Defendants themselves, or else the Chairman of the Board of Sunrun, has admitted that Sunrun was forced to lower its growth estimates for the fiscal year 2016 from 80% to 40% specifically as a result of increased cancellations. (*See supra* ¶ 48.) Accordingly, either the Individual Defendants themselves have admitted to knowing that increased cancellations already were materially and adversely affecting Sunrun's business prior to August 2016, or else the Chairman of the Board of Sunrun knew this fact, and his knowledge may be imputed to Sunrun. The fact that one of the three highest ranking officers at Sunrun knew about this effect of increased cancellations on Sunrun's business prior to August 2016 also strongly supports the inference that the Individual Defendants each knew of this effect.

Deleted: <#>Darren Jennings served as a Sunrun regional sales manager in Hawaii, one of the company's largest markets, from February 2015 until February 2017. Jennings has stated that approximately three months prior to Sunrun's IPO, he and other sales managers were told by Sunrun superiors that they should hold off on processing customer cancellations. According to Jennings, sales employees in Hawaii did not process about 200 cancellations, equal to approximately 40% of total orders in Hawaii. Jennings has stated that regional sales managers were encouraged by their superiors to delay reporting cancellations on the March 2015 Conference Call in which regional managers and their superiors participated.¶
<#>Evan Stockdale was a Sunrun regional manager from April 2015 to January 2016 in Fresno, California, Sunrun's largest market (approximately 50% of Sunrun's customers are located in California). Stockdale has confirmed that regional managers (including managers in California) were encouraged by their superiors on the March 2015 Conference Call to delay cancellations. According to Stockdale, managers complied—managers were not processing customer cancellations in the months before and after the IPO. Stockdale explained that superiors pressured managers to delay cancellations in order to inflate sales figures: "We were pushed for sales numbers," Stockdale stated.¶
<#>John Clasby, who served as Sunrun's East Coast operations manager from November 2014 to May 2015, stated that sales were often booked at homes that could not support solar panels because they had too much shade or their roofs were too old. When Clasby's team found it impossible to install a system, the order for that system would nevertheless not be cancelled or reported as cancelled for sometimes hundreds of days. Clasby repeatedly informed his superiors of this situation.¶

97.     Defendants Jurich and Komin each signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") for each SEC filing referenced in Part V above during her or his tenure as CEO or CFO.  In these certifications, each of Jurich and Komin certified that she or he had reviewed the SEC filings and determined that they contained no false or misleading statements or omissions.

98.     In virtue of their high-level positions, Jurich and Komin's knowledge (or that of any other board member or high-ranking Sunrun officer) may be imputed to Sunrun.

### VII.    CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sunrun securities publicly traded on the NASDAQ during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosure.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

100.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sunrun securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

101.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

**Deleted:** *<object><object><object><object>*

102.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

103.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

- whether the prices of Sunrun securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

104.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Deleted:** *<object><object><object><object>*

105. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Sunrun securities are traded in efficient markets;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold Sunrun securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

106. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

107. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VIII.   COUNT ONE

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

108. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

Deleted: *<object><object><object><object>*

109.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

110.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Sunrun securities during the Class Period.

112.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

Deleted: *<object><object><object><object>*

113.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

114.    As a result of the foregoing, the market price of Sunrun securities was artificially inflated during the Class Period.  In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Sunrun securities during the Class Period in purchasing Sunrun securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

115.    Had Plaintiffs and the other members of the Class been aware that the market price of Sunrun securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Sunrun securities at the artificially inflated prices that they did, or at all.

116.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

117.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Sunrun securities during the Class Period.

## IX.    COUNT TWO

**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

118.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

Deleted: <object><object><object><object>

119.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

120.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

121.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sunrun securities.

122.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company.  By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

123.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

Deleted: <object><object><object><object>

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury in this Action.

Dated: May 3, 2018                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Austin P. Van*
Jeremy A. Lieberman (admitted *pro hac vice*)
Marc I. Gross (admitted *pro hac vice*)
Austin P. Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (917) 463-1044
E-mail:  jalieberman@pomlaw.com
migross@pomlaw.com
avan@pomlaw.com

**POMERANTZ LLP**

Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, California 90210
Telephone:    (818) 532-6499
E-mail:  jpafiti@pomlaw.com

*Attorneys for Lead Plaintiffs*

Deleted: ¶

Deleted: September 25, 2017¶

¶
¶
¶
¶
¶
¶
¶
¶
¶
¶
¶
¶

Deleted:  application pending

Deleted: 212) 661-8665

Deleted: ¶

Deleted: CA

Deleted: ⎯⎯⎯⎯⎯⎯Section Break (Next Page)⎯⎯⎯⎯⎯⎯

Deleted: <object><object><object><object>

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Deleted:

Deleted: September 25, 2017

/s/ Austin P. Van
Austin P. Van

Deleted:        /s/ Austin P. Van¶
. . . . . . . . Austin P. Van¶