SUSAN S. MUCK (CSB No. 126930)
smuck@fenwick.com
DEAN S. KRISTY (CSB No. 157646)
dkristy@fenwick.com
NAIR DIANA CHANG (CSB No. 287624)
dchang@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:    415.875.2300
Facsimile:    415.281.1350

Attorneys for Defendants
Sunrun Inc., Lynn Michelle Jurich, and
Robert Patrick Komin, Jr.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SUNRUN INC. SECURITIES LITIGATION | Case No.: 3:17-cv-02537-VC<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>Date:    July 19, 2018<br>Time:   10:00 a.m.<br>Dept:    4 – 17th Floor<br>Judge:   Hon. Vince Chhabria<br><br>Date Action Filed: May 3, 2017 |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................... 1

ISSUES TO BE DECIDED ........................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

    I.    INTRODUCTION ................................................................................................. 1

    II.    STATEMENT OF FACTS .................................................................................... 3

        A.    Sunrun's Business .................................................................................... 3

        B.    Post-IPO Events ....................................................................................... 4

        C.    May 2017 Wall Street Journal Articles .................................................... 5

        D.    The Litigation ........................................................................................... 6

    III.    THE SAC IS SUBJECT TO STRICT PLEADING STANDARDS ...................... 7

    IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) ................ 7

        A.    Plaintiffs Still Fail to Allege Facts Raising a Strong Inference of Scienter ..................................................................................................... 7

            1.    The CWs Lack Personal Knowledge ........................................... 8

            2.    The CWs Fail to Show Contemporaneous Contrary Knowledge by Either Individual Defendant ................................ 10

            3.    Plaintiffs Cannot Rely on the Core Operations Theory ................ 11

            4.    Plaintiffs' Scienter Allegations Also Fail Under a Holistic Analysis ......................................................................... 12

        B.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission ............ 13

        C.    Plaintiffs Fail to Plead Loss Causation .................................................... 14

    V.    THE SECTION 20(A) CLAIM MUST BE DISMISSED ................................... 15

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Brodsky v. Yahoo! Inc.*,
   630 F. Supp. 2d 1104 (N.D. Cal. 2009) .......................................................................... 13

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ............................................................................ 7

*Colyer v. AcelRx Pharm., Inc.*,
   2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ............................................................ 7, 12

*Costabile v. Natus Med. Inc.*,
   293 F. Supp. 3d 994 (N.D. Cal. 2018) ............................................................................ 11

*Curry v. Yelp Inc.*,
   875 F.3d 1219 (9th Cir. 2017) ........................................................................................ 15

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................................. 14, 15

*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ............................................................................................ 8

*In re Accuray, Inc. Sec. Litig.*,
   757 F. Supp. 2d 936 (N.D. Cal. 2010) ............................................................................ 13

*In re Business Objects S.A. Sec. Litig.*,
   2005 WL 1787860 (N.D. Cal. July 27, 2005) ............................................................. 8, 13

*In re Downey Sec. Litig.*,
   2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ................................................................ 11

*In re Fusion-io, Inc. Sec. Litig.*,
   2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ................................................................... 10

*In re NorthPoint Commc'ns Grp., Inc. Sec. Litig.*,
   184 F. Supp. 2d 991 (N.D. Cal. 2001) ......................................................................... 8, 11

*In re NVIDIA Corp. Sec. Litig.*,
   2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) ........................................................... 10, 13

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ........................................................................................ 12

*In re Rackable Sys., Inc. Sec. Litig.*,
   2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ..................................................................... 9

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...................................................................................... 7, 12

# TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*In re SolarCity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ............................................................................... *passim*

*Karpov v. Insight Enters., Inc.*,
2010 WL 4867634 (D. Ariz. Nov. 16, 2010),
*aff'd*, 471 F. App'x 607 (9th Cir. 2012) ........................................................................................ 9

*Lloyd v. CVB Financial Corp.*,
811 F.3d 1200 (9th Cir. 2016) ..................................................................................................... 15

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ................................................................................................ 14, 15

*McCasland v. FormFactor Inc.*,
2008 WL 2951275 (N.D. Cal. July 25, 2008) ............................................................................... 9

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ................................................................................................. 7, 14

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ....................................................................................................... 14

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051
(9th Cir. 2014) ............................................................................................................. 7, 9, 11, 12

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017) *aff'd*, 716 F. App'x 663 (9th Cir.
2018) ............................................................................................................................................ 15

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ........................................................................................................ 8

*Roofers Local No. 149 Pension Fund v. DreamWorks Animation SKG, Inc.*,
677 F. App'x 376 (9th Cir. 2017) ................................................................................................ 15

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ....................................................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................................................... 7, 8, 12

*Vote Solar v. PUCN*,
2016 Nev. Dist. LEXIS 602 (1st Dist. Sept. 12, 2016) ................................................................. 5

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018) ...................................................................................... 7, 11, 12, 15

*Welgus v. TriNet Group, Inc.*,
2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ....................................................................... 12, 13

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F. 3d 981 (9th Cir. 2009) ............................................................................................ 8, 9, 12

**STATUTES**

Private Securities Litigation Reform Act of 1995 ("PSLRA") ............................................... 1, 6, 7

Securities Exchange Act of 1934 ("34 Act"),
    Section 10(b), 15 U.S.C. §78j(b) ............................................................................... *passim*
    Section 20(a), 15 U.S.C. §78t(a) .................................................................................. 1, 6, 15
    Section 21D(b)(1), 15 U.S.C. §78u-4(b)(1) ............................................................................ 7
    Section 21D(b)(2)(A), 15 U.S.C. §78u-4(b)(2)(A) ................................................................. 7

**RULES**

Fed. R. Civ. P. 9(b) ........................................................................................................................ 7

Fed. R. Civ. P. 12(b)(6) ................................................................................................................. 1

## NOTICE OF MOTION AND MOTION TO DISMISS

**PLEASE TAKE NOTICE** that on July 19, 2018 at 10:00 a.m. or as soon thereafter as available, in the courtroom of the Honorable Vince Chhabria, located at 450 Golden Gate Avenue, San Francisco, CA, defendants Sunrun Inc. ("Sunrun" or "Company"), Lynn Michelle Jurich, and Robert Patrick Komin, Jr. (collectively, "defendants") will and hereby do move for an order to dismiss plaintiffs' Second Amended Class Action Complaint (the "SAC"). Defendants move pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA") on the grounds that plaintiffs fail to state a claim for violation for Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "34 Act"). This motion is based on the Memorandum of Points and Authorities, defendants' Request for Judicial Notice, the Declaration of Susan S. Muck ("Muck Decl.") and attached exhibits ("Ex."), the [Proposed] Order, the arguments of counsel, and any other matters properly before the Court.[1]

## ISSUES TO BE DECIDED

1. Should the Section 10(b) claim be dismissed where plaintiffs fail to plead: (i) specific facts showing that any defendant made a materially false and misleading statement, (ii) particularized facts giving rise to a strong, cogent and compelling inference of scienter, and (iii) loss causation by linking a decline in Sunrun's stock price to a "corrective" disclosure?

2. Should the Section 20(a) "control person" claim be dismissed where plaintiffs fail to plead an underlying violation of Section 10(b)?

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

This Court dismissed plaintiffs' prior complaint (the "AC") because it failed to allege specific facts giving rise to the strong inference of scienter the law demands. Despite that dismissal and the Court's detailed guidance as to what is required to meet the formidable requirements for pleading securities fraud, plaintiffs return with an SAC that is no improvement over its predecessor.

Once again, the essence of plaintiffs' claim is that Sunrun allegedly delayed processing

---

[1] References to "¶" are to the SAC and references to "Ex." are to exhibits to the Muck Decl.

customer cancellations so that it could increase its net bookings, or "MW Booked," in the second and third quarters of fiscal 2015 so that Sunrun's post-IPO performance would be improved. The alleged facts are supplied entirely by two former employees quoted in a Wall Street Journal ("WSJ") article from May 2017 and five anonymous confidential witnesses ("CWs") – one of whom appears to be the author of the WSJ article. Not one witness claims to have any personal knowledge that the named defendants, Sunrun's CEO Lynn Jurich and CFO Robert Komin, knew of (much less directed) delays in processing cancellations in order to make Sunrun appear more successful. No defendant is alleged to have traded in Sunrun's stock during the class period or to have benefitted in any way from the supposed "fraud," facts which themselves refute scienter.

At the hearing on Sunrun's first motion to dismiss, the Court concluded that plaintiffs had failed to plead scienter and directed them to do more than allege the existence of a spring 2015 conference call – many months before the IPO – during which sales managers were supposedly instructed by unspecified persons to delay the internal reporting of customer cancellations. The Court explained that plaintiffs were required to identify specific details, not conclusions or vague allegations, such as who heard the call, what was said, and who gave the supposed instruction to delay cancellations. Plaintiffs have not complied with that directive because they cannot. So-called witnesses reiterate their previous assertions, focusing merely on the existence of weekly conference calls among sales personnel well below the level of the named defendants. Not one witness claims that Jurich or Komin was aware of – much less gave – an instruction to delay the reporting or processing of cancellations. Not one witness claims to have personal knowledge of how cancellations were processed or recorded. Not one witness claims to know how MW Booked was even calculated, what cancellation rate was used, or whether MW Booked was even publicly reported (at the time of the alleged spring 2015 conference call it was not). Not one witness even claims to have communicated directly with any defendant, and therefore offers rank speculation on what any defendant supposedly "knew." The resulting SAC falls far short of what the court requested and the law requires to plead securities fraud.

Plaintiffs' theory makes little sense. It is premised on the notion that Sunrun needed to show "growth" immediately after its IPO, and therefore lied about its MW Booked. But MW

Booked was not a metric described in the IPO Prospectus, and Sunrun's business did grow after the IPO, as reflected in its MW Deployed – a critical metric that reflects the number of customers with solar systems installed on their roofs generating revenue for Sunrun.  ***MW Deployed was up over 76% and 85% respectively in the two quarters plaintiffs question (Q2 and Q3 2015)***. Since MW Deployed (and other metrics) *increased* after the IPO, the notion that defendants needed to "lie" about MW Booked is specious. Indeed, a recent decision in this district dismissed a virtually identical securities class action against Sunrun's most significant competitor, SolarCity. Plaintiffs have pleaded nothing to justify a different result here.

Although the Court can dismiss the SAC for the sole reason that plaintiffs fail to raise a strong inference of scienter, the SAC likewise fails to demonstrate falsity and loss causation. There is simply no case here, and the dismissal this time should be with prejudice.

## II. STATEMENT OF FACTS

### A. Sunrun's Business

Founded in 2007, Sunrun pioneered the "solar as a service" model to provide clean energy to homeowners at a savings with little to no upfront cost. Ex. 1, at 1. Sunrun's customers typically purchase solar energy services through a 20-year "Customer Agreement." *Id.* Sunrun designs and installs a solar energy system on the customer's home and monitors, insures and maintains the system for the 20-year term, and the customer pays Sunrun a monthly price for the solar energy generated by the system. *Id.* at 1, 18. Before installation, Sunrun performs site inspections at its own expense to confirm that the home is suitable for solar. Because solar as a service is a relatively new product offering and customers are making a long-term commitment, cancellation rates can be high, and Sunrun provides customers with liberal cancellation rights to ensure that solar is right for them. Either Sunrun or the customer can cancel the Customer Agreement at any time prior to installation – for example, if the site inspection reveals excessive shade or if the roof is determined to need replacement before solar can be installed. ¶ 19.

Sunrun is able to offer customers savings over traditional utilities through "net metering" programs developed by states to encourage clean energy alternatives. Ex. 1, at 90. Excess energy generated but not consumed by the homeowner is exported to the utility grid; the value of that

exported energy is credited to the homeowner, resulting in significant savings. *Id*. As Sunrun neared its IPO, traditional utilities were pressuring states to limit net metering. *Id.* at 16-18. Sunrun's Prospectus warned that net metering programs were facing legislative and regulatory attack in California, Nevada and other states that historically allowed net metering, and that such efforts, if successful, could harm Sunrun's business. *Id*.

Sunrun's IPO occurred on August 5, 2015. In its first full quarter as a public company, Sunrun reported 85% growth year-over-year in MW Deployed, the aggregate megawatt production capacity of Sunrun's installed solar energy systems. Ex. 2, at 5, 11. As of December 2015, Sunrun had approximately 111,000 customers in fifteen states and D.C. and operated one of the largest fleets of residential solar energy systems in the United States.  Ex. 3, at 4. Nevertheless, Sunrun's stock price traded below its IPO price from its first day as a public company – closing at $10.77 per share on August 5, 2015, down from the $14 IPO price – and continued to trade at around $10 per share thereafter. *See* Ex. 4, at 1.

### B. Post-IPO Events

Like other public solar companies, Sunrun described various metrics in its press releases and public filings, including MW Deployed. Starting after the IPO, Sunrun also began reporting MW Booked – "the aggregate megawatt production capacity of our solar energy systems sold directly to customers or subject to an executed Customer Agreement, *net of cancellations*"—but never provided forward-looking guidance for MW Booked. ¶ 21 (emphasis in SAC). Sunrun first disclosed MW Booked on September 10, 2015, reporting 61.2 MW Booked and 42.4 MW Deployed. Ex. 5, at 5; Ex. 6 at 27. At the same time, Sunrun warned that construction costs, construction or supplier delays, change orders, site changes, regulatory compliance and other contingencies could lead to increased cancellation rates. Ex. 6, at 47. On November 13, 2015, Sunrun released its results for Q3'15, reporting 94.5 MW Booked and 55.7 MW Deployed. Ex. 7, at 30. It again warned about the potential impact of cancellations on its business. *Id.* at 48-49.

On December 22, 2015, the Public Utilities Commission of Nevada ("PUCN") adopted unprecedented regulations that not only restricted the benefits of net metering to solar homeowners but applied those limitations retroactively to homeowners whose solar systems had

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

not yet been installed, effectively eliminating net metering in Nevada. Ex. 8, at 24. As a result, along with its competitors, Sunrun ceased operations in Nevada in January 2016. Ex. 9, at 1.[2]

On March 10, 2016, Sunrun released its results for Q4 and FY'15 and issued guidance for FY'16, including expected MW Deployed of 56 for Q1 and 285 for FY'16, an increase of 40% over FY'15. Ex.11, at 5-7. Sunrun noted that its guidance "removed approximately 12 MW of backlog from Nevada that would have been deployed in the quarter." Id. at 7. Analysts noted that the 40% growth rate, while lower than expected, was due to the Company's "discontinuation of business in Nevada." Ex. 12, at 1; see Ex. 13, at 1; Ex. 14, at 1.[3] At no time did Sunrun or any analyst suggest that the lower-than-expected guidance was due to overstated MW Booked in 2015. Sunrun's share price fell $0.79 and closed at $6.36 on March 11, 2016. Ex. 4, at 5.

Contrary to plaintiffs' suggestion that defendants were "concealing" the impact of cancellations, on August 11, 2016, Sunrun released earnings for Q2'16, disclosing that "***in the first half of 2016, we experienced increases in cancellations***." Ex. 15, at 38. Sunrun cautioned that "[i]f we continue to experience increased customer cancellations, our financial results will potentially be materially and adversely affected." ¶ 75. Following that release, Sunrun's share price rose $0.82 and closed at $6.23 on August 12, 2016. Ex. 4, at 8.

C.  **May 2017 Wall Street Journal Articles**

On May 3, 2017, the WSJ posted an online article asserting that the SEC was examining whether Sunrun and SolarCity "adequately disclosed how many customers have canceled contracts after signing up for a home solar-energy system." Ex. 16, at 1; see ¶ 51. The article noted that "[r]epresentatives for Sunrun didn't respond to multiple requests for comment." Ex. 16, at 2. Citing "people familiar with the figure," the article claimed that increasing cancellation rates "caused Sunrun to halve its growth expectations in 2016 from 80% to 40%" and cancellations "grew to be as high as 40% earlier" in 2017 (notably, ***not*** 2015 or 2016). Id. at 4-5. Sunrun's share price fell $0.46. ¶ 53. This lawsuit followed almost immediately.

---

[2] In September 2016, a Nevada court ruled that the PUCN order was unconstitutional and exceeded the PUCN's jurisdiction. Vote Solar v. PUCN, 2016 Nev. Dist. LEXIS 602 (1st Dist. Sept. 12, 2016). The PUCN reversed its order, and Sunrun returned to Nevada in 2017. Ex. 10.

[3] At the end of 2015, SolarCity similarly projected a 40% growth rate for 2016. See In re SolarCity Corp. Sec. Litig., 274 F. Supp. 3d 972, 992 (N.D. Cal. 2017).

On May 22, 2017, the WSJ posted a second article. Ex. 17; *see* ¶ 54. It claimed that four former "managers" were told by unnamed "superiors" to "hold off on internally reporting hundreds of customers who canceled their contracts during a roughly five-month period in the middle of 2015," supposedly to better position the Company for its IPO. Ex. 17, at 1. Sunrun's share price fell $0.15 to close that day at $4.90. Ex. 4, at 13. The SAC relies primarily on information from the WSJ articles (or, apparently, provided by the author of the articles).[4]

### D.  The Litigation

Between May 3 and May 18, 2017, three purported class action complaints alleging claims under Sections 10(b) and 20(a) were filed on behalf of purchasers of Sunrun common stock. After consolidation and appointment of lead plaintiffs, the AC was filed on July 25, 2016, alleging a class period of September 16, 2015 to May 21, 2017. Dkt. 45.

On April 5, 2018, the Court granted defendants' motion to dismiss the AC (Dkt. 62), and explained that "it seems pretty clear [plaintiffs are] not okay on intent" and "in terms of satisfying the [] PSLRA standard for intent, I mean, I don't think you got there." Dkt. 65 at 2-3 ("Transcript"). The Court further explained that the AC's allegation of a "March conference call to delay reporting of cancellations . . . lack[ed] specificity about even who was involved in issuing the directive, much less what their connection was to the CEO and CFO." *Id*.

Plaintiffs filed their SAC on May 3, 2018. Dkt. 68. The linchpin of the SAC is the allegation that during a conference call *five months* before the IPO, unspecified employees instructed other unspecified employees to delay internal reporting of customer cancellations. ¶ 33. That's it. From that vague allegation, plaintiffs assert that Sunrun materially misstated MW Booked in Sunrun's Form 10-Q for Q2'15 and Q3'15 as well as a handful of other misstatements that rely on MW Booked. ¶¶ 58, 63, 74, 79.

Notwithstanding this Court's unambiguous directives to plaintiffs, there is not a single fact in the SAC that supports an inference of fraudulent intent as to any defendant. Moreover, the SAC does not and cannot allege that MW Booked for Q2'15 and Q3'15 (or any other metrics) were

---

[4] On August 7, 2017, Sunrun disclosed that its Audit Committee had reviewed processing of customer cancellations and concluded the WSJ claims were unfounded. Ex. 18, at 4-5.

materially false or misleading or that Sunrun issued a "corrective disclosure" that would supply the requisite loss causation. The SAC should therefore be dismissed with prejudice.

## III.   THE SAC IS SUBJECT TO STRICT PLEADING STANDARDS

Section 10(b) requires: (1) a material false or misleading statement; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See, e.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1056-57 (N.D. Cal. 2012); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *8-9 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2014).

Plaintiffs must satisfy both Rule 9(b) and the "formidable pleading requirements" of the PSLRA. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud," including "the ***time, place, and specific content*** of the false representations." *Colyer v. AcelRx Pharm., Inc.*, 2015 WL 7566809, at *4 (N.D. Cal. Nov. 25, 2015) (emphasis added).

Under the PSLRA, plaintiffs must "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed.'" *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (quoting 15 U.S.C. § 78u-4(b)(1)). To "adequately plead scienter . . . the complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id*. (quoting 15 U.S.C. § 78u-4(b)(2)(A)).  That inference must be strong, "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007); *Webb v. SolarCity Corp.*, 884 F.3d 844, 850-51 (9th Cir. 2018). As to loss causation, "the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler*, 540 F.3d at 1063.

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b)

### A.   Plaintiffs Still Fail to Allege Facts Raising a Strong Inference of Scienter

Pleading facts establishing a strong inference of scienter is no minor hurdle; the facts must

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

be "compelling," "persuasive," "effective," and "powerful." *Tellabs*, 551 U.S. at 323-24. They must reflect an intent to defraud or deliberate recklessness so egregious as to be tantamount to actual intent. *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (plaintiff must allege "specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made"); *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743, 745 (9th Cir. 2008) (plaintiff must allege scienter as to each defendant). In dismissing the AC, this Court held that plaintiffs' allegations, including those based on the WSJ stories, failed to meet this standard. The Court even gave specific examples of questions plaintiffs left unanswered:

> Who are these superiors who issued the directive in the conference calls? What did they say? How much did they emphasize this? How big of a part of this March conference call was this directive? Was it sort of a casual aside or [a] significant part of the call? Was it only mentioned in one call?

Transcript at 7-8. Despite adding four new CWs (and dropping one), the SAC still falls far short.

### 1.   The CWs Lack Personal Knowledge

CWs must be identified with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F. 3d 981, 995 (9th Cir. 2009). Plaintiffs add four new CWs but not one purports to have any personal knowledge of what Jurich or Komin was told, knew, or believed. Not one of the CWs, and not one of the "former Sunrun managers"[5] mentioned in the same deficient WSJ articles, claims to have had any direct communication with Jurich or Komin. ¶¶ 30-41, 48. No CW claims to have furnished information about "delayed" cancellations to Jurich or Komin, or even claims to know how MW Booked was calculated or disclosed. Not one offers any information showing that a defendant believed that this metric, or any other statement, was inaccurate in any way. As a matter of law, these witnesses' statements cannot be

---

[5] Plaintiffs reference the four "former Sunrun managers" without providing dates of employment, responsibilities, or any description to "make apparent [their] position within the defendant corporation." *Zucco*, 552 F.3d at 996. As a result, it is impossible to verify the witnesses' personal knowledge. *See, e.g., In re Business Objects S.A. Sec. Litig.*, 2005 WL 1787860, at *6 (N.D. Cal. July 27, 2005); *In re NorthPoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1000 (N.D. Cal. 2001). And the information plaintiffs do offer makes clear the former employees lack any basis for inferring scienter of any defendant.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

relied upon to infer scienter of any defendant. *Intuitive Surgical*, 2012 WL 1868874, at *20 (allegations that failed to show witnesses actually communicated with defendants, or the substance and timing of communications, provided "little, if any, reliable basis from which to infer scienter."); *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *8 (N.D. Cal. Jan. 13, 2010) (no scienter where no CW claimed to have knowledge of statements by defendants "contradict[ing] or even cast[ing] doubt on challenged statement"); *McCasland v. FormFactor Inc.*, 2008 WL 2951275, at *8 (N.D. Cal. July 25, 2008) (CWs who had no "interaction or communication with any of the defendants" fail to "provide an adequate basis for believing plaintiffs' conclusory allegation that, on unspecified dates unspecified defendants directed unspecified employees to hide manufacturing issues and manipulate FormFactor's accounting").[6]

CW5 is the only person who claims to have ***possibly*** interacted with either Jurich or Komin[7] – but ***not*** as a Sunrun employee who witnessed contemporaneously the events at issue. Instead, plaintiffs refer to CW5 as a "journalist" who conducted interviews in 2017 – ***almost two years after*** the IPO. According to plaintiffs, CW5 claims to have spoken with ***either*** Jurich, Komin, or Board chairperson Ed Fenster (not a defendant) and was supposedly told by one of these three persons that Sunrun had lowered its 2016 growth estimates from 80% to 40% due to increased cancellations. ¶ 48. This allegation, which largely repeats what was already in the WSJ stories, raises more questions than it answers. Perhaps most importantly, how can CW5 be "reliable" when he or she doesn't know with whom he or she spoke? Why does CW5 not purport to have discussed cancellations at the time of the IPO, or claim that a defendant at any time believed that MW Booked or any other metric had been misstated? If CW5 is the Wall Street Journal reporter alluded to by plaintiffs, why doesn't the WSJ story even mention this supposed discussion? Put simply, CW5 adds nothing substantive to what was before the Court the last time. Under these circumstances, CW5's allegations fail to raise any inference of scienter. *In re NVIDIA Corp. Sec. Litig.*, 2010 WL 4117561, at *6 (N.D. Cal. Oct. 19, 2010) (rejecting claims of

---

[6] That four of the CWs were not employed by the Company during the entire class period further undermines their credibility. *See Zucco*, 552 F.3d at 996; *Karpov v. Insight Enters., Inc.*, 2010 WL 4867634, at *7 (D. Ariz. Nov. 16, 2010), *aff'd*, 471 F. App'x 607 (9th Cir. 2012).

[7] Significantly, no witness other than CW5 makes any mention of Komin, a fact that alone warrants dismissal of the claims against him. *See* ¶¶ 30-32, 34-41.

CW "who simply interviewed an unnamed senior [] employee" so had no personal knowledge to opine about the company's operations); *see also In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015) ("[w]here, as here, a confidential witness relies on hearsay, courts accord the account of that witness little weight").

### 2. The CWs Fail to Show Contemporaneous Contrary Knowledge by Either Individual Defendant

The SAC fails to plead particularized facts showing that Jurich or Komin had contemporaneous knowledge that Q2'15 or Q3'15 MW Booked was false or misleading. Plaintiffs again allege that during a spring 2015 conference call, unnamed "Sunrun executives directed the regional sales managers to delay reporting cancellations" to inflate MW Booked and present a favorable post-IPO view of Sunrun. ¶¶ 28, 33. Although plaintiffs rely on a handful of newly-added CWs (while dropping the prior CW2 referenced in the AC), no CW specifically alleges that Jurich or Komin participated in or knew the contents of that discussion, and nowhere do plaintiffs identify the "superior who issued the directive." ¶¶ 30-39; Transcript at 7.

CW1 was employed in Colorado and allegedly helped customers with installations and cancellations, but is ***not*** alleged to have communicated with Jurich or Komin, participated in the spring 2015 conference call, or heard any instruction to delay cancellations. CW2 was employed in Novato, California, but did not join Sunrun until 2016 (long after the alleged period in which MW Booked was supposedly inflated), and is not alleged to have ever communicated with Jurich or Komin. Instead, CW2 is included in the SAC for the sole purpose of alleging that he or she reported to someone (Greg Miller) who reported to someone else (Jason Zink) who claims to have said ***in 2016*** that he generally discussed with Jurich what happened in unspecified weekly calls. Even if accurate, the dizzying chain of conjecture offers no basis at all to infer knowledge by Jurich of the spring conference call a year earlier. *See SolarCity*, 274 F. Supp. 3d at 1010.

CW3 claims to have participated in regional sales calls but never claims he heard the alleged instruction to defer cancellations. Nor does he assert that Jurich or Komin was on the spring 2015 conference call. CW4 also fails to support scienter, speculating without any stated

basis that Jurich "heard about" monthly calls[8] from "someone." ¶¶ 35-36. Not one of the former Sunrun employees referenced in the WSJ article mentions Jurich, Komin or a supposed directive to delay cancellations. ¶¶ 32, 38-39. And no witness who claims to have participated on these calls describes specifics—the name of the superior who issued the directive, the details of that directive, when it was issued, how it was implemented, whether it was "a casual aside or [a] significant part" of the call, or any details sufficient to support a strong inference of scienter. Transcript at 7; *see Webb*, 884 F.3d at 850-52 (CW allegations about "a number of conference calls" that defendants participated in not sufficient to raise inference of scienter); *Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1014-15 (N.D. Cal. 2018) (rejecting as insufficient CW allegations lacking corroborating details); *SolarCity*, 274 F. Supp. 3d at 1011 (rejecting CW allegations of "weekly calls" without "specific allegations about the contents of those calls" as "general, vague" and insufficient to raise strong inference of scienter); *NorthPoint*, 184 F. Supp. 2d. at 1000 (CW allegations of "frequent conference calls" without specifics as to content of those discussions insufficient to support strong inference of scienter).[9]

### 3.   Plaintiffs Cannot Rely on the Core Operations Theory

Unable to plead specific facts showing scienter, plaintiffs resort to the "core operations" theory (¶¶ 88-96), arguing that scienter can be inferred "'where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.'" *Intuitive Surgical*, 759 F.3d at 1062 (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008)). But reliance on "core operations" is permissible only where plaintiffs produce "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring" or "witness accounts demonstrating that executives had actual involvement in creating false reports." *SolarCity*, 274 F. Supp. 3d at 1011-12 (citing *Intuitive Surgical*, 759 F.3d at 1062). Allegations in these circumstances must be "buttressed with detailed and specific allegations about

---

[8] Details such as the frequency of the calls vary from CW to CW, and no CW describes the spring 2015 conference call, rendering the entire narrative insufficient to support scienter. ¶¶ 34-35. *See In re Downey Sec. Litig.*, 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) (contradictions among CWs "severely undermine" their reliability, making them insufficient to support scienter).

[9] A made-up organizational chart (¶ 24) likewise fails to satisfy plaintiffs' burden.

management's exposure to factual information within the company." *AcelRx*, 2015 WL 7566809, at *12 (citing *Zucco*, 552 F.3d at 1000). The SAC offers nothing close to the requisite allegations. *See Webb*, 884 F.3d at 854 (rejecting invocation of core operations theory where allegations of accounting error were not specifically linked to management).

### 4. Plaintiffs' Scienter Allegations Also Fail Under a Holistic Analysis

Nor does a holistic analysis give rise to a strong, cogent and compelling inference of scienter. *See Tellabs*, 551 U.S. at 314, 323; *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). As a preliminary matter, plaintiffs' theory makes little sense: it is premised on the notion that Sunrun needed to show "growth" after its IPO and therefore lied about its MW Booked. But putting aside that MW Booked was not a metric described in the Prospectus or as to which Sunrun provided guidance, the business *did* in fact grow after the IPO: MW Deployed, which generates revenues and is Sunrun's most important metric, was up over 76% and 85% respectively in the two quarters plaintiffs question (Q2 and Q3 2015). Ex. 5, at 5; Ex. 2, at 5. Because MW Deployed *increased* after the IPO, Sunrun had no rational incentive to lie about a metric as to which there was no guidance, and certainly does not give rise to the strong, cogent and compelling inference of fraud the law demands. *See, e.g.*, *Welgus v. TriNet Group, Inc.*, 2017 WL 6466264, at *21-22 (N.D. Cal. Dec. 18, 2017).

Moreover, unlike the typical securities fraud case, plaintiffs do not even try to allege what any defendant supposedly gained by virtue of this supposed "fraud." No defendant is alleged to have known of any facts inconsistent with Sunrun's reported MW Booked, nor is any defendant alleged to have sold a single share of Sunrun stock during the lengthy class period. *See Rigel*, 697 F.3d at 884-85.

Sunrun is an innovative company offering technology that requires a 20-year commitment by its customers; the sale and installation of solar energy systems involve multiple steps and third parties; and a customer may have many reasons for opting to cancel. Sunrun was transparent about those possibilities, and when it experienced increased cancellation rates in 2016, it so informed investors. That too undermines scienter. Measured against the SAC's allegations, the far more compelling inference – indeed, the only rational and "cogent" inference – is that defendants

believed Sunrun's public statements were accurate. *See Welgus*, 2017 WL 6466264, at *21-22.

### B. Plaintiffs Fail to Plead an Actionable Misstatement or Omission

Plaintiffs' allegations fail to show falsity for at least three reasons. ***First***, none of the CWs claims to have any knowledge of how Sunrun calculates MW Booked; they do not even claim to be aware of the statements plaintiffs challenge. As such, the allegations fail to show falsity. *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 944 (N.D. Cal. 2010) (rejecting allegations that contracts to be cancelled were included in backlog because CWs lacked knowledge of falsity); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114-15 (N.D. Cal. 2009) (rejecting allegations of improper revenue recognition where plaintiffs fail to show that CWs had personal knowledge of accounting process). CW5 never worked for Sunrun, lacks personal knowledge of any relevant facts, and alleges nothing that establishes falsity. *See NVIDIA*, 2010 WL 4117561, at *6 (rejecting statements of a reporter who "simply interviewed an unnamed senior [] employee").

***Second***, none of the CWs explains how Sunrun's disclosures were false or misleading. Instead, plaintiffs rely on broad assertions about "increasing" or "high" cancellations with no specifics as to the impact of cancellations on reported MW Booked. Absent particularized facts demonstrating how an "increasing" or "high" cancellation rate somehow rendered specific statements false or misleading, plaintiffs fail to allege an actionable misstatement. That is precisely what the court found in *SolarCity*, and there is no pleaded basis for a different result here. 274 F. Supp. 3d at 999-1000 (allegation of high cancellation rates "does not necessarily mean that the key operating metrics were artificially inflated"); *see also Business Objects*, 2005 WL 1787860, at *7 (CW's allegation that "some sales were not recorded in the quarter in which they were made" was "vague and conclusory" and left the court "to speculate as to the date, sales quantity, and other relevant details").[10]

---

[10] For example, plaintiffs cannot show that 200 cancellations in Hawaii were material. Using the reported average system size of 7 kilowatts (or 0.007 MW), 200 cancellations is 1.4 total MW, which represents 0.7% of the 203 MW Deployed reported for FY'15. *See* Ex. 1, at 92; Ex. 3, at 47. After the May 22 WSJ story, analysts noted that "***bookings are not an important driver of valuation*** …. ***RUN never disclosed bookings in the IPO prospectus*** and … the comments [by the former employees cited in the article] refer to only about 200 homes which represents roughly ***1MW of bookings, a fairly immaterial number in our view . . . installations (as opposed to bookings) are the primary driver of valuation.***" Ex. 19, at 1.

***Third***, plaintiffs challenge Sunrun's statement in SEC filings from August 2016 through 2017 that "[i]f we ***continue to*** experience increased customer cancellations, our financial results will potentially be materially and adversely affected." ¶ 75 (emphasis added). Plaintiffs argue the statement falsely "implied" that Sunrun's results "had not already been" affected by increased customer cancellations when in fact they had been. ¶ 76. But the risk factor says exactly that – ***that the Company already experienced increased cancellations***. And plaintiffs offer no witnesses or facts suggesting the statement was false or misleading when made. To the contrary, Sunrun had already disclosed in March 2016 that the Nevada market closure would force Sunrun to cancel installations in Nevada that had been planned for fiscal 2016. Ex. 20, at 8. Thus, the SAC fails to allege a statement that was false when made.[11]

### C. Plaintiffs Fail to Plead Loss Causation

Loss causation is a "context dependent" inquiry and requires plaintiffs to trace a loss back to "the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). The market must have "learned of and reacted to this fraud." *Metzler*, 540 F.3d at 1063; *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014).

Plaintiffs identify three "corrective disclosures" that allegedly caused Sunrun's stock price to decline. ¶¶ 42-46, 50-56. The first was Sunrun's March 10, 2016 press release, which provided forward-looking guidance of 285 MW Deployed for 2016 (56 MW Deployed for Q1), noting the impact of Sunrun's exit from the Nevada market. *Id.* All three analyst reports plaintiffs cite also pointed to the Company's exit from Nevada as the reason for Sunrun's lower guidance. Ex. 12, at 1; Ex. 13, at 1; Ex. 14, at 1. They also noted other non-fraudulent reasons, including that Sunrun was "moving away from less profitable" partners. Ex. 12, at 1; *see Dura*, 544 U.S. at 343 (loss

---

[11] Plaintiffs also allege that net income (*e.g.*, ¶ 57) and net loss (*e.g.*, ¶ 62) were misstated and that Jurich and Komin's certifications of internal controls (*e.g.*, ¶ 60) in SEC filings were false and misleading because MW Booked were misstated. Plaintiffs fail to plead any facts showing how these metrics were misstated or why the processing of cancellations, delayed or not, impacted net income, net loss, or SOX certifications. *SolarCity*, 274 F. Supp. 3d at 997, 1001-02 (dismissing claim where plaintiffs alleged "that SolarCity committed fraud by retaining [inactive] contracts" in its database but failed to provide details as to why these contracts were unlikely to result in installations and to what extent these contracts "actually affected the key operating metrics").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

must be due to a revelation of fraud, not "new industry-specific or firm-specific facts"). Nothing in the press release revealed the alleged fraud.

Plaintiffs also contend that the May 3, 2017 WSJ article is a corrective disclosure because it mentions a possible SEC investigation into Sunrun and others. The announcement of an investigation, without any subsequent disclosure of actual wrongdoing by the defendant, fails to establish loss causation. *Roofers Local No. 149 Pension Fund v. DreamWorks Animation SKG, Inc.*, 677 F. App'x 376, 377 (9th Cir. 2017); *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017) (citing *Loos*, 762 F.3d at 890).[12] The subsequent May 22, 2017 WSJ article similarly contains no disclosure by defendants of wrongdoing and therefore also fails to establish loss causation. *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (requiring allegation of "subsequent corrective disclosure *by the defendant*") (emphasis added); *see Rok v. Identiv, Inc.*, 2017 WL 35496, at *19 (N.D. Cal. Jan. 4, 2017) (disclosure following announcement of investigation insufficient to plead loss causation if it does "not reveal any fraud or even the outcome of the [] investigation") *aff'd*, 716 F. App'x 663 (9th Cir. 2018).

## V. THE SECTION 20(A) CLAIM MUST BE DISMISSED

Because the predicate Section 10(b) claim fails, so does the Section 20(a) claim. *Webb*, 884 F.3d at 858.

## CONCLUSION

For the foregoing reasons, this motion to dismiss should be granted with prejudice.

Dated:   May 31, 2018                    FENWICK & WEST LLP

By: /s/ Susan S. Muck
Susan S. Muck
Attorneys for Defendants
Sunrun Inc., Lynn Michelle Jurich and
Robert Patrick Komin, Jr.

---

[12] Analysts' reaction after the May 3, 2017 WSJ story shows there was no "revelation" of a material misstatement. *E.g.*, "*Newsflash: Sunrun Does Not Convert 100% of Customer Leads to Deployments*": "The small discrepancy between 2016 bookings (285 MW) and deployments (282 MW) gives us confidence in deployment forecasts." Ex. 21, at 1; *see also* Ex. 19, at 1.