1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail:  jpafiti@pomlaw.com

*Attorney for Lead Plaintiffs*

*- additional counsel on signature page -*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISO DIVISION**

| | |
|---|---|
| In re Sunrun Inc. Securities Litigation | Master File No. 3:17-cv-02537-VC |
| | **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

# TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ................................................................................. 1

II.    FACTUAL BACKGROUND .................................................................................... 3

       A.     Company Background ....................................................................................... 3

              1.     Sunrun's Solar Power Business ............................................................. 3

              2.     Sunrun's IPO ......................................................................................... 4

       B.     Sunrun Misled Investors About MW Booked Figures, Which Resulted in
              Inflated Analyst Projections for MW Deployed ................................................ 4

       C.     Sunrun Led Investors to Believe that Increased Customer Cancellations
              Had Not Materially Affected Its Business, When in Fact They Had..................... 5

       D.     Upon Revelation of Sunrun's Fraud, Sunrun's Stock Price Dropped ................... 6

III.   ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED VIOLATIONS OF
       SECTION 10(b) OF THE EXCHANGE ACT ................................................................ 6

       A.     The Second Amended Complaint Straightforwardly Cures the Scienter
              Allegations with Respect to the First Basis for Section 10(b) Liability ................. 7

       B.     The Second Amended Complaint Straightforwardly Cures the Scienter
              Allegations with Respect to the Second Basis for Section 10(b) Liability........... 11

       C.     Plaintiffs Have Adequately Alleged False and Misleading Statements and
              Omissions.................................................................................................... 11

              1.     Defendants' Overstatements of MW Booked, Which Underlie the
                     First Basis for Section 10(b) Liability, Were False and Misleading......... 11

              2.     Defendants' Statements Relating to the Effect of Cancellations on
                     Sunrun's Business, Which Underlie the Second Basis for Section
                     10(b) Liability, Were False and Misleading ............................................. 13

       D.     Plaintiffs Have Adequately Pleaded Loss Causation for Each of the Dates
              Specified in the Amended Complaint .................................................................. 14

IV.    ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED VIOLATION OF
       SECTION 20(a) OF THE EXCHANGE ACT ............................................................... 15

V.     CONCLUSION............................................................................................................ 15

**TABLE OF ABBREVIATIONS**

| Class Period | September 16, 2015 to May 21, 2017 |
|---|---|
| Company | Sunrun Inc. |
| CW | Confidential Witness |
| Defendants | Sunrun Inc., Lynn Michelle Jurich and Robert Patrick Komin Jr. |
| FAC or First Amended Complaint | Amended Class Action Complaint for Violation of Federal Securities Laws (September 25, 2017) [Dkt. 45] |
| Individual Defendants | Lynn Michelle Jurich and Robert Patrick Komin Jr. |
| Defs.' Mem. | Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint for Violations of Federal Securities laws [Dkt. 73] |
| Motion | Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint for Violations of Federal Securities laws [Dkt. 73] |
| MW | megawatts |
| MW Booked | Megawatts Booked |
| MW Deployed | Megawatts Deployed |
| Plaintiffs | Ricky Elmore, Dmitri Karpov, William McCormick, Joseph McIntire and Alice Twomey |
| Q2 | Second quarter |
| Q3 | Third quarter |
| SAC or Second Amended Complaint | Second Amended Class Action Complaint for Violation of Federal Securities Laws [Dkt. 68] |
| Spring 2015 Conference Call | (Defined in paragraph 33 of the Second Amended Complaint.) |
| SOX | Sarbanes-Oxley Act of 2002 |
| SEC | United States Securities and Exchange Commission |
| Section 10(b) | Securities Exchange Act, 15 U.S.C. § 78j(b) |
| Section 20(a) | Securities Exchange Act, 15 U.S.C. § 78t(a) |
| Tr. | Transcript of April 5, 2018 Conference [Dkt. 65] |
| WSJ | Wall Street Journal |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...................................................................9, 10

*Finisar Corp. Sec. Litig.*,
    646 F. App'x 506 (9th Cir. 2016) ............................................................7, 11

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................................13

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005) ........................................................................9

*In re Facebook, Inc.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) ...........................................................13

*In re Prudential Sec. Ltd. Pshps. Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ...................................................................13

*In re SolarCity Corp. Sec. Litig.*,
    2017 U.S. Dist. LEXIS 129137 at *12 (N.D. Cal. 2017) ...............................12

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. Dec. 2005) ...................................................13

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ......................................................................15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) .....................................................................................6, 10

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ...............................................................1, 14, 15

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West*,
    320 F.3d 920 (9th Cir. 2003) ..........................................................................9

*Police & Fire Ret. Sys. of Detroit v. Crane*,
    87 F. Supp. 3d 1075 (N.D. Cal. 2015) ..........................................................10

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ..........................................................................7

*S. Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ..........................................................................9

*SEC v. Phan,*
    500 F.3d 895 (9th Cir. 2007) ....................................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)..............................................................................................2, 10

*Zucco Partners v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) ...............................................................................7, 10

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B).........................................................................................11

# I.   PRELIMINARY STATEMENT

The Second Amended Complaint alleges two independent bases for Defendants' liability under Sections 10(b).  *First*, Defendants materially overstated the MW Booked figures they reported in Q2 and Q3 of 2015.  The Company had instructed regional sales managers to withhold reporting cancellations of customer contracts internally, so Sunrun failed to subtract the MW from those cancelled contracts in calculating its MW Booked figures, which were misleadingly reported as "net of cancellations."  *Second*, beginning in August 2016, Sunrun led investors to believe that the increased customer cancellations the Company had been experiencing had not materially and adversely affected Sunrun's business, when in fact such customer cancellations by that time had caused the Company to cut its growth rate for 2016 in half.

At the April 5, 2018 hearing on Defendants' motion to dismiss the First Amended Complaint (Dkt. 45), the Court appeared to indicate that the allegations in the FAC came close to stating a claim under Section 10(b) under both bases for liability.  The Court found that Plaintiffs had adequately pleaded loss causation and gave no indication that Plaintiffs had failed to plead falsity or materiality adequately with respect to any claim.  The Court expressed concern only about the adequacy of Plaintiffs' allegations regarding Defendants' scienter.  Specifically, with respect to the first basis for liability, the Court held that while "the allegations that the CFO and CEO knew about [the instruction to delay reporting of cancellations] or were involved in it are certainly plausible," scienter had not adequately been pleaded because "there [was] a lack of specificity about . . . who was involved in issuing the directive" and "what their connection was to the CEO and CFO."  With respect to the second basis for liability, the Court recognized that it was a "fair point" that if, as alleged, a senior executive working directly with Defendant Jurich knew that increased customer cancellations had caused the Company to cut its growth rate in half, Defendant Jurich also likely knew.  Nevertheless, the Court suggested that "those allegations can be beefed up as well."

The Second Amended Complaint straightforwardly cures these deficiencies.  With respect to the first basis for liability, the SAC alleges that the directive to delay reporting cancellations came from a Sunrun executive at the level of Chief Sales Officer or Vice President of Sales, or

1     above, and specifies that those positions were occupied during the relevant period by Bill Schuh

2     and Kurt Miller, respectively, and after Miller left, by Matthew Woods.  Moreover, the SAC

3     includes a detailed organization chart that shows the reporting structure of the sales team at Sunrun,

4     and makes clear that the Chief Sales Officer or Vice President of Sales reported to Defendant CEO

5     Lynn Jurich.  The organizational chart also shows the position in Sunrun's organization of the

6     regional sales managers who reported receiving the directive to withhold reporting customer

7     cancellations, and details how many such employees there are at Sunrun and how many employees

8     reported to them.

9           With respect to the second basis for liability, the SAC now alleges that the individual who

10    reported to our confidential witness that in early 2016 the Company decided to cut its growth rate

11    for that year in half specifically as a result of increased customer cancellations was Defendant

12    Jurich, Defendant Komin, or Sunrun Chairperson of the Board Edward Fenster.  Beefier

13    allegations of scienter are hard to imagine.

14          Defendants' motion to dismiss ignores these cures to the Court's key concerns.  Instead,

15    Defendants spend pages nitpicking the CWs' statements and arguing that each, standing on its

16    own, fails to give rise to a strong inference of scienter.  Defendants miss the forest for the trees.

17    As *Tellabs* teaches, there are no magic ingredients necessary to allege scienter—proper scienter

18    analysis is holistic.  Here, each confidential witness was in a position to know the facts ascribed to

19    that individual, and those facts, when considered together, give rise to a strong inference of

20    scienter.  Indeed, the ultimate question for the Court is whether the scienter allegations when

21    considered holistically give rise to an inference of scienter that is at least as compelling as an

22    opposing inference.

23          The inference of scienter for both bases of liability is overwhelming.  The inference that

24    Defendants, at a minimum, were aware of the Company's nationwide plan to withhold reporting

25    cancellations, implemented by those working immediately below them and known throughout the

26    Company's sales operations, a plan that drastically affected the Company's key metrics at a critical

27    time for Sunrun, is at least as compelling as the inference that Defendants were among the only

28    ones at the Company not to get the memo.  With respect to the second basis for liability, no

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
Case No.: 3:17-cv-02537-VC

1    inference of scienter is required—Jurich, Komin or Fenster personally admitted that in early 2016

2    the Company decided to cut its growth rate for that year in half specifically as a result of increased

3    customer cancellations, and so knew the Company's statement to the contrary was false.

4        Defendants' other arguments simply rephrase arguments from Defendants' prior briefs that

5    the Court appears not to have found compelling.  Rephrasing these arguments does not save them;

6    they fail for the same reasons Plaintiffs already articulated in their prior opposition brief.  The

7    Court should deny Defendants' motion in its entirety.

8                                 II.    FACTUAL BACKGROUND

9        A.    Company Background

10                1.    Sunrun's Solar Power Business

11        Sunrun's primary business is providing solar power to homes in the United States.

12    (SAC ¶ 17.)  The Company sells solar power to customers primarily through ongoing agreements

13    (the "Customer Agreement").  (*Id*.)  Under the Customer Agreement, Sunrun installs the solar

14    power system at the customers' homes.  (SAC ¶ 18.)  Customers may cancel their Customer

15    Agreement, subject to certain conditions, at any time prior to the commencement of the physical

16    installation of the solar power system.  (*Id*.)

17        Sunrun tracks the success of its operations with what it labels "key operating metrics,"

18    which it discloses in each quarterly SEC filing.  (SAC ¶ 20.)  Financial analysts base their valuation

19    of Sunrun, and projections of its future growth, in significant part on these metrics.  (SAC ¶¶ 20,

20    22, 45.)  These metrics are highly material to investors because they are direct indicators of the

21    success of Sunrun's operations.  (*Id*.)

22        Two of these key operating metrics are "MW Booked" and "MW Deployed."  (SAC ¶ 21.)

23    During the Class Period, Sunrun defined "MW Booked" as the "megawatt production capacity of

24    our solar energy systems sold directly to customers or subject to an executed Customer Agreement,

25    *net of cancellations*."  (*Id*.) (Emphasis added.)  Sunrun defined "MW Deployed" during the Class

26    Period as the "megawatt production capacity of our solar energy systems . . . installed on the roof,

27    subject to final inspection . . . ."  (*Id*.)  MW Booked is a leading indicator of MW Deployed:  the

28

number of MW Sunrun books under contract suggests the number of MW Sunrun is likely to deploy in the future once the solar systems are installed.  (*See* SAC ¶¶ 42-43.)

### 2. Sunrun's IPO

Sunrun had its IPO in August 2015.  (SAC ¶ 27.)  In public markets, as elsewhere, first impressions matter.  (SAC ¶ 25.)  The post-IPO period is extremely important.  (*Id*.)  If the company does well during this period, the company can establish itself as a solid investment opportunity and lay the foundation for a stable share price.  (*Id*.)  If, however, a new company performs poorly post-IPO, investors quickly view the company negatively.  (*Id*.)

### B. Sunrun Misled Investors About MW Booked Figures, Which Resulted in Inflated Analyst Projections for MW Deployed

In order to bolster its key operating metrics around Sunrun's August 2015 IPO, Defendants engaged in a fraudulent scheme to inflate the MW Booked figures reported to investors. (SAC ¶ 27.)  Starting no later than March 2015, and continuing at least into the fourth quarter of 2015, Sunrun executives, at the level of Chief Sales Officer/Vice President of Sales, or at one level above, at the level of CEO Defendant Jurich, directed regional sales managers to withhold or delay reporting cancellations of customer contracts.  (*Id*.)  In this way, Sunrun inflated its publicly reported MW Booked figures for at least the first two quarters following its IPO, thereby ensuring a favorable initial view of the company.  (*Id*.)  Analysts relied in large part on these inflated MW Booked figures in projecting total MW Deployed for 2016 of 345-363 MW, which would have constituted a continuation of the Company's reported 80% plus growth rate. (SAC ¶ 45.)

Sunrun's scheme was implemented in all major regions in which it operated, including Southern and Northern California (which houses roughly 50% of Sunrun's customers), Hawaii (another one of Sunrun's largest markets) and the East Coast.  (SAC ¶ 29.)

Sunrun materially underreported customer cancellations in the months surrounding the IPO.  (SAC ¶ 27.)  The cancellation rate for Sunrun nationwide was approximately 42% during the Class Period, so the amount of cancelled contracts not reported internally amounted to roughly 40% of total orders.  (*See* SAC ¶ 31-32.)

Sunrun's policy of delaying reporting cancellations of Customer Agreements originated from upper management.  (SAC ¶ 33.)  In Spring 2015, Sunrun regional mangers joined a national conference call attended by Sunrun executives at the level of Chief Sales Officer/Vice President of Sales, or at one level above, at the level of CEO Defendant Jurich.  (*Id.*)  On this call, the Sunrun executives directed the regional sales managers to delay reporting cancellations.  (*Id.*)

Confidential witnesses CW3 and CW4 confirm that Defendant Jurich was informed of, and sometimes directly participated in, conference calls held among the sales management team.  (SAC ¶¶ 34-35.)  CW2 has confirmed that the content of what was discussed at conference calls among the operations team was regularly reported directly to Defendant Jurich.  (SAC ¶ 36.)

At least four former Sunrun managers confirmed that they were aware of, or participated in, withholding reporting customer cancellations in the months prior to and following Sunrun's IPO.  (SAC ¶ 37.)  Darren Jennings, a Sunrun regional sales manager in Hawaii from February 2015 until February 2017, attended the Spring 2015 Conference Call.  (SAC ¶ 38.)  Evan Stockdale, a Sunrun regional manager from April 2015 to January 2016 in Fresno, California, likewise attended the conference call.  (SAC ¶ 39.)  Stockdale has confirmed that regional sales managers (including managers in California) were directed by their superiors on a conference call to delay reporting cancellations.  (*Id.*)  According to Stockdale, managers complied—managers did not process customer cancellations in the months before and after the IPO.  (*Id.*)  Two other former Sunrun employees likewise have confirmed that they were aware of or took part in Sunrun's delaying the reporting of customer cancellations.  (SAC ¶¶ 40-41.)

**C.    Sunrun Led Investors to Believe that Increased Customer Cancellations Had Not Materially Affected Its Business, When in Fact They Had**

Sunrun misled investors in a second way when it repeatedly stated in its quarterly and annual reports beginning in August 2016 that "[i]f [Sunrun] continue[d] to experience increased customer cancellations, [Sunrun's] financial results w[ould] potentially be materially and adversely affected."  (SAC ¶¶ 47-49.)  Sunrun's statements implied that Sunrun's "financial results" as of each statement had not already been "materially and adversely" affected by increased

customer cancellations, when they had been—Sunrun was forced to revise downward its growth estimate for 2016 from 80% to 40% as a direct result of these increased cancellations.  (*Id.*).

### D.    Upon Revelation of Sunrun's Fraud, Sunrun's Stock Price Dropped

Having led the market to believe that it had successfully navigated the IPO period by inflating its MW Booked figures, Sunrun began in 2016 to disclose its backlog of customer cancellations by incorporating these cancellations into its performance metrics.  (SAC ¶ 42.)  In its March 2016 press release, Sunrun projected significantly lower MW Deployed for 2016 than Sunrun's inflated MW Booked figures had led analysts to expect.  (SAC ¶¶ 42-43.)  After Sunrun issued its March 10, 2017 press release, its share price fell 11.12%.  (SAC ¶ 46.)

The market's reaction to Sunrun's March 10, 2016 press release only partially corrected the distortion caused by Sunrun's fraud.  (SAC ¶ 50.)  Investors were not told the degree to which the prior inflation contributed to the lower projected growth, or the legal and reputational liability arising from the scheme—Sunrun did not acknowledge at this time that it was belatedly recognizing earlier customer cancellations.  (*Id.*)  Those additional revelations did not occur until May 2017, when two articles in the WSJ exposed the full extent of Sunrun's fraud.  (SAC ¶ 51.)  The first article, published May 3, 2017, indicated that the SEC was examining whether Sunrun had "adequately disclosed how many customers ha[d] canceled contracts after signing up for a home solar-energy system."  (*Id.*)  The article added, "The increase in [Sunrun's] cancellations caused Sunrun to halve its growth expectations in 2016 from 80% to 40% . . . ."  (*Id.*)  On this news, Sunrun's share price fell 8.83%.  (SAC ¶ 53.)

The second article, published on May 22, 2017 and titled, "Solar Company Sunrun Was Manipulating Sales Data, Say Former Managers," revealed that four Sunrun managers had been requested by their superiors to delay reporting cancellations of customer contracts in the months surrounding Sunrun's IPO in 2015.  (SAC ¶ 54.)  On this news, Sunrun's share price fell nearly 3%.  (SAC ¶ 55.)

### III.    ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT

While a claim for violation of Section 10(b) and Rule 10(b)-5 has six elements, *Matrixx*

*Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011), at the April 5, 2018 hearing, the Court expressed concern only with respect to Plaintiffs' pleading the element of scienter. (Tr. 2:18-21.)

**A.     The Second Amended Complaint Straightforwardly Cures the Scienter Allegations with Respect to the First Basis for Section 10(b) Liability**

In the Ninth Circuit, a plaintiff adequately pleads scienter if all the facts alleged, taken collectively, give rise to the "strong inference" that "the defendant made false or misleading statements either intentionally or with deliberate recklessness." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014); *Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 n.2 (9th Cir. 2016). "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Finisar*, 747 F.3d at 569. An inference of scienter need only be "at least as compelling as an alternative innocent explanation." *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 1006 (9th Cir. 2009).

Courts "must review all the allegations holistically" when determining whether scienter has been pleaded sufficiently. *Reese*, 747 F.3d at 569 (quoting *Matrixx*, 563 U.S. at 48). The relevant inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*.

At the April 5, 2018 hearing, the Court recognized that "the allegations that the CFO and CEO knew about [the instruction to delay reporting of cancellations] or were involved in it are certainly plausible." (Tr. 3:2-4.) The Court then went on to explain repeatedly exactly what was missing from the scienter allegations:  scienter had not adequately been pleaded because "there [was] a lack of specificity about . . . who was involved in issuing the directive" and "what their connection was to the CEO and CFO." (Tr. 3:8-11.) The Court likewise asked, "Who were the superiors [who issued the directives]?  What were their titles?  What was their connection to the CEO and CFO?" (Tr. 4:2-5.) The Court again clarified its concern in asking, "I don't have a sense of what those titles [regional manager and supervisor] mean, what responsibilities those people had, where those people fit in the org chart of the company, how big the company is." (Tr. 5:2-5.)

1    And then again, "I don't know how many levels there are between regional manager and CEO.  I

2    don't know how many levels there are between these unnamed and unspecified superiors who

3    issued the directive on the conference call, and the CEO and the CFO."  (Tr. 5:23-25.)

4         In short, the Court left no doubt as to what it wanted to see in the Second Amended

5    Complaint:  the Court sought identifying information about the individuals who issued the

6    directives to delay internal reporting of cancellations, their positions, and where they fit in the

7    organization chart of the company in relation to the CEO and CFO.  The Court likewise sought to

8    know where the regional managers fit in the Company's organization chart, as well as the

9    responsibilities of this position and the number of employees occupying it.

10        It is easy to see why the Court found that such information would support a strong inference

11   of scienter.  Without providing an indication of the level at which the directive to delay reporting

12   cancellations was issued, the FAC failed to specify how far removed Defendants Jurich and Komin

13   were from those issuing the directive, and so failed to support an inference that the Defendants

14   must have known about the directive because they were not far removed from it.

15        The SAC squarely addresses the Court's apparent concern.  The SAC alleges that the

16   directive to delay reporting cancellations came from a Sunrun executive at the level of Chief Sales

17   Officer or Vice President of Sales, or above (SAC ¶ 27), and specifies that those positions were

18   occupied during the relevant period by Bill Schuh and Kurt Miller, respectively, or by Miller's

19   successor, Vice President of Sales Matthew Woods (SAC ¶ 23).  The SAC includes a detailed

20   organization chart that shows the reporting structure of the sales team at Sunrun, and makes clear

21   that the Chief Sales Officer or Vice President of Sales reported to Defendant CEO Lynn Jurich.

22   (SAC ¶ 24, Diagram A.)  The SAC also alleges that there were only some 20-40 regional sales

23   managers, who were directed to withhold reporting customer cancellations, and that these

24   managers reported to five to seven "regional sales directors," who in turn reported to the Chief

25   Sales Officer and/or Vice President of Sales.  (SAC ¶ 23.)  The SAC complaint specifies that the

26   regional sales managers oversaw 600-800 field sales consultants.  (*Id.*)

27        These additions make the inference of scienter overwhelming.  The directive to withhold

28   reporting cancellations appears to have been given by Schuh, Miller or Woods, each of whom, as

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
Case No.: 3:17-cv-02537-VC

1    Chief Sales Officer or Vice President of Sales reported directly to Defendant Jurich.  (SAC ¶ 23.)

2    The directive was no secret at the Company:  it was given on the Spring 2015 Conference Call,

3    which was attended by the regional managers from across the country, so this critical directive

4    appears to have been widely known at Sunrun.  (SAC ¶ 27.)  CWs 3 and 4 even confirm that

5    Defendant Jurich was informed of, and sometimes directly participated in, conference calls held

6    among the sales management team (SAC ¶¶ 34-35), and CW2 has confirmed that the content of

7    what was discussed at similar conference calls among the operations team was regularly reported

8    directly to Defendant Jurich (SAC ¶ 36).  The directive persisted for half a year and directly and

9    majorly impacted the heart of Sunrun's business, which consists of booking and deploying

10   megawatts of electricity.  (SAC ¶ 92-94.)  Viewed holistically, these facts give rise to the strong

11   inference that Defendants knew about this critical companywide directive, issued by those

12   reporting directly to them—an inference that is at least as compelling as the inference that they

13   somehow failed to learn what appears to have been widely known at the Company.

14          Defendants argue that Plaintiffs' scienter allegations are insufficient because, Defendants

15   claim, the SAC does not adequately allege that the witnesses had personal knowledge of what

16   Jurich and Komin were told.  (Defs.' Mem. 8-11.)  Such allegations are not necessary.  The SAC

17   includes robust allegations regarding the roles of each of the witnesses and other facts that make

18   clear that each witness was in a position to know the facts ascribed to that individual.  (SAC ¶¶ 30-

19   31, 34-35, 48.)  *See In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. 2005).  Those facts together

20   are sufficient to raise a strong inference of scienter.

21          Defendants also argue that Plaintiffs cannot rely on the "core operations theory" to allege

22   scienter.  (Defs.' Mem. 11-12.)  Under this theory, a plaintiff may adequately allege scienter

23   *relying solely* on the fact that "the nature of the relevant fact is of such prominence that it would

24   be absurd to suggest that management was without knowledge of the matter."  *S. Ferry LP v.*

25   *Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).  The nature of what Sunrun misrepresented—a

26   coordinated nationwide effort dramatically to inflate Sunrun's key operating metric—was indeed

27   so prominent that it would be absurd to suggest that Defendants did not know about it.  *See Berson*

28   *v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008); *No. 84 Employer-Teamster Joint*

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
Case No.: 3:17-cv-02537-VC

9

*Council Pension Trust Fund v. America West*, 320 F.3d 920 (9th Cir. 2003). Yet in any event, Plaintiffs certainly do not rely solely on this inference to support scienter. Rather, Plaintiffs ask the Court to consider the prominence of such facts in its holistic scienter analysis, as required by precedent. *Matrixx*, 563 U.S. at 48; *Zucco Partners*, 552 F.3d at 991-92.

Defendants argue that under a holistic analysis, Plaintiffs' scienter allegations fail to give rise to a cogent and compelling inference of scienter because, according to Defendants, "plaintiffs' theory makes little sense."[1] (Defs.' Mem. 12-13.) Plaintiffs' theory is perfectly sensical: Sunrun inflated MW Booked figures for at least the first two quarters following its IPO because "[t]he post-IPO period is extremely important." (SAC ¶ 25.) Defendants suggest that this theory is somehow contradicted by the fact that Sunrun's MW Deployed numbers increased during the post-IPO period. (Defs.' Mem. 12.) Not so. Sunrun's MW Deployed figure is a *lagging* indicator of its MW Booked figure, (SAC ¶¶ 42-43), so the movement of one does not track the movement of the other simultaneously. In any event, that Sunrun's MW Deployed figure increased during a period does not indicate that the figure increased as much as prior MW Booked figures indicated. Indeed, Plaintiffs' theory is that Sunrun inflated investors' expectations of future MW Deployed by inflating MW Booked in 2Q and 3Q 2015, and then, in March 2016, after the immediate post-IPO period was over, halved its estimates for MW Deployed.[2] (*Id.*)

Finally, Defendants argue that Sunrun demonstrated transparency by informing investors in late 2016 that it was experiencing increased cancellation rates, which they claim undermines scienter. (Defs.' Mem. 12.) To the contrary, Sunrun was in no way transparent about its fraud. Sunrun never informed investors about its withholding reporting cancellations, or about any of the other conduct that gave rise to the misrepresentations at issue. Moreover, as explained above,

---

[1] Defendants also argue that Plaintiffs fail to allege a motive for Defendants to have committed fraud. (Defs.' Mem. 12.) Motive "*can be* a relevant consideration," but is not always, as "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) (emphasis added). What is clear is that pleading "motive," or "irregular trading by insiders," is "not necessary to create a strong inference of scienter." *Police & Fire Ret. Sys. of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1086 (N.D. Cal. 2015) (Chhabria, J.) (citing *Matrixx*, 131 S.Ct. at 1324).

[2] Plaintiffs' theory of Defendants' fraud is similar to that the Ninth Circuit found cogent and compelling in *Berson*. 527 F.3d at 988.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
Case No.: 3:17-cv-02537-VC

Sunrun's statement in late 2016 that it had experienced increased cancellations in certain regions affirmatively misled investors to believe that Sunrun's cancellations had not "materially and adversely" affected its business, when they already had affected Sunrun's business drastically.

**B.   The Second Amended Complaint Straightforwardly Cures the Scienter Allegations with Respect to the Second Basis for Section 10(b) Liability**

The Individual Defendants likewise knew that Sunrun's financial results had been "materially and adversely affected" by customer cancellations by the end of Q2 2016, when Defendants stated otherwise. (SAC ¶ 47-49.) CW5 spoke directly to Defendant Jurich, Defendant Komin or Sunrun Chairperson of the Board Edward Fenster, and was told by that individual that Sunrun was forced to lower its growth estimates for the fiscal year 2016 from 80% to 40% specifically as a result of increased cancellations. (SAC ¶ 48.) This individual, who during the Class Period either was, or worked directly with, Sunrun's CEO, Defendant Jurich, was present when the decision to lower growth estimates was made internally. (*Id.*) Contrary to Defendants' argument (Defs.' Mem. 9), CW5's statement is not unreliable because it fails to identify with which of the three individuals CW5 spoke; CW5 is a journalist and did not wish uniquely to identify her or his source. (*See* SAC ¶ 48.)

**C.   Plaintiffs Have Adequately Alleged False and Misleading Statements and Omissions**

Although the Court expressed concerns only with the scienter allegations in the FAC, Defendants argue that the SAC fails adequately to plead falsity. "To plead falsity," Plaintiffs need merely "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Finisar*, 646 F. App'x at 507; 15 U.S.C. § 78u-4(b)(1)(B)).

**1.   Defendants' Overstatements of MW Booked, Which Underlie the First Basis for Section 10(b) Liability, Were False and Misleading**

The majority of Defendants' statements identified in Part V of the Amended Complaint are false or misleading by virtue of Sunrun's having published inflated MW Booked figures in Q2 and Q3 of 2015. In its definition of MW Booked in its Q2 and Q3 2015 quarterly reports, Sunrun represented that its MW Booked figures for those periods were calculated "net of cancellations" (SAC ¶¶ 58, 63), which a reasonable investor would of course understand to mean "net of all

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
Case No.: 3:17-cv-02537-VC

cancellations that occurred during the period." In fact, the MW Booked figures presented in these quarterly reports were not calculated net of all cancellations because Sunrun failed to subtract from these figures the MW Booked associated with a significant number of cancelled contracts. The SAC makes clear that regional managers were instructed to "with[old] reporting" internally customer cancellations during this period. (*E.g.*, SAC ¶ 77.) Multiple confidential witnesses confirmed that this instruction was given to regional managers, and that regional managers complied. (SAC ¶¶ 38-39.) As regional managers failed to report or process cancelled contracts, those cancellations could not have been subtracted in calculating MW Booked by the entity at Sunrun that aggregates reports of MW Booked for financial reporting purposes.[3]

Defendants' arguments that Plaintiffs have failed to allege the falsity of Sunrun's MW Booked figures proceed by confusing or ignoring the theories in the SAC. (Defs.' Mem. 13-14.) Defendants argue that the confidential witnesses referenced in the SAC did not directly state that Sunrun's Q2 and Q3 2015 MW Booked figures were inaccurate. (Defs.' Mem. 13.) Yet that Sunrun's MW Booked figures for these periods were false follows from the fact that regional managers withheld reporting cancelled contracts internally during these periods (SAC ¶ 27), so these cancellations could not have been subtracted from the aggregate MW Booked figures Sunrun reported for these periods, and the resulting figures reported "net of cancellations" were false.

Defendants also argue that the SAC fails to state by exactly what amount Defendants overstated MW Booked. (Defs.' Mem. 13.) Here Defendants conflate falsity and materiality, but the SAC adequately pleads both. If Defendants overstated Q2 and Q3 2015 MW Booked figures by *any* amount by including in those figures MW associated with cancelled contracts (as they did,

---

[3] The amount by which Sunrun overstated its MW Booked in its second and third quarter 2015 quarterly reports was material. Sunrun instructed regional managers nationwide to withhold reporting cancellations on the Spring 2015 Conference Call (SAC ¶ 27), and confidential witnesses specifically confirmed that regional managers withheld reporting cancellations in California (accounting for 50% of Sunrun's customers), Hawaii and the northeastern United States (SAC ¶ 29). CW1 stated that approximately 30% of total orders at Sunrun were cancelled during the Class Period. (SAC ¶ 30.) CW2 stated that in 2016, customers routinely cancelled between 40-48% of Sunrun's total orders in Northern California, and that nationwide the cancellation rate was about 42%. (SAC ¶ 31.) In Hawaii, the regional manager withheld reporting cancellations that amounted to 40% of the total contracts for the region. (SAC ¶ 32.) Unlike plaintiffs in *In re SolarCity Corp. Sec. Litig.*, 2017 U.S. Dist. LEXIS 129137 at *12 (N.D. Cal. 2017), Plaintiffs here *do* allege "to what extent these contracts actually affected the key operating metrics."

1   (SAC ¶ 27-28)), those figures were false, regardless of the exact amount.  In any event, as

2   explained above (*supra* 12 n.4), the amounts were material:  the SAC alleges that regional

3   managers nationwide withheld reporting cancellations, which averaged about 40%, so the SAC

4   alleges that Defendants overstated MW Booked by approximately 40%.  (SAC ¶¶ 31-32.)

5           **2.**    **Defendants' Statements Relating to the Effect of Cancellations on Sunrun's Business, Which Underlie the Second Basis for Section 10(b) Liability, Were False and Misleading**

6

7           Sunrun also misled investors when it repeatedly stated in its quarterly and annual reports

8   that "[i]f [Sunrun] continue[d] to experience increased customer cancellations, [Sunrun's]

9   financial results w[ould] potentially be materially and adversely affected."  (SAC ¶¶ 47-49.)

10  Sunrun's statements implied that Sunrun's "financial results" when it made each statement had not

11  already been "materially and adversely" affected by increased customer cancellations, but in fact

12  they had been—Sunrun was forced to revise downward its growth estimate for 2016 from 80% to

13  40% as a direct result of these increased cancellations.  (*Id.*)  *See, e.g.*, *In re Countrywide Fin.*

14  *Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 n.62 (C.D. Cal. 2008) (quoting *Rombach v. Chang*,

15  355 F.3d 164, 173 (2d Cir. 2004)) ("cautionary words about future risk cannot insulate from

16  liability the failure to disclose that the risk has transpired").[4]

17          Defendants argue that Sunrun's disclosures that customer cancellations were increasing

18  disclosed the truth Sunrun purportedly misrepresented in these statements.  (Defs.' Mem. 14.)

19  Again, not so.  Sunrun's statement that "we have experienced increased customer cancellations"

20  was not a statement that such cancellations were *materially* affecting its bottom line.  Sunrun

21  directly implied that such cancellations were *not* currently materially impacting its bottom line,

22  when they were indeed having a material impact—they had caused Sunrun to decrease its growth

23  projection for 2016 by *half*.  (SAC ¶¶ 47-49.)

24          Defendants also argue that Sunrun had disclosed to the market in March 2016 that the

25  closure of its Nevada operations would result in Sunrun's cancelling installations, so the

26

27  [4] *See also In re Facebook, Inc.*, 986 F. Supp. 2d 487, 518 (S.D.N.Y. 2013) (construing "present certainty as a future possibility" is actionable); *In re Prudential Sec. Ltd. Pshps. Litig.*, 930

28  F. Supp. 68, 72 (S.D.N.Y. 1996) (same); *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. (Dec. 2005) (same).

Company's indication that increased customer cancellations had not materially and adversely affected its business was not misleading.  (Defs.' Mem. 14.)  Yet Sunrun's disclosure that *the Company* was cancelling contracts in Nevada was not a disclosure that *customers* were cancelling contracts to an extent that had materially and adversely affected Sunrun's business.  Moreover, in the conference call cited by Defendants, Sunrun disclosed that the cancelled contracts in Nevada constituted a loss of 12MW. (Defs.' Ex. 20, at 8.)  Calculating based on Sunrun's growth estimate of 40% in MW Booked in 2016 from 205MW to 285MW, had Sunrun not exited from Nevada, Sunrun growth estimates would have been reduced from 80% to 45%, instead of from 80% to 40%, so the remaining cancellations, which were cancellations *by customers*, had still caused the Company to cut by about half its growth estimates for 2016.  Accordingly, customer cancellations had indeed materially and adversely affected the Company's operations by early 2016, even if the Court accepts *arguendo* the Company's disclosures regarding Nevada to be true.

### D.     Plaintiffs Have Adequately Pleaded Loss Causation for Each of the Dates Specified in the Amended Complaint

The third element of Plaintiffs' Section 10(b) claims that Defendants target is also one that the Court has indicated that Plaintiffs already have pleaded adequately:  loss causation.  (Defs.' Mem. 14-15.)  As the Court stated at the April 5, 2018 hearing, "I think you're okay on loss causation." (Tr. 2:19.)  The Court's position is correct.

"To prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc*., 881 F.3d 750 (9th Cir. 2018). "Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Id*.  For example, "[a] plaintiff may . . . prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id*. at 754.

Sunrun's reporting of MW Deployed on March 10, 2016 partly revealed Sunrun's overstatement of its MW Booked:  when Sunrun slashed its MW Deployed guidance for 2016, the Company revealed that MW Booked in prior periods, on which analysts had based their projections

1    for 2016 MW Deployed, had been significantly overstated.  (SAC ¶¶ 42-46.)  On May 3, 2017 the

2    WSJ published an article revealing that the SEC was investigating whether Sunrun had adequately

3    disclosed customer cancellations, and increased customer cancellations had caused Sunrun to

4    halve its growth expectation for 2016.  (SAC ¶ 51.)  On May 22, 2017, a WSJ article revealed that

5    Sunrun managers had been instructed to delay reporting customer cancellations in the months

6    surrounding Sunrun's IPO in 2015, and so revealed the Company's fraud.  (SAC ¶ 54.)[5]

7            Defendants argue that on March 10, 2016, the market reacted to Sunrun's closure of its

8    operations in Nevada.  (Defs.' Mem. 14.)  As Defendants' own exhibits suggest, analysts were

9    merely parroting the Company's explanation for the lower than expected guidance, an explanation

10   contradicted by the SAC, which clearly alleges that the Company's lower than expected guidance

11   resulted from the Company's processing a backlog of cancellations fraudulently withheld from the

12   market, and these allegations must be accepted as true.  (SAC ¶¶43-46.)  The market was reacting

13   to Sunrun's slashing its MW Deployed guidance for 2016, and so was reacting to the revelation of

14   "the very facts about which [Sunrun had] lied," that the Company's MW Booked in prior periods,

15   on which analysts had based their projections for 2016 MW Deployed, had been materially

16   overstated.  *See First Solar Inc.*, 881 F.3d at 753-54.  That the market did not learn at the time that

17   the overstatement was actually due to fraud is irrelevant under *First Solar*.  *See id.*

## IV.    ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

As Plaintiffs have adequately pleaded primary violations of Section 10(b), Defendants'

only argument for dismissal of Plaintiff's Section 20(a) claim fails. (Defs.' Mem. 15.)

## V.    CONCLUSION

For all the above reasons, Defendants' Motion should be denied in its entirety.

---

[5] Defendants also argue that to allege loss causation with respect to the May 3, 2017 disclosure of an SEC investigation, Plaintiffs must allege a subsequent corrective disclosure that revealed fraudulent conduct.  (Defs.' Mem. 15.)  The May 22, 2017 WSJ article was precisely such a corrective disclosure, as it revealed the actual wrongdoing Sunrun had committed in withholding the reporting of customer cancellations.  (SAC ¶ 54.)  *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).  Moreover, the May 3, 2017 WSJ article revealed that increased customer cancellations had caused Sunrun to halve its growth expectation for 2016, revealing "actual wrongdoing," and so satisfies loss causation for the second basis of Section 10(b) liability.  (SAC ¶ 52.)

Dated:  June 21, 2018

Respectfully submitted,

POMERANTZ LLP

*/s/ Austin P. Van*
Marc I. Gross (*admitted* pro hac vice)
Austin P. Van (*admitted* pro hac vice)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  migross@pomlaw.com
avan@pomlaw.com

*Attorneys for Lead Plaintiffs*

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
Case No.: 3:17-cv-02537-VC