PAGES 1 – 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

IN RE:  SUNRUN, INC. SECURITIES     )
LITIGATION.                         )
                                    )
                                    )  NO. 17-CV-02537 VC
                                    )
                                    )  SAN FRANCISCO, CALIFORNIA
_____)  THURSDAY, JULY 19, 2018

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND**

**RECORDING  10:20 A.M. – 11:28 A.M.**

**APPEARANCES:**

**FOR MOVANTS**          POMERANTZ LLP
                         600 THIRD AVENUE, FLOOR 20
                         NEW YORK, NEW YORK 10016
                 **BY:  AUSTIN VAN, ESQUIRE**


**FOR DEFENDANTS**       FENWICK & WEST LLP
                         555 CALIFORNIA STREET, 12TH FLOOR
                         SAN FRANCISCO, CA 94104
                 **BY:  SUSAN SAMUELS MUCK, ESQUIRE**
                       **NAIR DIANA CHANG, ESQUIRE**


*TRANSCRIBED BY:  JOAN MARIE COLUMBINI, CSR #5435, RPR*
*                 RETIRED OFFICIAL COURT REPORTER, USDC*

```
 1   THURSDAY, JULY 19, 2018                          10:20 A.M.

 2   (TRANSCRIBER'S NOTE: DUE AT TIMES TO COUNSELS' FAILURE TO

 3   IDENTIFY THEMSELVES WHEN SPEAKING, CERTAIN SPEAKER

 4   ATTRIBUTIONS ARE BASED ON EDUCATED GUESS.)

 5                          ---O0O---

 6                         PROCEEDINGS

 7            THE CLERK:  CALLING CASE NO. 17-CV-2537, IN RE:

 8   SUNRUN, INC. SECURITIES LITIGATION.

 9            COUNSEL, PLEASE STEP FORWARD AND STATE YOUR

10   APPEARANCES FOR THE RECORD.

11            MR. VAN:  AUSTIN VAN ON BEHALF OF LEAD PLAINTIFFS.

12            THE COURT:  GOOD MORNING.

13            MS. MUCK:  GOOD MORNING, YOUR HONOR.  SUSAN MUCK,

14   FENWICK & WEST, ON BEHALF OF THE DEFENDANTS.  AND WITH ME IS MY

15   COLLEAGUE DIANA CHANG.

16            THE COURT:  GOOD MORNING.

17            OKAY, MR. VAN, MAYBE I'LL START WITH YOU AGAIN.  YOU

18   KNOW, I WAS GOING THROUGH THE AMENDED COMPLAINT OR THE SECOND

19   AMENDED COMPLAINT, OR WHATEVER IT IS, I FOUND MYSELF, YOU KNOW,

20   THINKING ABOUT -- PONDERING SOMETHING THAT I DON'T BELIEVE WE

21   DISCUSSED LAST TIME.  AND BEFORE WE GET TOO INTENT, I WANT TO

22   DISCUSS THIS WITH YOU.

23            I FOUND IT A LITTLE BIT DIFFICULT READING YOUR

24   COMPLAINT, GETTING A SENSE OF JUST HOW IMPORTANT THE MEGAWATTS

25   BOOKED METRIC IS, AND RELATEDLY, AND PERHAPS MORE IMPORTANTLY,
```

1    JUST HOW BIG OF A DEAL THESE -- THE DELAYED REPORTING OF

2    CANCELLATIONS WAS, ASSUMING THAT IT HAPPENED AS YOU ALLEGE IN

3    THE COMPLAINT.

4            WHERE -- WHERE IN THE COMPLAINT DO I GO TO LEARN HOW

5    IMPORTANT THE MEGAWATTS BOOKED METRIC IS AND HOW BIG A DEAL

6    THESE DELAYS IN REPORTING THE CANCELLATIONS WAS IN THE GRAND

7    SCHEME OF THINGS FOR THE COMPANY AND THE COMPANY'S NUMBERS?

8            **MR. VAN:**  RIGHT.  SO THEY WERE CRITICAL METRICS, AND

9    I THINK THE COMPLAINT IS VERY CLEAR ABOUT THAT.  THESE WERE THE

10   MOST IMPORTANT OPERATIONAL METRICS FOR THE COMPANY.  IT'S A

11   COMPANY THAT SELLS ELECTRICITY, AND THEY MEASURE HOW MUCH

12   ELEC- --

13           **THE COURT:**  SO THEY IDENTIFY A NUMBER OF DIFFERENT

14   METRICS, ONE OF WHICH IS MEGAWATTS BOOKED.  SO I GUESS I WILL

15   AGREE WITH YOU THAT WE CAN ASSUME THAT MEGAWATTS BOOKED IS ONE

16   OF THE MOST IMPORTANT METRICS, BECAUSE IT'S ONE OF THE METRICS

17   THAT THEY IDENTIFY OR THEY STARTED IDENTIFYING TO THE PUBLIC IN

18   THE FALL OF 2015.

19           **MR. VAN:**  YES, IT WAS AFTER THE IPO.

20           **THE COURT:**  AND IT'S A METRIC THAT THEY KEPT TRACK

21   OF --

22           **MR. VAN:**  RIGHT.

23           **THE COURT:**  -- INTERNALLY BEFORE THAT, RIGHT?

24           **MR. VAN:**  RIGHT.

25           **THE COURT:**  BUT SO -- BUT IN TERMS OF UNDERSTANDING

```
 1   HOW IMPORTANT IT IS COMPARED TO THE OTHER METRICS, MOST
 2   OBVIOUSLY, MEGAWATTS DEPLOYED, HOW DO I -- HOW DO I GET AN
 3   UNDERSTANDING OF THAT FROM THE COMPLAINT?
 4          MR. VAN:  RIGHT.  SO I GUESS THE MOST IMPORTANT
 5   PASSAGE OF THE COMPLAINT ON THAT POINT IS THAT ONE IS A LEADING
 6   INDICATOR OF THE OTHER.  MEGAWATTS BOOKED IS LOOKED TO BY
 7   ANALYSTS.
 8          THE COURT:  AND THAT'S PARAGRAPH 40-SOMETHING?
 9          MR. VAN:  I'M EMBARRASSED TO SAY I HAVE NOT MEMORIZED
10   PARAGRAPH NUMBERS.  I WOULD BE HAPPY TO SEND A LETTER TO THE
11   COURT WITH THAT PARAGRAPH NUMBER.
12          THE COURT:  NO.
13          MR. VAN:  UNLESS YOU WANT ME TO --
14          THE COURT:  NO.  YOU NEED TO BE PREPARED TO TELL ME
15   WHERE THE PARAGRAPH IS.
16          MR. VAN:  FAIR, FAIR.
17          THE COURT:  THAT'S WHAT HEARINGS LIKE THIS ARE FOR.
18          MR. VAN:  SO CERTAINLY PARAGRAPHS 20 AND 21 WHERE
19   SUNRUN IS LABELING THESE THE KEY OPERATING METRICS ITSELF
20   STRONGLY SUGGESTS THAT THE METRICS ARE CRITICAL TO THE COMPANY.
21          THE COURT:  AND YOU SAID THEY LABEL IT AS KEY
22   OPERATING METRICS ITSELF IN THEIR --
23          MR. VAN:  SEC FILINGS.
24          THE COURT:  -- IN THEIR SEC FILINGS.  OKAY.
25          MR. VAN:  THEY ARE DIRECT INDICATORS OF THE SUCCESS
```

```
 1    OF SUNRUN'S OPERATION.  SUNRUN HAS STATED:
 2                    "WE REGULARLY REVIEW A NUMBER OF
 3            METRICS, INCLUDING KEY OPERATING METRICS, TO
 4            EVALUATE OUR BUSINESS, MEASURE OUR
 5            PERFORMANCE, IDENTIFY TRENDS AFFECTING OUR
 6            BUSINESS, FORMULATE FINANCIAL PROJECTIONS AND
 7            MAKE STRATEGIC DECISIONS."
```

 8        **THE COURT:**  THE QUESTION I ASKED YOU WAS:  WHERE DO I
 9    GO IN THE COMPLAINT TO LEARN ABOUT -- AMONG THESE METRICS, HOW
10    IMPORTANT IS MEGAWATTS BOOKED?

11        **MR. VAN:**  WELL, SO --

12        **THE COURT:**  HOW IMPORTANT IS IT VIS-A-VIS --

13        **MR. VAN:**  MEGAWATTS DEPLOYED.

14        **THE COURT:**  -- MEGAWATTS DEPLOYED, FOR EXAMPLE?

15        **MR. VAN:**  RIGHT.  SO I THINK PARAGRAPH 21 PROBABLY
16    GIVES US ENOUGH.  EVEN THOUGH I BELIEVE ELSEWHERE IN THE
17    COMPLAINT IT IS STATED THAT MEGAWATTS BOOKED IS A LEADING
18    INDICATOR OF MEGAWATTS DEPLOYED, I THINK IT'S DERIVABLE FROM
19    PARAGRAPH 21 JUST BASED ON THE DEFINITIONS.

20        IT'S CLEAR THAT MEGAWATTS BOOKED, YOU KNOW,
21    ELECTRICITY UNDER CONTRACT, IS A GOOD ESTIMATE OF HOW MUCH THE
22    COMPANY IS GOING TO DEPLOY, HOW MUCH ELECTRICITY ULTIMATELY THE
23    COMPANY IS GOING TO --

24        **THE COURT:**  BUT YOU KNOW THAT THERE ARE
25    CANCELLATIONS, RIGHT?  I MEAN, IT'S NOT A SECRET THAT THERE ARE

1    CANCELLATIONS.

2              **MR. VAN:**  NO, IT'S NOT.

3              **THE COURT:**  RIGHT?  SO WHAT DO WE KNOW ABOUT HOW

4    PREDICTIVE MEGAWATTS BOOKED IS OF MEGAWATTS DEPLOYED?

5              **MR. VAN:**  WE KNOW THAT ANALYSTS DO LOOK TO MEGAWATTS

6    BOOKED TO PREDICT MEGAWATTS DEPLOYED, AND THE COMPANY HAS

7    STATED TO ANALYSTS IN PRESENTATIONS YOU CAN ESTIMATE, YOU KNOW

8    LOOKING BACK AT MEGAWATTS -- ACTUALLY, LOOKING AT MEGAWATTS

9    DEPLOYED, I THINK YOU CAN ESTIMATE WHAT MEGAWATTS BOOKED WERE,

10   IF I REMEMBER THE STATEMENT CORRECTLY.

11             **THE COURT:**  WHERE IS THAT IN THE COMPLAINT?

12             **MR. VAN:**  IT'S NOT DIRECTLY STATED IN THE COMPLAINT.

13             **THE COURT:**  IT'S EITHER STATED OR IT'S NOT STATED IN

14   THE COMPLAINT.

15             **MR. VAN:**  WELL, I BELIEVE IT'S IN CONFERENCE CALLS

16   WITH ANALYSTS THAT MIGHT BE REFERENCED IN THE COMPLAINT.  SO TO

17   THAT EXTENT IT MAY BE INCORPORATED.

18             **THE COURT:**  WHERE?  I MEAN, I WANT TO KNOW.  I

19   WANT -- LIKE -- AS I SAID, I WENT THROUGH THE COMPLAINT.  I

20   READ THROUGH THE COMPLAINT, AND I WAS LEFT WONDERING ABOUT THE

21   RELATIONSHIP -- HOW CLOSE THE RELATIONSHIP IS BETWEEN MEGAWATTS

22   BOOKED AND MEGAWATTS DEPLOYED, WHAT THE COMPANY SAID ABOUT THE

23   RELATIONSHIP BETWEEN MEGAWATTS BOOKED AND MEGAWATTS DEPLOYED,

24   AND I'M LEFT WONDERING THAT -- ABOUT THAT AFTER READING THE

25   COMPLAINT.  SO I'M ASKING YOU TO SHOW ME WHERE I GO IN THE

1    COMPLAINT TO DEVELOP A BETTER UNDERSTANDING OF THAT.

2          **MR. VAN:**  RIGHT.

3          **THE COURT:**  IT'S NOT SUFFICIENT FOR YOU TO TALK TO ME

4    ABOUT SOMETHING THE COMPANY MIGHT HAVE SAID TO AN ANALYST

5    THAT'S NOT DISCUSSED IN THE COMPLAINT.

6          **MR. VAN:**  YOU'RE RIGHT, IT'S NOT DISCUSSED.  AND

7    IT'S -- I'M NOT CERTAIN STANDING HERE NOW I CAN POINT YOU TO A

8    PART OF THE COMPLAINT THAT INCORPORATES IT CLEARLY BY

9    REFERENCE.

10          THAT STATED, I THINK IT IS DERIVABLE, YOU KNOW, THAT

11    MEGAWATTS DEPLOYED IS A LAGGING INDICATOR OF MEGAWATTS BOOKED

12    AND IT'S -- WE ALLEGE THAT THE COMPANY WAS NOT TELLING THE

13    PUBLIC THAT THERE WERE TONS AND TONS OF CANCELLATIONS.  THEY

14    SAID THERE WERE INCREASED CUSTOMER CANCELLATIONS, BUT THEY GAVE

15    NO INDICATION TO THE PUBLIC THAT THAT INCREASE IN CUSTOMER

16    CANCELLATIONS WAS MATERIAL.  SO IT SEEMS TO BE DERIVABLE FROM

17    THE COMPLAINT.

18          **THE COURT:**  BUT THAT GETS TO MY OTHER QUESTION, WHICH

19    IS -- THAT I ASKED AT THE BEGINNING, WHICH IS I'M -- THE OTHER

20    THING THAT I HAVE TROUBLE DISCERNING FROM THE COMPLAINT IS HOW

21    IMPORTANT ARE THESE -- HOW -- HOW SIGNIFICANT OF A CHANGE WAS

22    THERE IN THE CANCELLATIONS, AND HOW MUCH OF AN EFFECT DID THIS

23    DELAY IN THE REPORTING OF THE CANCELLATIONS HAVE IN THE OVERALL

24    SCHEME OF THINGS?

25          **MR. VAN:**  RIGHT.  SO I THINK THOSE CONCERNS ARE BEST

```
 1    ADDRESSED BY OTHER PARAGRAPHS WHERE WE GO INTO THE CONFIDENTIAL
 2    WITNESS STATEMENTS, AND WE HAVE CONFIDENTIAL WITNESSES NOTING
 3    THE EXTENT TO WHICH THERE WERE CUSTOMER CANCELLATIONS, AND IT
 4    WAS HUGE.
 5              THE COURT:  LET'S GO THROUGH -- LET'S GO THROUGH
 6    THOSE.
 7              MR. VAN:  OKAY.  SO CONFIDENTIAL WITNESS NUMBER 1
 8    ESTIMATED THAT APPROXIMATELY 30 PERCENT --
 9              THE COURT:  WHAT PARAGRAPH NUMBER ARE YOU?
10              MR. VAN:  I'M SORRY.  THIRTY.
11              THE COURT:  PARAGRAPH 30.  OKAY.
12              MR. VAN:   "CW1 HAS ESTIMATED THAT APPROXIMATELY
13    30 PERCENT OF TOTAL ORDERS AT SUNRUN WERE CANCELED IN THE YEARS
14    2012 TO 2017."
15              THE COURT:  OKAY.
16              MR. VAN:  CONFIDENTIAL WITNESS NUMBER 2 --
17              THE COURT:  SO FAR -- I KNOW WE HAVE TO LOOK AT THE
18    ENTIRETY OF THE COMPLAINT.  BUT THAT SENTENCE GIVES YOU
19    NOTHING, RIGHT?  BECAUSE IT'S NOT A SECRET THAT THERE ARE
20    CANCELLATIONS, AND YOU -- AND THE STATEMENT IS THAT 30 PERCENT
21    OF TOTAL ORDERS AT SUNRUN WERE CANCELED IN THE YEARS 2012 TO
22    2017.  WE KNOW THERE ARE CANCELLATIONS, WE KNOW A CERTAIN
23    PERCENTAGE OF ORDERS WERE CANCELED.  WHAT YOU ARE TRYING TO
24    ALLEGE IS THAT THE CANCELLATIONS REALLY STARTED INCREASING AT
25    SOME POINT AND THAT THE COMPANY DID SOMETHING TO SWEEP THOSE
```

1   CANCELLATIONS UNDER THE RUG, VIS-A-VIS THE MEGAWATTS BOOKED

2   NUMBER.  SO THAT SENTENCE GIVES YOU NOTHING.

3           **MR. VAN:**  SO --

4           **THE COURT:**  RIGHT?

5           **MR. VAN:**  I THINK I SHOULD CLARIFY WHAT WE ARE

6   ALLEGING.

7           WE'RE ALLEGING THAT THE COMPANY TOLD REGIONAL

8   MANAGERS:  STOP TELLING US ABOUT CANCELLATIONS; WE DON'T -- WE

9   ARE NOT GOING TO REPORT THEM.

10          **THE COURT:**  RIGHT.

11          **MR. VAN:**  "WE WANT TO INFLATE OUR KEY OPERATING

12  METRICS AFTER OUR IPO."

13          AND SO IF, AS WE ALLEGE, REGIONAL MANAGERS FOLLOWED

14  THAT DIRECTIVE AND STOPPED INTERNALLY REPORTING CUSTOMER

15  CANCELLATIONS, AND CUSTOMER CANCELLATIONS WERE HUGE, LIKE 30 TO

16  48 PERCENT, THEN IT'S CLEAR THAT THERE WAS A SIGNIFICANT IMPACT

17  ON THE KEY OPERATING METRICS FOR THE COMPANY.

18          **THE COURT:**  BUT, I MEAN -- I GUESS THE -- PART OF

19  WHAT YOU WERE JUST SAYING TO ME A SECOND AGO IS THAT

20  CANCELLATIONS INCREASED.  IS THAT NOT PART OF YOUR THEORY, THAT

21  CANCELLATIONS INCREASED AND THAT THE COMPANY CONCEALED THE

22  INCREASED CANCELLATIONS?

23          **MR. VAN:**  THAT IS.  IT'S SOMEWHAT SEPARATE.  AND

24  THERE MIGHT BE WHERE YOUR, YOU KNOW, PRIMARY CONCERN IS, THE

25  EXTENT TO WHICH, YOU KNOW, INCREASING CANCELLATIONS WAS OF

1    CONCERN.

2              **THE COURT:**  OKAY.  LET'S PUT ASIDE FOR A SECOND THE

3    INCREASED CANCELLATIONS AND LOOK AT WHAT YOU WERE JUST SHOWING

4    ME FROM CONFIDENTIAL WITNESS NUMBER 1.

5              **MR. VAN:**  SURE.

6              **THE COURT:**  SO CONFIDENTIAL WITNESS NUMBER 1

7    ESTIMATED THAT APPROXIMATELY 30 PERCENT OF TOTAL ORDERS AT

8    SUNRUN WERE CANCELED IN THE YEARS 2012 TO 2017.  SO THE POINT

9    YOU'RE MAKING IS THAT THAT'S A LARGE NUMBER OF CANCELLATIONS,

10   AND YOU'RE SAYING IT WAS NOT A SECRET THAT THERE WERE

11   CANCELLATIONS, EVERYBODY KNEW -- SORT OF OBVIOUS FROM THE

12   NATURE OF THE BUSINESS -- THAT THERE WERE GOING TO BE

13   CANCELLATIONS, BUT -- BUT THE COMPANY DECIDED IN 2015 TO TREAT

14   THOSE CANCELLATIONS DIFFERENTLY?

15             **MR. VAN:**  CORRECT.

16             **THE COURT:**  BY, ESSENTIALLY, NOT INCORPORATING THEM

17   INTO THE MEGAWATTS BOOKED NUMBER THAT THEY SHOULD HAVE BEEN

18   INCORPORATED INTO.

19             **MR. VAN:**  THAT'S EXACTLY CORRECT.

20             **THE COURT:**  AND -- OKAY.  AND SO IF THERE'S A

21   RELATIONSHIP BETWEEN MEGAWATTS BOOKED AND MEGAWATTS DEPLOYED,

22   THEN I WOULD THINK THAT YOU WOULD START SEEING A DIFFERENCE IN

23   THE RELATIONSHIP BETWEEN THOSE NUMBERS AFTER 2015, RIGHT, OR

24   LATER IN 2015.

25             IN OTHER WORDS -- THIS IS JUST A HYPOTHETICAL, BUT

1  LET'S SAY YOU HAVE, YOU KNOW -- IN 2014, LET'S SAY YOU HAD

2  200 MEGAWATTS BOOKED AND 150 MEGAWATTS DEPLOYED, RIGHT?

3          **MR. VAN:**  YES.

4          **THE COURT:**  WHAT THAT MEANS IN 2014 IS THAT -- AND I

5  UNDERSTAND THERE'S SOME LAG TIME THIS HYPOTHETICAL IS NOT

6  TAKING INTO ACCOUNT, BUT I'M TRYING TO SIMPLIFY.  WHAT THAT

7  MEANS IS THAT, YOU KNOW, YOU'RE GOING TO SEE, YOU KNOW,

8  25 PERCENT LESS IN MEGAWATTS DEPLOYED THAN YOU'RE GOING TO SEE

9  IN MEGAWATTS BOOKED.

10          **MR. VAN:**  AND THAT'S EXACTLY WHAT HAPPENED HERE.

11          **THE COURT:**  AND SO -- BUT THEN IF YOU FAST FORWARD,

12  LET'S SAY, TO 2016 WHEN THE COMPANY IS MANIPULATING THE

13  MEGAWATTS BOOKED NUMBER, I WOULD THINK THAT YOU WOULD SEE A

14  LARGER DIFFERENCE BETWEEN THE MEGAWATTS BOOKED NUMBER AND THE

15  MEGAWATTS DEPLOYED NUMBER SO THAT YOU MIGHT SEE 200 MEGAWATTS

16  BOOKED, BUT ONLY 100 MEGAWATTS DEPLOYED.

17          **MR. VAN:**  THAT'S EXACTLY CORRECT.

18          **THE COURT:**  OKAY.  AND THAT IS SOMETHING THAT I CAME

19  UP WITH IN MY HEAD.  I DID NOT SEE IT IN THE COMPLAINT

20  ANYWHERE.  DO YOU -- IS THERE ANYWHERE IN THE COMPLAINT WHERE

21  YOU SHOW THAT THERE -- YOU KNOW, AS A RESULT OF THE DECISION TO

22  STOP REPORTING THESE CANCELLATIONS, THAT THE GULF BETWEEN

23  MEGAWATTS BOOKED AND MEGAWATTS DEPLOYED WIDENED?

24          **MR. VAN:**  YES.

25          **THE COURT:**  OKAY.  WHERE?

1          **MR. VAN:**  IT'S IN THE -- JUST, I GUESS, THE

2    INTRODUCTION AND THE EXPLANATION OF THE --

3          **THE COURT:**  SHOW ME WHERE.  SHOW ME THE LANGUAGE.

4          **MR. VAN:**  OF COURSE, YOUR HONOR.  THANK YOU.

5          PARAGRAPH 42.

6          **THE COURT:**  FORTY-TWO?

7          **MR. VAN:**  YES.

8          **THE COURT:**  OKAY.

9                  "HAVING LED THE MARKET TO BELIEVE

10              THAT IT HAD SUCCESSFULLY NAVIGATED THE IPO

11              PERIOD BY INFLATING REPORTED MEGAWATTS

12              BOOKED, SUNRUN BEGAN IN 2016 TO DISCLOSE ITS

13              BACKLOG OF CUSTOMER CANCELLATIONS BY

14              INCORPORATING THESE CANCELLATIONS INTO ITS

15              PERFORMANCE METRICS.  IN MARCH 2016, SUNRUN

16              REVEALED A LOWER GROWTH RATE FOR THAT PERIOD

17              IN MEGAWATTS BOOKED AND IMPORTANTLY PROJECTED

18              SIGNIFICANTLY LOWER GROWTH RATES IN MEGAWATTS

19              DEPLOYED GOING FORWARD THAN SUNRUN'S INFLATED

20              MEGAWATTS BOOKED FIGURES HAD LED ANALYSTS TO

21              EXPECT."

22          I MEAN, THAT -- I DON'T THINK THAT SAYS WHAT I WAS

23    HYPOTHESIZING, WHICH IS THAT THERE GREW A WIDER GULF BETWEEN

24    MEGAWATTS BOOKED AND MEGAWATTS DEPLOYED BECAUSE THE MEGAWATTS

25    BOOKED BECAME A LESS ACCURATE PREDICTOR OF MEGAWATTS DEPLOYED

1   THAN IT WAS BEFORE THEY STARTED -- BEFORE THEY STOPPED

2   REPORTING THESE CANCELLATIONS.

3           **MR. VAN:**  WITH RESPECT TO THAT, THAT IS WHAT WE'RE

4   TRYING TO CONVEY HERE.  AND JUST TO --

5           **THE COURT:**  WELL, WHERE ARE THE NUMBERS?  THERE ARE

6   NUMBERS, RIGHT?  I MEAN, THE COMPANY PUT OUT NUMBERS -- THERE

7   WAS ONE PLACE.  WHERE WAS THE -- WHEN THEY FIRST PUT OUT THE

8   NUMBERS WAS WITH THEIR IPO, RIGHT?  THAT WAS THE FIRST TIME

9   THEY PUT OUT MEGAWATTS BOOKED?

10          **MR. VAN:**  SO I BELIEVE THE NUMBERS ARE IN

11  PARAGRAPH 45.

12          **THE COURT:**  IN PARAGRAPH 45?

13          **MR. VAN:**  WE'RE TALKING ABOUT ANALYSTS --

14          **THE COURT:**  I'M SORRY.  LET ME GO BACK TO THAT.

15          WELL, THIS IS WHAT -- SO ANALYSTS ARE TALKING --

16  THESE ARE NUMBERS THAT ANALYSTS ARE TALKING ABOUT, RIGHT?

17          **MR. VAN:**  RIGHT.

18          **THE COURT:**  OKAY.

19          **MR. VAN:**  AND THE ANALYSTS ARE SAYING:  WE PROJECTED,

20  BASED ON WHAT YOU WERE TELLING US WITH MEGAWATTS BOOKED, THAT

21  YOU WOULD BE DEPLOYING 345 MEGAWATTS, BUT YOU'RE TELLING US

22  YOU'RE JUST GOING TO DEPLOY 285.  THAT LOOKS LIKE A BIG GAP.

23  STOCK PRICE DROPS.

24          **THE COURT:**  BUT WHERE DOES -- WHERE IN THESE QUOTES

25  ARE THE ANALYSTS SAYING:  WE PROJECTED BASED ON MEGAWATTS

1    BOOKED THAT YOU WERE GOING TO BE DEPLOYING "X" OR "Y"?  WHERE

2    DOES IT SAY THAT?

3           **MR. VAN:**  WE ALLEGED IN PARAGRAPH -- IN THE PARAGRAPH

4    WE READ PREVIOUSLY IN 42 --

5           **THE COURT:**  YOU JUST TOLD ME IN PARAGRAPH 45 ANALYSTS

6    SAID THAT THE -- BASED ON MEGAWATTS BOOKED, WE PROJECTED THE

7    COMPANY TO DEPLOY X, Y AND Z, AND THAT ENDED UP BEING WRONG.  I

8    MEAN, I DON'T THINK THAT THE QUOTES THAT YOU INCLUDE IN

9    PARAGRAPH 45 SAY THAT, DO THEY?

10          **MR. VAN:**  THEY DO NOT, YOUR HONOR.  I THINK --

11          **THE COURT:**  OKAY.  WHERE DOES IT SAY THAT?

12          **MR. VAN:**  I THINK YOU HAVE TO PAIR IT WITH

13   PARAGRAPH 42 WHERE WE ALLEGE THAT PROJECTED SIGNIFICANTLY LOWER

14   GROWTH RATES (INDISCERNIBLE) DEPLOYED GOING FORWARD --

15          **THE COURT:**  HOLD ON.  YOU'RE READING TOO FAST.

16   SORRY.  YOU'RE READING FROM PARAGRAPH --

17          **MR. VAN:**  I'M READING THE SECOND HALF OF THE SECOND

18   SENTENCE.

19          **THE COURT:**  OKAY.

20          **MR. VAN:**  "IMPORTANTLY PROJECTED SIGNIFICANTLY.

21          LOWER GROWTH RATES (INDISCERNIBLE) DEPLOYED GOING

22          FORWARD IN SUNRUN'S INFLATED MEGAWATTS BOOKED FIGURES

23          HAS LED ANALYSTS TO EXPECT..."

24          **THE COURT:**  YEAH, BUT THAT'S A -- I MEAN, I WOULD

25   THINK, THEN, THAT YOU WOULD BE ABLE TO POINT TO SOME STATEMENT

1  BY AN ANALYST THAT ACTUALLY SAYS THAT.  YOU'VE GOT THESE QUOTES

2  FROM ANALYSTS THAT SEEM LIKE THEY'RE KIND OF TAKEN OUT OF

3  CONTEXT AND YOU'RE TRYING TO SHOEHORN THEM INTO THE CONCEPT OF

4  ANALYSTS EXPECTED THAT THERE WERE GOING TO BE HIGHER RATES OF

5  MEGAWATTS DEPLOYED BASED ON THE MEGAWATTS BOOKED FIGURES

6  PRESENTED BY THE COMPANY.  I MEAN, WHY -- WHY DIDN'T YOU -- I

7  MEAN -- YOU KNOW, BECAUSE PARAGRAPH 42 -- AND THAT'S JUST IN

8  KIND OF A BARE ALLEGATION ON YOUR PART, AND IT'S NOT REALLY --

9  IN PARAGRAPH 42, IT'S NOT REALLY SUPPORTED BY ANYTHING.  WHAT

10 YOU'RE TELLING ME IS THAT THE SUPPORT COMES FROM PARAGRAPH 45,

11 BUT IT SEEMS LIKE THE ANALYSTS ARE NOT SAYING WHAT YOU SAY THEY

12 THOUGHT IN PARAGRAPH 42.  DOES THAT MAKE SENSE WHAT I SAID?

13      **MR. VAN:**  IT DOES, YOUR HONOR.  NO DOUBT WE COULD GO

14 FIND ANALYSTS, YOU KNOW, WHO RECOGNIZE THAT MEGAWATTS DEPLOYED

15 IS A LAGGING INDICATOR OF MEGAWATTS BOOKED.  THAT ISN'T

16 CONTROVERSIAL, TO BE FRANK WITH THE COURT.

17      THAT IS -- THAT PAIRING IS DERIVABLE FROM PRIOR

18 PARAGRAPHS WE'VE ALREADY GONE OVER.

19      **THE COURT:**  BUT WHERE -- I MEAN, I GUESS -- I'M SORRY

20 I KEEP INTERRUPTING YOU, BUT I GUESS -- SO MY QUESTION I ASKED

21 A WHILE AGO, WHICH I STILL DON'T THINK I'VE GOTTEN AN ANSWER

22 TO, IS:  I WOULD EXPECT THAT YOU WOULD BE ABLE TO PUT IN THE

23 COMPLAINT CLEARLY THE NUMBERS, RIGHT?  IN 2014 MEGAWATTS BOOKED

24 WAS 200, AND MEGAWATTS DEPLOYED WAS 150.  IN 2016, MEGAWATTS

25 BOOKED WAS 200 AND MEGAWATTS DEPLOYED WAS 100, WHICH SHOWS US

1    THAT THE NUMBER BECAME LESS RELIABLE.  IT BECAME A -- IT BECAME

2    A LESS RELIABLE PREDICTER OF MEGAWATTS DEPLOYED.  OR, IN OTHER

3    WORDS -- IN OTHER WORDS, THE MEGAWATTS BOOKED METRIC FROM 2016

4    WAS NOT THE SAME AS THE MEGAWATTS BOOKED METRIC FROM 2014

5    BECAUSE THEY CHANGED HOW THEY WERE -- HOW THEY CALCULATED IT.

6         **MR. VAN:**  WELL, I THINK THEY WOULD HAVE CHANGED

7    ANYWAY BECAUSE THE COMPANY WAS GROWING.  SO I DON'T KNOW THAT,

8    YOU KNOW --

9         **THE COURT:**  RIGHT, THE COMPANY WAS GROWING, BUT I'M

10   JUST -- FINE.  BUT I'M TALKING ABOUT AS A PERCENTAGE, RIGHT?

11        SO LET'S SAY 2016 -- YOU WOULD EXPECT, IF YOUR THEORY

12   WAS TRUE, RIGHT -- LET'S SAY, OKAY, THE COMPANY IS GROWING,

13   RIGHT?  SO IN 2014 IT WAS 200 MEGAWATTS -- THESE ARE

14   HYPOTHETICAL NUMBERS.  IN 2014 IT WAS 200 MEGAWATTS BOOKED,

15   150 MEGAWATTS DEPLOYED.  IN 2016, MAYBE YOU SEE 400 MEGAWATTS

16   BOOKED AND 200 MEGAWATTS DEPLOYED.  AND WHAT YOU SAY FROM THAT

17   IS YOU SAY, WAIT A MINUTE, THERE'S SOMETHING WRONG HERE, RIGHT?

18   BECAUSE IN 2014 THEY WERE GETTING 75 PERCENT OF THE BOOKED

19   MEGAWATTS DEPLOYED AND IN 2016 THEY WERE ONLY GETTING

20   50 PERCENT OF THE BOOKED MEGAWATTS DEPLOYED; THAT SUPPORTS OUR

21   THEORY THAT THEY WERE COOKING THE NUMBERS FOR MEGAWATTS BOOKED.

22   YOU HAVEN'T PUT ANYTHING LIKE THAT IN HERE.

23        **MR. VAN:**  WITH RESPECT, YOUR HONOR, I THINK THAT WE

24   HAVE, AND IT'S IN, AGAIN, PARAGRAPH 45 WHERE THE ANALYSTS SAY,

25   BASED ON MEGAWATTS BOOKED, AND, YOU KNOW HISTORY OF THE WAY

1    THESE THINGS ROLL --

2            **THE COURT:**  YOU KEEP SAYING THINGS THAT ANALYSTS SAY.

3    YOU KEEP CHARACTERIZING --

4            **MR. VAN:**  THIS IS IN PARAGRAPH 45.

5            **THE COURT:**  BUT LET'S SEE WHAT IT ACTUALLY SAYS.

6    LIKE SHOW ME WHAT IT ACTUALLY SAYS.  WHAT QUOTE DO YOU INCLUDE

7    THAT ACTUALLY STANDS FOR THE PROPOSITION THAT WE'RE TALKING

8    ABOUT HERE?

9            **MR. VAN:**  WHICH COMPARES TO OUR ESTIMATE OF --

10           (SIMULTANEOUS COLLOQUY.)

11           **THE COURT:**  WAIT A MINUTE.  HOLD ON.  LET ME MAKE

12   SURE I'M FOLLOWING YOU --

13           SO YOU'RE TALKING ABOUT THE ANALYSTS MATT TUCKER AND

14   BRIAR BUCHANAN --

15           **MR. VAN:**  CORRECT.

16           **THE COURT:**  -- AT KEY BANK CAPITAL MARKETS WROTE IN

17   BOLDED TEXT:

18               "THE FIRST QUARTER AND 2016

19               GUIDANCE BELOW ARE ESTIMATES AND THAT

20               MANAGEMENT EXPECTS TO DEPLOY AROUND

21               285 MEGAWATTS, PLUS 40 PERCENT YEAR OVER YEAR

22               IN 2016, WHICH COMPARES TO OUR ESTIMATE OF

23               345 MEGAWATTS."

24           SO, YEAH.  WHAT THAT SAYS IS THAT:  WE ESTIMATED

25   345 MEGAWATTS DEPLOYED, AND THEY ARE EXPECTING 285 -- THE

```
1    COMPANY IS EXPECTING 285 MEGAWATTS DEPLOYED.  SO THAT SAYS

2    NOTHING ABOUT THE ISSUE THAT I WAS JUST TALKING TO YOU ABOUT,

3    WHICH IS A COMPARISON OF THE RELATIONSHIP BETWEEN MEGAWATTS

4    BOOKED AND MEGAWATTS DEPLOYED IN 2014 AND MEGAWATTS BOOKED

5    AND -- THE RELATIONSHIP BETWEEN MEGAWATTS BOOKED AND MEGAWATTS

6    DEPLOYED IN 2016, AS AN EXAMPLE.

7         MR. VAN:  THAT'S RIGHT, YOUR HONOR.  AND NO DOUBT

8    THAT WOULD PROVIDE ADDITIONAL SUPPORT.  I THINK --

9         THE COURT:  BUT I CAN'T DENY A MOTION TO DISMISS

10   BASED ON WHAT YOU TELL ME AT A HEARING THAT IS NOT IN THE

11   COMPLAINT.

12        MR. VAN:  BUT WHAT IS IN THE COMPLAINT, WHICH DOES

13   NOT TRACK THE PARTICULAR SUPPORT THAT, YOU KNOW, YOU WERE

14   INTERESTED IN JUST NOW, NEVERTHELESS DOES PROVIDE SUFFICIENT

15   SUPPORT TO MAKE IT CLEAR THAT SOMETHING WAS AMISS, THAT THE

16   MEGAWATTS BOOKED FIGURE DID NOT ALIGN WITH THE MEGAWATTS

17   DEPLOYED, AND THERE HAD TO HAVE BEEN SOME REASON FOR THAT

18   SEVERE MISALIGNMENT.

19        THE COURT:  WAIT A MINUTE.  YOU MEAN, BECAUSE --

20   YOU'RE SAYING I SHOULD ASSUME THAT THE REASON ANALYSTS

21   PROJECTED -- THE REASON THESE TWO PEOPLE, MATT TUCKER AND BRIAR

22   BUCHANAN, PROJECTED THE COMPANY TO DEPLOY 345 MEGAWATTS IN 2016

23   WAS BECAUSE OF THE COMPANY'S PRIOR STATEMENTS ABOUT MEGAWATTS

24   BOOKED, AND THAT THE REASON THAT MANAGEMENT NOW EXPECTS TO

25   DEPLOY ONLY 285 MEGAWATTS IS BECAUSE THOSE MEGAWATTS BOOKED
```

1    TOTALS WERE WRONG?  I SHOULD DISCERN THAT FROM -- I SHOULD

2    ASSUME THAT THAT'S WHAT THOSE ANALYSTS WERE SAYING BASED ON THE

3    BARE QUOTATIONS OR PARTIAL QUOTATIONS THAT YOU'VE GIVEN ME?

4         **MR. VAN:**  WELL, THERE SEEMS TO BE AN IMPORTANT

5    DIFFERENCE BETWEEN ASSUMING AND INFERRING.  I THINK THAT YOU

6    CAN INFER FROM THAT STATEMENT AND FROM OTHER STATEMENTS IN THE

7    COMPLAINT, MOST IMPORTANTLY THE ONES WE READ AT THE BEGINNING,

8    DEFINING MEGAWATTS BOOKED AND MEGAWATTS BEING DEPLOYED, BEING

9    CLEAR THAT THE FORMER IS A LEADING INDICATOR OF THE LATTER.

10   THAT FACT, PAIRED WITH THEIR EXPECTATIONS, CERTAINLY MAKES IT,

11   YOU KNOW, A PLAUSIBLE THEORY.

12        **THE COURT:**  I AGREE IT'S PLAUSIBLE THEORY, BUT THAT'S

13   NOT THE TEST.

14        **MR. VAN:**  WELL, I'M NOT SURE THAT FOR FALSITY IT'S

15   HIGHLY PLAUSIBLE.  I MEAN, THERE'S, YOU KNOW, A STRONG

16   INFERENCE THAT WHAT -- THAT WHAT WAS AMISS HERE WAS DUE TO --

17        **THE COURT:**  WHAT WERE THE NUMBERS?

18        **MR. VAN:**  -- WHAT IS OTHERWISE ALLEGED IN THE

19   COMPLAINT.

20        **THE COURT:**  CAN YOU TELL ME --

21        **MR. VAN:**  WHICH IS THAT THERE WAS A SCHEME GOING ON.

22        **THE COURT:**  I KNOW THAT IT'S NOT IN THE COMPLAINT,

23   BUT DO YOU KNOW WHAT THE NUMBERS WERE?

24        **MR. VAN:**  WHICH NUMBERS ARE THOSE?  I'M SORRY?

25        **THE COURT:**  WHAT -- MEGAWATTS BOOKED VERSUS MEGAWATTS

1  DEPLOYED IN 2014 COMPARED TO MEGAWATTS BOOKED VERSUS MEGAWATTS

2  DEPLOYED IN 2016?  DO YOU KNOW WHAT THOSE NUMBERS ARE?

3          **MR. VAN:**  I DO NOT KNOW THEM OFFHAND, UNFORTUNATELY,

4  YOUR HONOR.  I'M SORRY.

5          **THE COURT:**  OKAY.  THERE WAS -- THERE WAS SOMETHING I

6  READ.  WHERE WAS THE -- WHERE'S THE DOCUMENT WHERE THEY FIRST

7  PUT OUT THESE KEY OPERATIONAL METRICS, OR WHATEVER THEY CALL

8  THEM, IN CONNECTION WITH THE IPO?  I WAS LOOKING AT THAT LAST

9  NIGHT.

10          **MR. VAN:**  WHEN THEY FIRST DEFINED THE OPERATIONAL

11  METRICS, IT WOULD BE --

12          **THE COURT:**  IT WAS MAYBE THE -- EXHIBIT 6 OF YOUR

13  DECLARATION; IS THAT RIGHT?  LET'S SEE HERE.

14          SO BECAUSE -- SO IF YOU LOOK AT EXHIBIT -- EXHIBIT 6,

15  TO MS. MUCK'S DECLARATION, RIGHT?  THIS I THINK IS THE FIRST

16  TIME THAT THE COMPANY PUTS OUT ITS DESCRIPTION OF THESE KEY

17  OPERATING METRICS, RIGHT?  IS THAT CORRECT?  IN CONNECTION WITH

18  THE IPO?

19          **MR. VAN:**  I'M NOT CERTAIN, BUT I THINK IT ONLY

20  BECOMES RELEVANT AT THAT POINT.

21          **THE COURT:**  OKAY.  SO, ANYWAY, ON PAGE -- ON THE

22  FOURTH PAGE -- I THINK IT'S THE FOURTH PAGE OF THAT DOCUMENT,

23  IT PUTS OUT NUMBERS FOR THE THREE MONTHS ENDING JUNE 30TH,

24  2015, AND THE THREE MONTHS ENDING JUNE 30TH, 2014.  FOR 2014 IT

25  SAYS 50.8 MEGAWATTS BOOKED AND 35 MEGAWATTS DEPLOYED.  FOR 2015

 1   IT SAYS 61 MEGAWATTS BOOKED, 42 MEGAWATTS DEPLOYED.

 2          SO IT LOOKS LIKE ABOUT THE SAME DIFFERENCE BETWEEN --

 3   I DON'T KNOW, I HAVEN'T DONE THE PERCENTAGE CALCULATION.  BUT

 4   IT LOOKS LIKE ABOUT THE SAME DIFFERENCE BETWEEN MEGAWATTS

 5   BOOKED AND MEGAWATTS DEPLOYED IN THAT 2014 PERIOD AND THE 2015

 6   PERIOD.  IT WOULD BE INTERESTING TO SEE IN THE 2016 PERIOD WHAT

 7   WERE MEGAWATTS BOOKED AND WHAT WERE MEGAWATTS DEPLOYED?  OR IN

 8   THE -- LATER IN 2015 WHAT WERE MEGAWATTS BOOKED VERSUS

 9   MEGAWATTS DEPLOYED.

10          WOULDN'T YOU AGREE THAT ONE WOULD EXPECT THERE TO BE

11   A WIDER GULF BETWEEN THE TWO NUMBERS AFTER THEY STARTED -- THEY

12   STOPPED RECORDING THE CANCELLATIONS?

13          **MR. VAN:**  YES.  AND I THINK THAT GAP IS SHOWN

14   ULTIMATELY BY --

15          **THE COURT:**  WHERE?

16          **MR. VAN:**  IN PARAGRAPH 45.

17          **THE COURT:**  IT'S NOT.  IT'S NOT.  IT'S JUST NOT.  I

18   MEAN --

19          **MR. VAN:**  IT'S NOT YEAR OVER YEAR, ALTHOUGH THERE IS

20   THAT 40 PERCENT METRIC OF YEAR OVER YEAR.  BUT IT DOES SHOW

21   THAT THE MEGAWATTS BOOKED HAD OVERSTATED THE AMOUNT OF

22   MEGAWATTS THAT WERE GOING TO BE DEPLOYED.

23          **THE COURT:**  WELL, BY DEFINITION IT OVERSTATES -- BY

24   DEFINITION MEGAWATTS BOOKED OVERSTATES --

25          **MR. VAN:**  SO TO SUCH AN EXTENT --

1              (SIMULTANEOUS COLLOQUY.)

2          **THE COURT:**  BY DEFINITION -- OR TO PUT IT ANOTHER

3    WAY, MEGAWATTS BOOKED IS NOT -- IF WE ARE TOLD THAT THEY HAVE A

4    HUNDRED MEGAWATTS BOOKED, WE KNOW THAT A HUNDRED MEGAWATTS ARE

5    NOT GOING TO BE DEPLOYED.  WE KNOW THAT IT'S GOING TO BE LESS

6    THAN THAT.  SO IF THAT'S WHAT YOU MEAN, BY DEFINITION,

7    MEGAWATTS BOOKED OVERSTATES MEGAWATTS DEPLOYED, AND EVERYBODY

8    KNOWS THAT BECAUSE EVERYBODY KNOWS THERE ARE GOING TO BE

9    CANCELLATIONS.

10         **MR. VAN:**  YOU ARE ABSOLUTELY RIGHT.  WHAT I MEANT TO

11   SUGGEST IS THAT THE MEGAWATTS BOOKED BASED ON, YOU KNOW, THE

12   OPINIONS OF EXPERTS, PEOPLE WHO FOLLOW THIS COMPANY AND KNOW

13   ALL ABOUT THE COMPANY IN PRIOR YEARS, THEIR PROJECTIONS --

14   TAKING INTO ACCOUNT, YOU KNOW, THE EXPECTED, YOU KNOW,

15   DISCREPANCY BETWEEN BOOKINGS AND DEPLOYMENT, NEVERTHELESS WAS

16   VASTLY OFF.  THEY EXPECTED THERE TO BE 325 WHEN, IN FACT, THERE

17   WERE PROJECTED TO BE 285.

18         **THE COURT:**  AND IN THOSE -- I MEAN, WE'VE BEEN GIVEN

19   THIS VERY TINY SNIPPET OF WHAT THE ANALYSTS SAID, AND IT'S NOT

20   CLEAR WHAT THEIR PROJECTIONS WERE BASED ON.  YOU'RE ASKING ME

21   TO ASSUME THAT THEIR PROJECTIONS ARE BASED ON WHAT THE COMPANY

22   PREVIOUSLY SAID ABOUT MEGAWATTS BOOKED.  IS THERE ANYTHING

23   LIKE -- DO YOU -- HAS ANYBODY INCLUDED IN THE RECORD THE

24   TRANSCRIPTS OF THE ANALYSTS' STATEMENTS, OR THE PRESS RELEASE

25   FROM THE ANALYSTS, OR WHATEVER IT WAS?  DO WE HAVE THAT FULL

1    DOCUMENT ANYWHERE IN THE RECORD?  NO.

2            **MR. VAN:**  I MIGHT HAVE TO ASK -- I DON'T KNOW THE

3    RECORDS AS WELL AS THEY -- I'M NOT CERTAIN --

4            **THE COURT:**  IF, IF YOU COME BACK FOR ANOTHER HEARING,

5    YOU NEED TO BE MUCH MORE FAMILIAR WITH THE COMPLAINT THAT

6    YOU'RE DEFENDING AND THE RECORD RELATING TO THAT COMPLAINT.

7            **MR. VAN:**  THANK YOU, YOUR HONOR.

8            **THE COURT:**  OKAY.  SO IT APPEARS THAT YOU COULD DO A

9    MUCH BETTER JOB OF EXPLAINING HOW BIG A DEAL THESE

10   CANCELLATIONS WERE AND A BETTER JOB OF EXPLAINING THE

11   RELATIONSHIP BETWEEN MEGAWATTS BOOKED AND MEGAWATTS DEPLOYED

12   AND HOW THAT CHANGED OVER TIME AND ANYTHING ELSE TO PROVIDE

13   MORE SPECIFICITY AND CONTEXT TO THIS TO GIVE THE READER A

14   BETTER UNDERSTANDING OF HOW IMPORTANT THIS WAS.

15           BUT LET'S ASSUME FOR THE SAKE OF ARGUMENT THAT THIS

16   WAS A PRETTY IMPORTANT ISSUE.  HOW HAVE YOU GOTTEN BETTER ON

17   THE ISSUE OF INTENT IN THIS COMPLAINT?

18           **MR. VAN:**  WELL, WE PROVIDED WHAT YOUR HONOR ASKED

19   FOR, WHICH WAS A SHOWING OF THE RELATIONSHIP IN THE COMPANY OF

20   THE REGIONAL MANAGERS TO THE CEO AND TO THE INDIVIDUALS THAT WE

21   UNDERSTAND MUST HAVE BEEN ISSUING THIS DIRECTIVE, AND THEY

22   WEREN'T THAT FAR APART, AND THE NUMBER OF REGIONAL MANAGERS WAS

23   NOT THAT GREAT, ALL OF WHICH I THINK IS, YOU KNOW, ACCORDING TO

24   YOUR THINKING AND OUR PRIOR HEARING, VERY HELPFUL.

25           **THE COURT:**  BUT WE STILL DON'T KNOW -- I MEAN, WE

1    STILL DON'T KNOW IF JURICH -- THERE ARE TWO INDIVIDUAL

2    DEFENDANTS, RIGHT?  ONE IS THE CEO, JURICH.

3           **MR. VAN:**  CORRECT.

4           **THE COURT:**  AND THE OTHER IS THE CFO?

5           **MR. VAN:**  CORRECT.

6           **THE COURT:**  THERE'S NOT EVEN -- I MAY HAVE MISSED IT,

7    BUT I DIDN'T EVEN SEE A MENTION OF THE CFO'S INVOLVEMENT IN ANY

8    OF THIS IN THE ENTIRE COMPLAINT.

9           **MR. VAN:**  WELL, SO WE UNDERSTAND HIS INVOLVEMENT, YOU

10   KNOW, TO BE --

11          **THE COURT:**  THE STATEMENT I MADE WAS:  I DIDN'T SEE

12   MENTION OF HIS OR HER INVOLVEMENT IN THE ENTIRE COMPLAINT.  I

13   DON'T CARE WHAT YOUR UNDERSTANDING OF THE CFO'S INVOLVEMENT IS.

14   I'M SAYING DID YOU EXPLAIN THE CFO'S INVOLVEMENT AT ALL

15   ANYWHERE IN THE COMPLAINT?

16          **MR. VAN:**  IN THE ADDITIONAL (INDISCERNIBLE)

17   ALLEGATIONS, WE ALLEGED THAT THE CFO SURELY KNEW ABOUT THIS

18   CRITICAL POLICY THAT WAS DRAMATICALLY IMPACTING THE FINANCES OF

19   THE COMPANY.  IF HE DIDN'T, HE WAS, YOU KNOW, INCONCEIVABLY

20   INEPT.

21          **THE COURT:**  SO HE MUST HAVE KNOWN ABOUT IT, BUT

22   THERE'S NO EXPLANATION OF WHICH CALLS HE WAS ON, WHICH MEETINGS

23   HE WAS AT, WHAT HE WAS INVOLVED IN.

24          **MR. VAN:**  THAT WE DO NOT HAVE, YOUR HONOR.

25          **THE COURT:**  WHO REPORTED TO HIM.  YOU KNOW, THERE'S

1    NO MENTION OF ANYTHING LIKE THAT ANYWHERE IN THE COMPLAINT,

2    RIGHT?

3          **MR. VAN:**  CORRECT.

4          **THE COURT:**  OKAY.  THERE IS MENTION OF JURICH, BUT

5    YOU DON'T KNOW IF JURICH WAS EVEN ON THE CALL.  YOU DON'T KNOW

6    WHETHER JURICH ISSUED ANY DIRECTIVE, RIGHT?

7          **MR. VAN:**  THE INFERENCE THAT SHE KNEW ABOUT THIS IS

8    AT LEAST AS COMPELLING AS THE INFERENCE THAT SHE DIDN'T GET THE

9    MEMO, AND THAT IS ALL THAT NEEDS TO BE SHOWN FOR THIS MOTION TO

10   DISMISS TO BE DENIED.

11         **THE COURT:**  WELL --

12         **MR. VAN:**  BASED ON SCIENTER.

13         **THE COURT:**  I MEAN, I WOULD ASSUME THAT A LOT -- I

14   MEAN, AGAIN, WE ARE ASSUMING FOR THE -- I MEAN, IT SEEMS TO ME

15   THAT MATERIALITY AND INTENT ARE BOUND UP IN ONE ANOTHER IN THIS

16   CASE, BECAUSE YOU ARE -- YOU'RE -- IT'S A *BURSON* ARGUMENT THAT

17   YOU'RE MAKING, RIGHT?  IT'S THIS WAS SO IMPORTANT THAT THEY

18   MUST HAVE KNOWN THAT IT WAS GOING ON, AND THEY MUST HAVE

19   DIRECTED IT, RIGHT?  I MEAN, THAT'S BASICALLY WHAT YOU'RE

20   SAYING.

21         GO AHEAD.

22         **MR. VAN:**  THAT'S CERTAINLY A SIGNIFICANT COMPONENT,

23   BUT WE ACTUALLY HAVE MORE THAN *BURSON* HERE.  WE HAVE -- NOW WE

24   HAVE A CHAIN OF COMMAND.

25         **THE COURT:**  YOU HAVE WHAT?

1          **MR. VAN:**  WELL, FACTS IDENTIFYING WHERE THIS WAS

2     TAKING PLACE (INDISCERNIBLE) CLEARLY KNEW ABOUT IT AND HOW

3     CLOSELY THEY WERE CONNECTED TO THE CEO.

4          AND WE ALSO HAVE SUGGESTION ABOUT THE UBIQUITY OF THE

5     COMPANY, THAT LOTS AND LOTS OF PEOPLE SEEM TO KNOW THAT THIS

6     WAS GOING ON, AND THAT'S SOMETHING MORE THAN *BURSON* HAD.

7     *BURSON* WAS JUST THIS IS A REALLY, REALLY BIG IMPORTANT FOR THE

8     COMPANY.

9          **THE COURT:**  RIGHT.  AND LOTS AND LOTS OF PEOPLE KNEW

10     THAT IT WAS GOING ON IN *BURSON* AND -- BUT IT WAS SUCH A --

11          **MR. VAN:**  THAT WASN'T PART OF THE COURT'S --

12          **THE COURT:**  BUT IT WAS AN IMPORTANT THING --

13          **MR. VAN:**  SO IMPORTANT, YEAH.

14          **THE COURT:**  -- THAT THE EXECUTIVES ALSO MUST HAVE

15     KNOWN WHAT WAS GOING ON, RIGHT, AND MUST HAVE BEEN INVOLVED --

16          **MR. VAN:**  EXACTLY.  AND HERE NOT ONLY IS IT SO

17     IMPORTANT, BUT IT'S ALSO WE CAN ALLEGE A WIDELY KNOWN FACT

18     WITHIN THE COMPANY, BOTH OF WHICH, YOU KNOW, YEAH, UNDER

19     CONTROLLING LAW STRONGLY SUGGEST THAT SCIENTER HAS BEEN

20     SUFFICIENTLY PLED.

21          **THE COURT:**  BUT WIDELY KNOWN AMONG REGIONAL SALES

22     MANAGERS, RIGHT?

23          **MR. VAN:**  AND AMONG THE REGIONAL MANAGERS AND,

24     APPARENTLY, THE VICE PRESIDENT OF SALES HIMSELF.

25          **THE COURT:**  APPARENTLY?

1          **MR. VAN:**  YES.  THIS IS WHAT'S ALLEGED IN THE

2     COMPLAINT.  WE HAVEN'T PROVEN THESE ALLEGATIONS.

3          **THE COURT:**  AND WHERE DOES -- WHERE IS -- WHY DON'T

4     YOU GO -- WHY DON'T YOU SHOW ME WHERE I GO IN THE COMPLAINT TO

5     LEARN ABOUT THE VICE PRESIDENT OF -- THE VICE PRESIDENT OF

6     SALES' KNOWLEDGE?

7          **MR. VAN:**  SO I THINK CONFIDENTIAL WITNESS 3 MAKES

8     CLEAR THAT.

9          **THE COURT:**  WHAT PARAGRAPH?

10         **MR. VAN:**  THIRTY-FOUR.  THERE WERE WEEKLY AND

11    NATIONWIDE CONFERENCE CALLS ATTENDED BY ALL THE REGIONAL SALES

12    MANAGERS, REGIONAL SALES DIRECTORS, AND VICE PRESIDENTS OF

13    SALES.

14         **THE COURT:**  VICE PRESIDENTS OF SALES?

15         **MR. VAN:**  SO --

16         **THE COURT:**  ON YOUR ORG CHART, IS THAT THE PERSON WHO

17    YOU PUT JUST BELOW LYNN JURICH?

18         **MR. VAN:**  YES.  AND OUR UNDERSTANDING IS THAT THAT

19    INDIVIDUAL REPORTED DIRECTLY TO CEO LYNN JURICH.

20         **THE COURT:**  AND WHERE IS -- WHERE IS THAT PARAGRAPH

21    AGAIN?  SORRY, WHICH PARAGRAPH IS THAT AGAIN?

22         **MR. VAN:**  DIAGRAM A --

23         **THE COURT:**  NO.  THE ONE YOU JUST READ TO ME.

24         **MR. VAN:**  THIRTY-FOUR.

25         **THE COURT:**  OKAY.  LET ME LOOK AT THAT REAL QUICK.

1          OKAY.  SO THIS IS THE ONE:

2                    "CW 3 HAS CONFIRMED THAT SUNRUN

3          HELD WEEKLY NATIONWIDE CONFERENCE CALLS

4          ATTENDED BY ALL REGIONAL SALES MANAGERS,

5          REGIONAL SALES DIRECTORS, AND VICE PRESIDENTS

6          OF SALES."

7          I THOUGHT -- FROM YOUR ORG CHART IT LOOKED LIKE THERE

8     WAS JUST ONE VICE PRESIDENT OF SALES.  IS THAT WRONG?

9          **MR. VAN:**  THAT'S NOT WRONG.

10          **THE COURT:**  OKAY.

11          **MR. VAN:**  MY UNDERSTANDING.  OVER TIME THERE WERE

12     MULTIPLE VICE PRESIDENTS.  I BELIEVE THAT'S WHAT'S BEING

13     (INDISCERNIBLE).

14          **THE COURT:**  BUT THERE WAS ONE AT A TIME?

15          **MR. VAN:**  THAT'S OUR UNDERSTANDING.

16          **THE COURT:**  OKAY.

17          **MR. VAN:**  WHO PREVIOUSLY WAS -- WAS ALTERNATIVELY

18     REFERRED TO AS THE CHIEF SALES OFFICER, I BELIEVE, WHEN IT WAS

19     BILL (INDISCERNIBLE).

20          **THE COURT:**  OKAY.  ALL RIGHT.  AND THAT PERSON WAS

21     DIRECTLY BELOW JURICH?

22          **MR. VAN:**  REPORTED DIRECTLY TO JURICH.

23          **THE COURT:**  REPORTED DIRECTLY TO JURICH.  OKAY.

24          AND SO THE ALLEGATION, I GUESS, IS THAT EITHER JURICH

25     WAS ON THIS CALL OR AT A MINIMUM THE VICE PRESIDENT OF SALES

1    WAS ON THE CALL?

2          **MR. VAN:**  CORRECT.  THAT'S OUR ALLEGATION.

3          **THE COURT:**  OKAY.  I MEAN, IS THERE -- IS THERE -- I

4    MEAN, THERE'S -- IN THESE COMPANIES -- I MEAN, I THINK THERE'S

5    OBVIOUSLY A LOT OF PRESSURE TO HIT NUMBERS, RIGHT?  AND, YOU

6    KNOW, I ASSUME THAT WITH SOME FREQUENCY, THERE WILL BE PRESSURE

7    FROM A CEO, OR A CFO, OR WHOEVER TO HIT NUMBERS, BUT NOT A

8    SPECIFIC DIRECTIVE FROM A CEO OR A CFO ABOUT WHAT TO DO TO HIT

9    THE NUMBERS.  IT'S JUST LIKE:  DO BETTER, YOU ALL GOT TO DO

10   BETTER, RIGHT?

11         WHY -- WHY ISN'T IT SORT OF A MORE COMPELLING

12   INFERENCE FROM THE FACTS AS YOU'VE ALLEGED THEM HERE THAT THIS

13   WAS JUST A SITUATION OF:  ALL RIGHT, GUYS, WE GOT TO DO BETTER,

14   BECAUSE WE GOT OUR IPO COMING UP?  AND THEN IT WAS -- A

15   DECISION WAS MADE AT A LOWER LEVEL TO STOP REPORTING THESE

16   CANCELLATIONS SO THAT -- SO THAT THEY WOULD DO A BETTER JOB OF

17   MEETING THEIR PROJECTIONS.

18         **MR. VAN:**  WELL, WE HAVE TWO WITNESSES WHO CLAIM THAT

19   THEY WERE GIVEN A DIRECTIVE, NOT JUST TO DO BETTER, BUT TO STOP

20   REPORTING CANCELLATIONS, ON A CONFERENCE CALL AND THESE

21   CONFERENCE CALLS, APPARENTLY, WERE NATIONAL AND INVOLVED THE

22   HIGHER-UPS, INCLUDING THE VICE PRESIDENT OF SALES WHO --

23         **THE COURT:**  AND IF IT WAS JUST THE VICE PRESIDENT OF

24   SALES ON THAT CALL -- YOU STILL HAVE TO -- YOU STILL HAVE TO

25   MAKE THE LEAP TO CONCLUDE -- I MEAN, MAYBE IT'S NOT A HUGE

1    LEAP, BUT YOU STILL NEED TO MAKE THE LEAP AND ASSUME OR INFER

2    THAT BECAUSE THE VICE PRESIDENT OF SALES WAS ON THIS CALL, THAT

3    THE CEO MUST HAVE BEEN AWARE OF OR INVOLVED IN THE DIRECTION TO

4    CANCEL -- TO STOP REPORTING THESE CANCELLATIONS; IS THAT RIGHT?

5            **MR. VAN:**  THAT'S CORRECT, BUT SURELY HERE THE

6    INFERENCE THAT SHE KNEW IS AT LEAST AS COMPELLING AS THE

7    INFERENCE THAT SHE DIDN'T KNOW.

8            **THE COURT:**  OKAY.  DO YOU HAVE ANYTHING YOU'D LIKE TO

9    SAY?

10           **MS. MUCK:**  A COUPLE POINTS, YOUR HONOR.

11           WITH RESPECT TO THE ORG CHART ON PAGE 6 OF

12   PLAINTIFF'S COMPLAINT, I WANTED TO POINT OUT AGAIN THERE IS NO

13   ALLEGATION BY ANY CONFIDENTIAL WITNESS OR ANY -- ANYONE ELSE

14   THAT THIS IS AN ACCURATE DEPICTION OF THE REPORTING

15   RELATIONSHIP AT THE COMPANY.

16           THE BOXES PURPORT TO OR APPEAR TO REPRESENT OR

17   REFLECT A SINGLE INDIVIDUAL IN EACH PLACE, YET IF ONE LOOKS AT

18   THE ALLEGATION AT PARAGRAPH 24, WHAT PLAINTIFFS ARE REALLY

19   SHOWING HERE, EVEN IF YOU TAKE THEIR ALLEGATIONS AS ACCURATE,

20   ARE BETWEEN 600 AND 800 EMPLOYEES AMONG THE FIELD SALES

21   CONSULTANTS AND THE REGIONAL SALES STAFF.

22           AND SO, TO ME, THE REASON THAT THIS IS NOT AT LEAST

23   AS COMPELLING EVIDENCE OF SCIENTER AS THE OPPOSITE, IS THAT WE

24   HAVE A CHART HERE THAT BY PLAINTIFF'S OWN DESCRIPTION REFLECTS

25   800 POTENTIAL EMPLOYEES, NOT ONE OF WHOM HAS PROVIDED

```
1    PLAINTIFFS WITH A STATEMENT THAT LYNN JURICH, MUCH LESS BOB
2    KOMIN, WAS AWARE OF THIS SUPPOSED CALL.
3              THE COURT:  BUT IF THIS -- BUT IF THIS -- BUT IF THIS
4    CHART IS ACCURATE, AS I UNDERSTAND THE ALLEGATIONS, WE CAN --
5    AT A MINIMUM, THE VP OF SALES WAS ON THE CALL, AND THE REGIONAL
6    SALES DIRECTORS AND THE REGIONAL SALES MANAGERS WERE ON THE
7    CALL, AND ON THIS CALL A DIRECTION WAS GIVEN TO THE REGIONAL
8    SALES MANAGERS TO STOP REPORTING THE CANCELLATIONS.  THAT'S THE
9    ALLEGATION.
10             MS. MUCK:  I DON'T BELIEVE THAT'S IN THE COMPLAINT,
11   BUT I UNDERSTAND THAT'S WHAT PLAINTIFF IS SAYING NOW.
12             THE COURT:  WELL, I THINK --
13             MS. MUCK:  I DON'T BELIEVE THAT THERE'S AN ALLEGATION
14   THAT THE VP OF SALES.
15             THE COURT:  I THINK I DISCERN THAT.  I FEEL, THAT
16   LIKE, IS THE ALLEGATION.
17             MS. MUCK:  I RESPECTFULLY DIDN'T SEE THAT IN THE
18   COMPLAINT, BUT IT MAY BE.
19             AND THEN THE OTHER POINT I WOULD MAKE, YOUR HONOR,
20   IS --
21             THE COURT:  BUT IF THAT'S THE ALLEGATION, WHY -- I
22   MEAN, YOU'RE TALKING ABOUT 600 TO 800 EMPLOYEES.  I MEAN, THE
23   VAST MAJORITY OF THOSE ARE THE FIELD SALES CONSULTANTS, BUT THE
24   ALLEGATION IS ABOUT A CONFERENCE CALL WHERE I BELIEVE REGIONAL
25   SALES MANAGERS WERE DIRECTED TO STOP REPORTING THESE
```

1    CANCELLATIONS.

2              **MS. MUCK:**  IF THAT WERE THE CASE, YOUR HONOR, WE

3    WOULD HAVE THOUGHT THAT AT LEAST ONE OF THE CWS WOULD

4    SPECIFICALLY ATTEST TO THE FACT THAT THAT HAD BEEN THE

5    DIRECTION AND THAT MS. JURICH OR MR. KOMIN WAS AWARE OF IT, AND

6    WE DON'T SEE THAT IN THE COMPLAINT.

7              THE ONLY OTHER POINT I WOULD MAKE AT THIS TIME, YOUR

8    HONOR, IS THAT MEGAWATTS BOOKED WERE NOT DISCLOSED IN THE

9    PROSPECTUS.  THERE WAS NEVER ANY GUIDANCE PROVIDED FOR

10   MEGAWATTS BOOKED, WHICH IS PART OF THE REASON WHY WE BELIEVE

11   THAT WHILE IT WAS --

12             **THE COURT:**  BUT AFTER THE IPO, YOU PUT OUT MEGAWATTS

13   BOOKED, AND YOU COMPARED IT TO MEGAWATTS DEPLOYED, AND YOU

14   COMPARED MEGAWATTS BOOKED AND MEGAWATTS DEPLOYED IN 2014 TO

15   MEGAWATTS BOOKED AND MEGAWATTS DEPLOYED IN 2015.

16             **MS. MUCK:**  CORRECT.

17             **THE COURT:**  SO WHY DOES IT MATTER THAT IT'S NOT -- I

18   DON'T UNDERSTAND WHY IT MATTERS THAT IT WASN'T IN THE

19   PROSPECTUS.

20             **MS. MUCK:**  IT'S NOT A METRIC AS TO WHICH WE GAVE

21   GUIDANCE.

22             **THE COURT:**  RIGHT.

23             **MS. MUCK:**  THAT WAS THE POINT I WAS MAKING.

24             **THE COURT:**  OKAY.  BUT WHY DOES THAT -- WHY DOES THAT

25   MATTER?  I MEAN, THE POINT -- I WOULD NOT NECESSARILY EXPECT

1   YOU TO GIVE GUIDANCE ON MEGAWATTS BOOKED BECAUSE THE POINT OF

2   MEGAWATTS BOOKED IS TO GIVE SOME DEGREE OF GUIDANCE, LOOSE

3   GUIDANCE, LOOSE -- ONE CLUE, MAYBE ONE CLUE OF MANY AS TO HOW

4   MANY MEGAWATTS ARE GOING TO BE DEPLOYED.

5         **MS. MUCK:**  I AGREE IT IS A CLUE.  I DON'T BELIEVE IT

6   IS A METRIC AS TO WHICH ANALYSTS WOULD HAVE DEVELOPED MODELS.

7   AND THAT'S WHY I DON'T BELIEVE YOU WILL SEE A STATEMENT BY

8   ANALYSTS THAT THE MEGAWATTS BOOKED FIGURE WAS IN ANY WAY

9   MISLEADING.  IN FACT, AS WE POINTED OUT IN OUR MOTION TO

10  DISMISS, WHEN THE COMPANY DID, IN FACT, NOTE CANCELLATIONS HAD

11  INCREASED, ANALYSTS RESPONDED WITH STATEMENTS LIKE:  THAT'S NOT

12  A SURPRISE; WE KNEW THAT MEGAWATTS BOOKED WOULD NOT NECESSARILY

13  REFLECT MEGAWATTS DEPLOYED BECAUSE CUSTOMERS DO, IN FACT,

14  CANCEL.

15        **THE COURT:**  YEAH, ALTHOUGH THE -- ALTHOUGH INCREASED

16  CANCELLATIONS MIGHT BE A SURPRISE, RIGHT?  I MEAN, THE FACT

17  THAT THERE ARE CANCELLATIONS IS OBVIOUSLY NOT A SURPRISE, BUT

18  INCREASED CANCELLATIONS, I ASSUME, COULD BE A SURPRISE.

19        **MS. MUCK:**  IT COULD HAVE BEEN HAD IT BEEN MATERIAL

20  AND UNDISCLOSED.  AS WE SHOW IN AUGUST OF 2016, THE COMPANY

21  DID, IN FACT, DISCLOSE INCREASED CANCELLATIONS.

22        I KNOW PLAINTIFFS HAVE ALLEGED THAT SOMEHOW THAT

23  STATEMENT WASN'T SUFFICIENT.  I DON'T BELIEVE THERE'S ANY

24  FACTUAL BASIS FOR THAT OR LEGAL BASIS AS TO WHY THAT WOULD NOT

25  BE SUFFICIENT.

```
 1            THE COURT:  WHEN -- WHEN WAS THIS NEVADA BUSINESS?
 2    WHEN THE NEVADA -- IT WAS THE NEVADA PUC --
 3            MS. MUCK:  YES.
 4            THE COURT:  -- DECIDED THAT -- I DON'T REMEMBER THE
 5    TERM FOR IT, BUT THAT PEOPLE'S EXCESS ELECTRICITY COULDN'T BE
 6    CIRCLED BACK INTO THE SYSTEM OR SOMETHING LIKE THAT?
 7            MS. MUCK:  CORRECT.
 8            THE COURT:  (INDISCERNIBLE) IN THE POCKETS OF THE
 9    TRADITIONAL UTILITIES.
10            MS. MUCK:  YES.
11            THE COURT:  SO WHEN DID THAT HAPPEN?
12            MS. MUCK:  THAT HAPPENED IN DECEMBER OF 2015 JUST
13    AFTER THE IPO.
14            THE COURT:  OKAY.
15            MS. MUCK:  ALL OF THAT BECOMES THE SUBJECT OF
16    SIGNIFICANT DISCLOSURE.  THE COMPANY IN JANUARY OF 2016
17    ANNOUNCES IT'S GOING TO BE EXITING NEVADA, AND, ULTIMATELY,
18    THERE ARE CANCELLATIONS OF NEVADA CONTRACTS AS REFLECTED IN THE
19    MARCH PRESS RELEASE.
20            THE COURT:  WHERE'S THE MARCH PRESS RELEASE?  I WANT
21    TO LOOK AT THAT.
22            MS. MUCK:  EXHIBIT 8 TO MY DECLARATION, YOUR HONOR.
23            THE COURT:  OKAY.
24            MS. MUCK:  APOLOGIES.  THAT'S THE 10Q.
25            EXHIBIT 11 TO MY DECLARATION.
```

1          **THE COURT:**  AND WHAT PAGE?

2          **MS. MUCK:**  IT'S PAGE 6 OF THE .PDF.

3          **THE COURT:**  OKAY.  SO THIS IS WHEN YOU'RE -- THIS IS

4     IN MARCH OF 2016 YOU'RE ANNOUNCING FINANCIAL RESULTS FOR THE

5     FOURTH QUARTER OF 2015 AND FOR THE FULL YEAR OF 2015?

6          **MS. MUCK:**  CORRECT.

7          **THE COURT:**  AND THERE YOU'VE GOT 80 MEGAWATTS BOOKED,

8     68 MEGAWATTS DEPLOYED.

9          **MS. MUCK:**  AND THE CARRYOVER PARAGRAPH FROM PAGE 5 TO

10    PAGE 6 REFERS TO THE IMPACT OF THE NEVADA CANCELLATIONS.

11         **THE COURT:**  ALL RIGHT.  LET ME LOOK AT THAT REAL

12    QUICK.

13                    "IN FULL YEAR 2015 MEGAWATTS BOOKED

14              INCREASED TO 274 MEGAWATTS FROM 148 MEGAWATTS

15              IN FULL YEAR 2014, AND MEGAWATTS DEPLOYED

16              INCREASED TO 203 MEGAWATTS FROM 115 MEGAWATTS

17              IN FULL YEAR 2014, SLIGHTLY BELOW OUR

18              GUIDANCE OF 25 MEGAWATTS FOR 25, PRIMARILY

19              DUE TO THE CLOSURE OF THE NEVADA MARKET.

20              THIS RESULTED IN 85 PERCENT MEGAWATTS

21              YEAR-OVER-YEAR ORGANIC GROWTH IN MEGAWATTS

22              BOOKED AND 76 PERCENT YEAR-OVER-YEAR ORGANIC

23              GROWTH IN MEGAWATTS DEPLOYED."

24              AND THEN I ASSUME THERE WAS A CONFERENCE CALL WHERE

25    THIS WAS DISCUSSED MORE.  IS THAT IN THE --

```
 1              MS. MUCK:  THAT'S CORRECT, YOUR HONOR.

 2              THE COURT:  -- IS THAT IN THE RECORD?

 3              MS. MUCK:  THE -- THE REFLECTION OF THE DISCUSSIONS

 4    AT THAT CONFERENCE CALL ARE IN THE ANALYSTS' REPORTS THAT

 5    PLAINTIFFS AND WE CITED.

 6              THE COURT:  OKAY.  BUT YOU SAID THAT YOU DIS- -- MADE

 7    A DISCLOSURE ABOUT THE CANCELLATIONS THAT RESULTED FROM THE

 8    NEVADA CLOSURE.  IS THAT THE LANGUAGE THAT YOU JUST POINTED ME

 9    TO?

10              MS. MUCK:  YES, YOUR HONOR.

11              THE COURT:  I DON'T SEE ANY SPECIFIC REFERENCE --

12              MS. MUCK:  OH.

13              THE COURT:  -- TO CANCELLATIONS THERE.

14              MS. MUCK:  AT PAGE 20 -- I'M SORRY.  EXHIBIT 20 OF MY

15    DECLARATION.

16              THE COURT:  OKAY.

17              MS. MUCK:  WE HAVE THE TRANSCRIPT OF THE CONFERENCE

18    CALL.

19              THE COURT:  OKAY.

20              MS. MUCK:  AND IN THE CONFERENCE CALL SCRIPT, WE

21    NOTED AT VARIOUS POINTS THE IMPACT OF NEVADA, BUT PROBABLY THE

22    CLEAREST WAY TO SEE THAT WOULD BE ON PAGE 4 OF 16.  SO IT'S

23    PAGE 3 OF THE SCRIPT.

24              THE COURT:  OKAY.

25              MS. MUCK:  THE SECOND FULL PARAGRAPH:
```

1                     "WE EXPECT TO ACHIEVE THIS GROWTH

2              OF 40 PERCENT IN 2016 DESPITE HEADWINDS FROM

3              OUR NEVADA EXIT.  BECAUSE OF THIS MARKET'S

4              CLOSURE, WE CANCELED APPROXIMATELY

5              12 MEGAWATTS OF BACKLOG," ET CETERA.

6          **THE COURT:**  SO THAT IS A -- THAT'S A LOT OF -- IT

7     APPEARS THAT'S A LOT IN THE GRAND SCHEME OF THINGS.  IT'S A LOT

8     OF CANCELLATIONS.

9          **MS. MUCK:**  THAT WE AGREE IS A SIGNIFICANT

10    CANCELLATION AS A RESULT OF A COMPLETELY UNFORESEEABLE EVENT,

11    THE NEVADA EVENT.

12              AND IN THE PROSPECTUS, OBVIOUSLY, WE DISCLOSED

13    SIGNIFICANT CAUTIONS ABOUT THE POTENTIAL IMPACT OF THE NEVADA

14    PUC AND OTHER PUC ACTIVITIES THROUGHOUT THE UNITED STATES.  AND

15    SO THIS IS A REFLECTION OF THE FACT THAT THE MARCH 2016 PRESS

16    RELEASE, IN OUR VIEW, DESCRIBED WHAT THE IMPACT WAS OF NEVADA

17    IS NOT A DISCLOSURE THAT IN ANY WAY REFLECTS ANY KIND OF

18    MISLEADING OR ERRONEOUS INFORMATION OR DELAYED CANCELLATIONS.

19    THIS REFLECTS A FORTHRIGHT DESCRIPTION OF EXACTLY WHAT HAPPENED

20    AS A RESULT OF THE NEVADA PUC DECISION IN DECEMBER.

21          **THE COURT:**  AND I GUESS THAT -- I MEAN, I'VE BEEN

22    TALKING ABOUT HOW WE -- YOU KNOW, IT'S HARD TO GET A SENSE FROM

23    THE COMPLAINT REGARDING THE IMPORTANCE OF MEGAWATTS BOOKED

24    GENERALLY, THE IMPORTANCE OF THE CANCELLATIONS, THE IMPORTANCE

25    OF THE RELATIONSHIP BETWEEN MEGAWATTS BOOKED AND MEGAWATTS

1    DEPLOYED.

2            I GUESS A MORE -- A BETTER WAY TO PUT IT IS -- OR

3    MAYBE AN ADDITIONAL POINT TO MAKE ABOUT THAT IS THAT WE ALSO

4    DON'T HAVE AN UNDERSTANDING OF THE MAGNITUDE OR THE IMPACT OF

5    CANCELLATIONS OTHER THAN THE ONES RESULTING FROM THE NEVADA

6    CLOSURE, AND WE DON'T HAVE AN UNDERSTANDING OF THE MAGNITUDE OR

7    THE IMPACT OF THE FAILURE TO REPORT CANCELLATIONS WHEN YOU TAKE

8    THE NEVADA CLOSURE OUT OF THE MIX.

9            **MS. MUCK:**  EXACTLY.

10           **THE COURT:**  OKAY.  ALL RIGHT.

11           YOU WANT TO HAVE THE LAST WORD?

12           **MR. VAN:**  WELL, SO, WE DON'T THINK THAT -- WE THINK

13   THE COMPANY WAS BASICALLY LYING, TO SOME EXTENT, ABOUT THE

14   NEVADA CANCELLATIONS.

15           **THE COURT:**  WHAT?  SORRY.  SAY AGAIN.

16           **MR. VAN:**  WE BELIEVE TO SOME EXTENT THE COMPANY WAS

17   OVERSTATING THE CANCELLATIONS THAT WERE ATTRIBUTABLE TO NEVADA.

18   IT GOES ALONG WITH THE NARRATIVE.  IT WAS VERY CONVENIENT THAT

19   THEY CLOSED THEIR NEVADA --

20           **THE COURT:**  WHAT DO YOU MEAN IT WAS VERY CONVENIENT?

21   DO YOU THINK THEY WANTED TO CLOSE?

22           **MR. VAN:**  NO, NO, NO, NO.  BUT THAT THEN WAS AN

23   OPPORTUNITY FOR THEM TO PUT IN THE BACKLOG OF CANCELLATIONS

24   BECAUSE THERE WAS THIS EXCUSE.  ANALYSTS DID COME OUT AND SAY:

25   WE'RE SHOCKED THAT NEVADA HAD SUCH A SIGNIFICANT PERCENTAGE OF

```
 1   THE OPERATIONS OF SUNRUN.  WE WOULD NOT HAVE THOUGHT THAT, YOU
 2   KNOW, THIS LITTLE STATE ACCOUNTED FOR --
 3              THE COURT:  WHERE IS THAT?
 4              MR. VAN:  THAT WOULD HAVE TO BE ADDED TO THE
 5   COMPLAINT, YOUR HONOR.
 6              THE COURT:  OKAY.
 7              MR. VAN:  THERE ARE TWO SEPARATE THEORIES OF
 8   LIABILITY HERE, AND I THINK WE SHOULD BE CLEAR ABOUT THAT,
 9   BECAUSE DEFENDANTS BROUGHT UP THE SECOND, AND YOUR HONOR HAS
10   NOT DELVED INTO IT MUCH IN THIS HEARING.
11              JUST TO BE CLEAR, THE SECOND THEORY IS THAT IN
12   AUGUST 2016, THE COMPANY STATED THAT THERE WERE INCREASED
13   CUSTOMER CANCELLATIONS, BUT THAT IF THOSE INCREASED CUSTOMER
14   CANCELLATIONS CONTINUED, THEN POTENTIALLY THAT INCREASE,
15   SUNRUN'S OPERATIONS WOULD BE MATERIALLY AND ADVERSELY AFFECTED.
16              THERE'S PLENTY OF CASE LAW THAT SUGGESTS THAT IF YOU
17   MAKE A STATEMENT OF SOME RISK AND YOU STATE THAT THAT RISK IS
18   MERELY A POSSIBILITY WHEN, IN FACT, IT'S ALREADY MATERIALIZED,
19   YOU'RE MISLEADING THE PUBLIC.
20              THE COURT:  BUT WHERE DO YOU SHOW IN THE COMPLAINT OR
21   WHERE DO YOU ALLEGE WITH SPECIFICITY IN THE COMPLAINT THAT
22   INCREASED CANCELLATIONS WERE -- WERE AFFECTING THE BOTTOM LINE?
23              MR. VAN:  YES.  SO IT COULD NOT BE CLEARER.  IT IS CW
24   5 WHO STATES THAT INCREASED --
25              THE COURT:  CW -- WHY DO YOU CALL HIM -- HIM OR HER
```

1    CW 5?  IT'S A WALL STREET JOURNAL REPORTER.  WHY DON'T YOU JUST

2    IDENTIFY THE PERSON AS THE WALL STREET JOURNAL REPORTER?  ARE

3    YOU TRYING TO MAKE -- ARE YOU TRYING TO CREATE THE IMPRESSION

4    THAT IT'S LIKE SOMEBODY INSIDE THE COMPANY?

5              **MR. VAN:**  NO, NO, NO, NOT AT ALL.

6              **THE COURT:**  THEN WHY ARE YOU CALLING THEM CW FIVE?

7              **MR. VAN:**  IT WAS SOME ATTEMPT TO PRESERVE THE PRIVACY

8    OF THE JOURNALIST.

9              **THE COURT:**  BUT YOU MAKE CLEAR IN THE COMPLAINT THAT

10   IT'S THE WALL STREET JOURNAL REPORTER.

11             **MR. VAN:**  WE DON'T, YOUR HONOR.

12             **THE COURT:**  IT'S OBVIOUS FROM THE COMPLAINT THAT IT'S

13   THE WALL STREET JOURNAL REPORTER.

14             **MR. VAN:**  IT WAS JUST A MEASURE OF PRIVACY AFFORDED

15   AS A COURTESY.  I AGREE WITH THE COURT.

16             **THE COURT:**  IT'S SILLY.

17             ANYWAY, THE WALL STREET JOURNAL REPORTER SAID WHAT?

18             **MR. VAN:**  THAT --

19             **THE COURT:**  WHAT PARAGRAPH?

20             **MR. VAN:**  NINETY-SIX ADDRESSES IT.

21             **THE COURT:**  OKAY.  ALL RIGHT.

22             **MR. VAN:**  SO THIS JOURNALIST SPOKE DIRECTLY WITH

23   EITHER DEFENDANT JURICH, DEFENDANT KOMIN --

24             **THE COURT:**  IT'S TOTALLY -- I DON'T SEE HOW WE CAN

25   RELY ON THAT AT ALL.  YOU HAVE A -- FIRST OF ALL, IT'S A

1    REPORTER.  SECOND OF ALL, THE REPORTER ISN'T EVEN SAYING WHO

2    THEY SPOKE TO.

3              **MR. VAN:**  SO FOR THE PURPOSE --

4              **THE COURT:**  I DON'T SEE HOW WE CAN RELY ON THIS AT

5    ALL, BUT EVEN IF WE WERE RELYING ON THIS, TELL ME WHAT IT SAYS.

6              **MR. VAN:**  THAT THE COMPANY DECIDED PRIOR TO THIS

7    AUGUST 2016 STATEMENT TO --

8              **THE COURT:**  WAIT.  HOLD ON.  READ IT TO ME.  WHERE IS

9    IT?  EITHER THE INDIVIDUAL --

10             **MR. VAN:**  -- DEFENDANTS THEMSELVES.

11             **THE COURT:**  OKAY.  BUT THAT'S YOUR WORDS.  WHERE ARE

12   YOU DESCRIBING WHAT THE WALL STREET JOURNAL REPORTER SAID?

13             **MR. VAN:**  SO THAT STATEMENT THERE COMES FROM CW 5,

14   THE STATEMENT THAT EITHER THE INDIVIDUAL DEFENDANTS THEMSELVES

15   OR ELSE THE CHAIRMAN OF THE BOARD OF SUNRUN HAS ADMITTED THAT

16   SUNRUN WAS FORCED TO LOWER ITS GROWTH --

17             **THE COURT:**  NO, THAT DOESN'T COME FROM -- THAT'S YOUR

18   CHARACTERIZATION -- THAT'S YOUR CONCLUSION FROM WHAT CW 5 SAID.

19   SO WHAT DID CW 5 SAY?

20             **MR. VAN:**  CW 5 SAID THAT ONE OF THESE THREE

21   INDIVIDUALS SAID THAT THE COMPANY CUT BY HALF ITS INTERNAL

22   GROWTH RATE FOR 2016 AS A RESULT OF INCREASED CUSTOMER

23   CANCELLATIONS.  SO THERE'S NO QUESTION THAT INCREASED CUSTOMER

24   CANCELLATIONS WERE MATERIALLY AND ADVERSELY AFFECTING THE

25   COMPANY.

1          **THE COURT:**  THEN IT REFERS TO PARAGRAPH 48.  LET'S GO

2     BACK TO PARAGRAPH 48.

3          **MR. VAN:**  THAT MIGHT BE THE BETTER.

4          **THE COURT:**  "CW 5 WORKED FOR A MAJOR INTERNATIONAL

5     NEWSPAPER," BUT WE'RE NOT GOING TO TELL YOU WHICH ONE.

6               "...AND PERSONALLY CONDUCTED

7               INTERVIEWS OF SUNRUN EMPLOYEES IN 2017 TO

8               OBTAIN INFORMATION FOR A STORY CW 5 AUTHORED.

9               CW 5 SPOKE DIRECTLY TO ONE OF THE FOLLOWING

10               THREE INDIVIDUALS, JURICH, KOMIN, OR

11               FENSTER."

12          THE HIGH LEVEL INFORMANT, WHO'S THE HIGH LEVEL

13     INFORMANT?

14          **MR. VAN:**  IT'S JUST A WAY OF TERMING THIS INDIVIDUAL

15     OF THE --

16          **THE COURT:**  WHICH INDIVIDUAL?

17          **MR. VAN:**  ONE OF THE THREE, ANY ONE OF WHICH CLEARLY

18     GIVES RISE TO A STRONG INFERENCE OF SCIENTER TO THE COMPANY.

19          **THE COURT:**  OKAY.

20               "AND WAS TOLD BY ONE OF THESE THREE

21               PEOPLE THAT SUNRUN WAS FORCED TO LOWER ITS

22               GROWTH ESTIMATES FOR THE FISCAL YEAR 2016

23               FROM 80 PERCENT TO 40 PERCENT SPECIFICALLY AS

24               A RESULT OF INCREASED CANCELLATIONS."

25          AND SO THE GROWTH ESTIMATES FOR THE FISCAL YEAR 2016

1    WOULD HAVE COME WHEN?  WHEN WAS THIS REDUCTION?  WHEN DID THIS

2    REDUCTION HAPPEN?

3              **MR. VAN:**  IN EARLY 2016.

4              **THE COURT:**  OKAY.  SO IT WAS --

5              **MR. VAN:**  IT WAS PRIOR TO AUGUST 2016.

6              WITH RESPECT, I DON'T KNOW ANYTHING THE DEFENDANTS

7    HAVE SAID THAT'S COMPELLING ON THE SECOND PHASE OF LIABILITY.

8              **THE COURT:**  WHAT'S COMPELLING, IT'S A WALL STREET

9    JOURNAL REPORTER WHO'S NOT EVEN STATING WHERE THEY GOT THE

10   INFORMATION.

11             **MR. VAN:**  BUT SHE'S --

12             **THE COURT:**  I MEAN, I JUST DON'T --

13             **MR. VAN:**  SHE'S STATING VERY ACCURATELY WHERE SHE GOT

14   THE INFORMATION.  SHE IS NARROWING IT TO THREE INDIVIDUALS.

15   PLEADING IN THE ALTERNATIVE IS PERFECTLY PERMISSIBLE.

16             **THE COURT:**  THAT'S HER WAY OF NOT IDENTIFYING HER

17   SOURCE; IS THAT THE POINT?

18             **MR. VAN:**  THAT'S EXACTLY IT.

19             **THE COURT:**  I'M NOT IDENTIFYING MY SOURCE BY TELLING

20   YOU THAT MY SOURCE IS ONE OF THREE PEOPLE.

21             **MR. VAN:**  YES.  THAT'S EXACTLY WHAT HAPPENED, YOUR

22   HONOR.

23             **THE COURT:**  I MEAN, THAT CAUSES ME TO SORT OF FURTHER

24   CALL INTO QUESTION THE WISDOM OF THE WALL STREET JOURNAL

25   REPORTER IF SHE THINKS THAT'S A GOOD WAY TO PROTECT HER

1    SOURCES.

2          **MR. VAN:**  SO WE CAN DEBATE WHETHER OR NOT SHE'S

3    EFFECTIVELY, YOU KNOW, PROTECTING HER SOURCES HERE, BUT --

4          **THE COURT:**  AND WE CAN DEBATE WHETHER SHE'S RELIABLE.

5    I MEAN, YOU KNOW --

6          SORRY.  GO AHEAD.

7          **MR. VAN:**  THERE IS AMPLE PRECEDENT, YOU KNOW, I DON'T

8    KNOW HOW MANY TIMES PEOPLE HAVE RELIED ON INCREDIBLY

9    TRUSTWORTHY NEWS PUBLICATIONS JUST LIKE THE WALL STREET JOURNAL

10   IN DRAFTING COMPLAINTS.  THAT'S AS STANDARD AS IT COMES WHEN IT

11   COMES TO ALLEGATIONS.

12         **THE COURT:**  USUALLY IT'S THE -- IT'S AN INCREDIBLY

13   TRUSTWORTHY PUBLICATION LIKE THE WALL STREET JOURNAL REPORTING

14   ON THE COMPANY'S FINANCIAL RESULTS OR SOMETHING LIKE THAT,

15   RIGHT?  I MEAN, IT'S NOT -- OR REPORTING THAT SOMEBODY IS BEING

16   INVESTIGATED.  YOU KNOW THE FRAUD IS REVEALED IN THE NEWS

17   ARTICLE, RIGHT?

18         I MEAN, HERE WE HAVE A REPORTER APPARENTLY TALKING TO

19   YOU, PROVIDING INFORMATION ABOUT WHAT SOMEBODY TOLD THEM

20   PRIVATELY AND THEY WON'T EVEN IDENTIFY WHO IT WAS.

21         **MR. VAN:**  BUT THEY HAVE IDENTIFIED AN INDIVIDUAL --

22         **THE COURT:**  HOW RELIABLE IS THAT?

23         **MR. VAN:**  -- DOWN TO THREE INDIVIDUALS.  AND IT

24   DOESN'T MAKE ANY DIFFERENCE AS TO WHICH OF THE THREE IT WAS.

25   ANY ONE OF THEM CLEARLY GIVES RISE TO A STRONG INFERENCE OF

1   SCIENTER FOR THE COMPANY, AT LEAST.  MAYBE NOT FOR THE

2   INDIVIDUAL DEFENDANTS, BUT FOR THE COMPANY.  THERE'S JUST NO

3   WAY ANY -- ONE OF THE THREE OF THEM, YOU KNOW, DOESN'T COUNT AS

4   SOMEONE FOR WHOM SCIENTER HAS BEEN ADEQUATELY ALLEGED FOR THE

5   COMPANY.

6            **THE COURT:**  IS THERE ANYTHING YOU WANT TO SAY BRIEFLY

7   ON THE SECOND THEORY BEFORE WE WRAP IT UP?

8            **MS. MUCK:**  YES, YOUR HONOR.

9            THERE'S NO ALLEGATION THAT THE COMPANY MISSTATED ITS

10  EXPECTATIONS FOR FISCAL 2016.  THE COMPANY, IN FACT, MET ITS

11  GUIDANCE FOR 2016, SO I'M NOT SURE I EVEN UNDERSTAND THE THEORY

12  PLAINTIFFS ARE ALLEGING HERE.

13           AND I WOULD JUST NOTE AGAIN THAT IS A FRAUD CASE.

14  THESE INDIVIDUALS AND THE COMPANY ARE BEING SUED FOR FRAUD.

15  THIS HAS BEEN GOING ON NOW FOR A YEAR AND A HALF, AND WE

16  BELIEVE --

17           **THE COURT:**  PRICE OF DOING BUSINESS.

18           **MS. MUCK:**  IT IS.  UNFORTUNATELY, IT IS THE PRICE OF

19  DOING BUSINESS.

20           BUT WE DO THINK THE SECURITIES LAWS REQUIRE

21  PLAINTIFFS TO COME FORWARD WITH FAR MORE THAN THEY'VE COME

22  FORWARD WITH HERE AFTER THREE TRIES.  AND SO WE WOULD ASK THE

23  COURT TO DISMISS THE COMPLAINT WITH PREJUDICE AT THIS POINT.

24           **THE COURT:**  OKAY.  I WILL GIVE IT A LITTLE BIT MORE

25  THOUGHT AND ISSUE A -- ISSUE A RULING SHORTLY.  THANK YOU.

1          **MR. VAN:**  THANK YOU, YOUR HONOR.

2          **MS. MUCK:**  THANK YOU, YOUR HONOR.

3          (PROCEEDINGS ADJOURNED AT 11:28 A.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF TRANSCRIBER**

2

3      I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

4  TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF

5  THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE

6  U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE

7  PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE

8  ABOVE MATTER.

9      I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR,

10 RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN

11 WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT

12 FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE

13 ACTION.

14

15                    _Jncolumbini_

16       JOAN MARIE COLUMBINI

17          JULY 26, 2018

18

19

20

21

22

23

24

25